Case No. 22-16613

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

PRUTEHI LITEKYAN: SAVE RITIDIAN,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF THE AIR FORCE; FRANK KENDALL, Secretary of the Air Force; UNITED STATES DEPARTMENT OF DEFENSE; and LLOYD AUSTIN, Secretary of Defense,

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF GUAM

Civil Case No. 22-00001, Honorable Frances M. Tydingco-Gatewood

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

DAVID L. HENKIN
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org

THIEN T. CHAU
EARTHJUSTICE
1001 G St., NW, Suite 1000
Washington, D.C. 20001
T: (202) 745-5226
Email: tchau@earthjustice.org

Attorneys for Plaintiff-Appellant Prutehi Litekyan: Save Ritidian

January 26, 2023

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Prutehi Litekyan: Save Ritidian has no parent

corporations and does not issue stock.

Dated at Honolulu, Hawai'i, January 26, 2023.

/s/ David L. Henkin
DAVID L. HENKIN
THIEN T. CHAU
EARTHJUSTICE

# **TABLE OF CONTENTS**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES .................................................................. iv

TABLE OF ACRONYMS ..................................................................... xii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT .......................................................... 3

STATEMENT OF ISSUES ...................................................................... 3

STANDARDS OF REVIEW ..................................................................... 4

STATEMENT OF THE CASE ................................................................... 5

      A.    Legal Framework. ................................................................ 5

      B.    Statement of Facts. ............................................................... 9

            1.    The Air Force Decided, Without Conducting Any NEPA Analysis, to Open Burn and Open Detonate Hazardous Waste Munitions on Tarague Beach. .......................................... 9

            2.    The Air Force Continues to Open Detonate Hazardous Waste Munitions While Its Permit Renewal Application Is Pending. .................................................................. 12

            3.    The Air Force's OB/OD Operations Have the Potential for Significant Impacts on the Human Environment. ............... 13

            4.    Alternatives to OB/OD Are Available to Treat Hazardous Waste Munitions. ................................................................ 14

            5.    Procedural History. ............................................................. 16

SUMMARY OF ARGUMENT ............................................................... 17

ARGUMENT ....................................................................................... 22

I.  THE DISTRICT COURT ERRED IN HOLDING THAT IT DOES
    NOT HAVE SUBJECT MATTER JURISDICTION. ...................................22

    A.  Prutehi Litekyan Has Standing...........................................................22

        1.  Injury In Fact.................................................................24

        2.  Causation.......................................................................26

        3.  Redressability................................................................29

    B.  Prutehi Litekyan's NEPA Claims Are Ripe.......................................30

    C.  Prutehi Litekyan Challenges Final Agency Action............................34

II. THE DISTRICT COURT ERRED IN HOLDING THAT PRUTEHI
    LITEKYAN FAILED TO STATE A CLAIM. ............................................39

    A.  The RCRA Permitting Process Does Not Render Defendants'
        NEPA Compliance Redundant...........................................................41

    B.  The District Court Erred in Applying the Functional
        Equivalence Doctrine to Exempt Defendants From NEPA. ...............51

        1.  This Court Has Never Adopted the Functional
            Equivalence Doctrine to Exempt Any Federal Agency
            From Its Obligation to Prepare an EA or EIS..........................52

        2.  Jurisdictions That Have Adopted the Functional
            Equivalence Doctrine Apply It Narrowly to Only A
            Subset of Environmentally Protective Regulatory Actions
            Taken by Environmental Agencies..........................................56

CONCLUSION ....................................................................................................59

STATEMENT OF RELATED CASES ..................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979) ................................................................9

*Ashoff v. City of Ukiah*,
    130 F.3d 409 (9th Cir. 1997) .............................................10

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ................................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................19, 34, 35

*Brown v. Stored Value Cards, Inc.*,
    953 F.3d 567 (9th Cir. 2020) .............................................13

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) ....................24, 25, 28, 31, 36

*Citizens for Clean Energy v. U.S. Dep't of the Interior*,
    384 F. Supp. 3d 1264 (D. Mont. 2019) ....................36, 37, 38

*Conservation Council for Hawai'i v. Nat'l Marine Fisheries Serv.*,
    97 F. Supp. 3d 1210 (D. Haw. 2015) ....................45, 46, 47

*Dent v. Nat'l Football League*,
    968 F.3d 1126 (9th Cir. 2020) .............................................5

*Douglas County v. Babbitt*,
    48 F.3d 1495 (9th Cir. 1995) .......................................54, 55

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) .....................................*passim*

*Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*,
    489 F.2d 1247 (D.C. Cir. 1973) ...............................*passim*

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*,
    426 U.S. 776 (1976) .............................................................56

**Page(s)**

## CASES (continued)

*Foman v. Davis*,
    371 U.S. 178 (1962)...................................................................13

*Friedman Brothers Investment Co. v. Lewis*,
    676 F.2d 1317 (9th Cir. 1982) .................................................36

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000)...................................................................26

*Gill v. United States Dep't of Just.*,
    913 F.3d 1179 (9th Cir. 2019) ...................................................5

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) .............................................23, 29

*Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Prot.*
    *Agency*,
    912 F.2d 1525 (D.C. Cir. 1990)................................................37

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) .................................................28

*ʻĪlioʻulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006) ...........................................47, 48

*Indiana & Michigan Elec. Co. v. Envtl. Prot. Agency*,
    509 F.2d 839 (7th Cir. 1975) .............................................57, 58

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) .....................................................7

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976).....................................................................6

*LaFlamme v. Fed'l Energy Regul. Comm'n*,
    852 F.2d 389 (9th Cir. 1988) .......................................17, 43, 55

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...........................................*passim*

**Page(s)**

## CASES (continued)

*Laub v. U.S. Dep't of Interior*,
  342 F.3d 1080 (9th Cir. 2003) ....................................................4

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360 (1989).....................................................20, 41, 51

*Massachusetts v. Envtl. Prot. Agency*,
  549 U.S. 497 (2007).............................................................29

*Merrell v. Thomas*,
  807 F.2d 776 (9th Cir. 1986) ......................................55, 57

*Municipality of Anchorage v. United States*,
  980 F.2d 1320 (9th Cir. 1992) .............................52, 53, 54

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998).............................................30, 31, 32

*Oregon Natural Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ....................................34, 37

*Portland Cement Ass'n v. Ruckelshaus*,
  486 F.2d 375 (D.C. Cir. 1973)..............................21, 56, 59

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)........................................................*passim*

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...................43, 52, 54, 55, 57

*Save the Bull Trout v. Williams*,
  51 F.4th 1101 (9th Cir. 2022) ...........................................29

*State of Ala. ex rel. Siegelman v. U.S. Envtl. Prot. Agency*,
  911 F.2d 499 (11th Cir. 1990) .........................42, 56, 57, 58

*Sierra Club v. U.S. Army Corps of Engineers*,
  446 F.3d 808 (8th Cir. 2006) ......................................25, 38

**Page(s)**

**CASES (continued)**

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).......................................................................22

*State of Cal. v. Block*,
    690 F.2d 753 (9th Cir. 1982) ...........................................8, 18, 25, 36

*Texas v. United States*,
    523 U.S. 296 (1998)..........................................................................31

*Trout Unlimited v. Lohn*,
    No. CV05-1128-JCC, 2007 WL 1730090 (W.D. Wash. June 13,
    2007) .................................................................................................55

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ......................................................22, 23

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) .....................................4, 18, 24, 26, 29

*Wyoming v. Hathaway*,
    525 F.2d 66 (10th Cir. 1975) .............................................................57

**UNITED STATES CODE**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 .................................3

10 U.S.C. § 9062(c) ................................................................................58

28 U.S.C. § 1291 .......................................................................................3

28 U.S.C. § 1331 .......................................................................................3

28 U.S.C. § 1361 .......................................................................................3

28 U.S.C. § 2201 .......................................................................................3

28 U.S.C. § 2202.......................................................................................3

33 U.S.C. § 1371(c) .................................................................................53

**Page(s)**

**UNITED STATES CODE (continued)**

National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ............................... 5

42 U.S.C. § 4321 ............................................................................................ 41

42 U.S.C. § 4332 ................................................................................... 40, 43, 56

42 U.S.C. § 4332(2)(C) .............................................................................. *passim*

42 U.S.C. § 4332(2)(E) ......................................................................... 53, 54

42 U.S.C. § 6902(a)(4) ................................................................................ 42

42 U.S.C. § 6902(b) .................................................................................... 42

42 U.S.C. § 6924(a) .................................................................................... 42

42 U.S.C. § 6925(c)(1) ................................................................................ 42

42 U.S.C. § 6926(d) .................................................................................... 10

**CODE OF FEDERAL REGULATIONS**

32 C.F.R. § 989.1(a) .................................................................................... 59

32 C.F.R. § 989.3(d)(3) ................................................................................. 9

32 C.F.R. § 989.4(d) ................................................................................. 9, 47

32 C.F.R. § 989.8(a) .................................................................................... 48

32 C.F.R. § 989.8(b) .............................................................................. 48, 50

32 C.F.R. § 989.14(e) .................................................................................. 48

32 C.F.R. pt. 989, app. B at A2.2 .................................................................. 7

40 C.F.R. pt. 260 ....................................................................................... 11

40 C.F.R. § 260.10 ...................................................................................... 49

40 C.F.R. pt. 270 ....................................................................................... 50

**Page(s)**

## CODE OF FEDERAL REGULATIONS (continued)

40 C.F.R. § 270.1(c) ................................................................26

40 C.F.R. § 270.1(c)(2)(i) ........................................................50

40 C.F.R. § 270.1(c)(2)(vi) ......................................................50

40 C.F.R. § 270.30(b) .........................................................10, 26

40 C.F.R. § 270.51(d) .............................................12, 27, 28, 32, 51

40 C.F.R. § 1500.1(b) ..............................................................59

40 C.F.R. § 1500.3(a) ..............................................................59

40 C.F.R. § 1501.3(a)(3) ............................................................7

40 C.F.R. § 1501.4(a) ...............................................................7

40 C.F.R. § 1501.4(b) ...........................................................7, 25

40 C.F.R. § 1501.5(a) ...............................................................6

40 C.F.R. § 1501.5(c)(2) .....................................................7, 42, 48

40 C.F.R. § 1501.5(d) ..............................................................44

40 C.F.R. § 1501.6(a) ...............................................................7

40 C.F.R. § 1501.7(a) ..............................................................45

40 C.F.R. § 1501.7(a)(1) ...........................................................42

40 C.F.R. § 1501.7(c)(2) ...........................................................43

40 C.F.R. § 1501.8(a) ..............................................................45

40 C.F.R. § 1501.8(b)(8) ...........................................................45

40 C.F.R. § 1501.11 ...............................................................45

40 C.F.R. § 1501.12 ...............................................................45

**Page(s)**

**CODE OF FEDERAL REGULATIONS (continued)**

40 C.F.R. § 1502.1 .................................................................6, 7, 48

40 C.F.R. § 1502.5 ............................................................................44

40 C.F.R. § 1502.5(a) .......................................................................44

40 C.F.R. § 1502.5(b) .......................................................................44

40 C.F.R. § 1502.14 ......................................................................7, 48

40 C.F.R. § 1502.16(a)(1) .................................................................42

40 C.F.R. § 1506.3(a) .......................................................................45

40 C.F.R. § 1506.6 ............................................................................25

40 C.F.R. § 1506.6(b) .........................................................................8

40 C.F.R. § 1508.1(g)(1) ...................................................................42

40 C.F.R. § 1508.1(q)(2) ...................................................................42

40 C.F.R. § 1508.1(z) ........................................................................48

**FEDERAL REGISTER**

51 Fed. Reg. 1,370 (Jan. 13, 1986) .............................................10, 50

85 Fed. Reg. 43,304 (July 16, 2020)..................................................6

**FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. App. P. 4(a)(1)(B) .................................................................3

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(1).......................................................................4

Fed. R. Civ. P. 12(b)(6)....................................................................4, 5

## GUAM ADMINISTRATIVE RULES AND REGULATIONS

Guam Hazardous Waste Mgmt. Regul. pt. II.A (1992)...........................................11

Guam Hazardous Waste Mgmt. Regul. pt. II.B (1992)...........................................11

Guam Hazardous Waste Mgmt. Regul. pt. IV (1992) ...........................................50

Guam Hazardous Waste Mgmt. Regul. pt. V (1992) ............................................50

Guam Hazardous Waste Mgmt. Regul. pt. X.A (1992)..........................................50

Guam Hazardous Waste Mgmt. Regul. pt. X.C (1992)..........................................50

## <u>TABLE OF ACRONYMS</u>

| | |
|---|---|
| Andersen AFB | Andersen Air Force Base |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| Guam EPA | Guam Environmental Protection Agency |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| OB/OD | Open Burning and Open Detonation |
| RCRA | Resource Conservation and Recovery Act |
| U.S. EPA | United States Environmental Protection Agency |

**INTRODUCTION**

Plaintiff Prutehi Litekyan: Save Ritidian ("Prutehi Litekyan") challenges Defendants' failure to comply with the National Environmental Policy Act ("NEPA") before the U.S. Air Force made its decision to dispose of hazardous waste munitions by blowing them up on the bare sand and burning them in the open air on Tarague Beach in northern Guam. The Air Force's open burning and open detonation ("OB/OD") operations threaten Guam's drinking water supply, local families that recreate and fish nearby, as well as endangered green sea turtles that nest and migratory seabirds that forage on Tarague Beach. Further, the Air Force decided to conduct OB/OD on land seized from Guam families after World War II, risking permanent contamination with toxic chemicals and unexploded ordnance that could preclude return of these ancestral lands to the original owners.



Open Detonation of M117 Bomb on Tarague Beach, Guam, ER-94

Rather than resolve the merits of Prutehi Litekyan's NEPA lawsuit, the District Court of Guam dismissed it. The dismissal improperly insulated from judicial review Defendants' failures to take the statutorily mandated "'hard look' at environmental consequences" and to "consider potential alternatives to the proposed action *before*" deciding to treat hazardous waste munitions using OB/OD at Tarague Beach. *Lands Council v. Powell*, 395 F.3d 1019, 1026-27 (9th Cir. 2005) (citation omitted; emphasis added).

The district court relieved Defendants of their duty to comply with NEPA merely because the Air Force's OB/OD operations require a permit from the Guam Environmental Protection Agency ("Guam EPA"). In reaching this erroneous conclusion, the district court misapplied fundamental principles of standing, ripeness, and finality, and well established NEPA jurisprudence. The district court's opinion contravenes Congress's command for "each federal agency spearheading a major federal project"—including the Air Force— "to put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decision making." *Id.* at 1027.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (actions under the Administrative Procedure Act), 28 U.S.C. § 1331 (actions arising under the laws of the United States), 28 U.S.C. § 1361 (actions to compel an officer of the United States to perform their duty), and 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this appeal from the district court's October 6, 2022, decision and order granting Defendants' motion to dismiss (ER-5–17) and final judgment (ER-4).

Pursuant to Fed. R. App. P. 4(a)(1)(B), Prutehi Litekyan timely noticed its appeal on October 18, 2022. ER-115–18.

## STATEMENT OF ISSUES

1.     Did the district court err in concluding that Prutehi Litekyan lacks standing, where Defendants' NEPA violations inflict both procedural harm— failure to take the mandated "hard look" at impacts and alternatives and deprivation of Prutehi Litekyan's opportunity to submit comments before Defendants decided to conduct OB/OD operations on Tarague Beach—and on-the-ground harm from continued open detonation activities?

2.     Did the district court err in concluding that Prutehi Litekyan's claims are not ripe, where a NEPA violation is ripe for judicial review when it occurs and

3

Prutehi Litekyan suffers ongoing harm from continued open detonation activities at Taragué Beach?

      3.     Did the district court err in concluding that Prutehi Litekyan does not challenge a final agency action, where Defendants' decision to conduct OB/OD operations has legal consequences, depriving Prutehi Litekyan of procedural rights under NEPA and allowing the Air Force to continue open detonation operations?

      4.     Did the district court err in concluding that Defendants are exempt from NEPA's command for all federal agencies to take a hard look at environmental impacts, evaluate environmentally preferred alternatives, and consider public comment before making decisions to proceed with actions that have the potential to harm the human environment, and, thus, Prutehi Litekyan failed to state a claim under Fed. R. Civ. P. 12(b)(6)?

      The addendum bound hereto contains pertinent statutes and regulations.

## STANDARDS OF REVIEW

      This Court reviews *de novo* whether the district court erred in concluding that it lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003).

      The Court conducts *de novo* review of the district court's dismissal for lack of standing, "construing the factual allegations in the complaint in favor of the plaintiffs." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th

Cir. 2015) (citation omitted). This Court also reviews *de novo* "questions of ripeness," *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022) ("*EDC*"), and "whether agency action is final," *Gill v. United States Dep't of Just.*, 913 F.3d 1179, 1184 (9th Cir. 2019).

This Court reviews *de novo* the district court's conclusion that Prutehi Litekyan failed to state a claim under Fed. R. Civ. P. 12(b)(6). *Dent v. Nat'l Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020). "In reviewing a complaint at the motion to dismiss stage, [this Court] 'must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party.'" *Id.* (citation omitted).

## STATEMENT OF THE CASE

A.    <u>Legal Framework.</u>

Congress enacted the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action **before** the government launches any major federal action." *Lands Council*, 395 F.3d at 1026 (emphasis added). "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be

discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA's policy goals are "realized through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences' . . . and that provide for broad dissemination of relevant environmental information." *Id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). NEPA commands all federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must "provide full and fair discussion of significant environmental impacts and inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.[1]

When an agency does not know whether the effects of its action will be "significant," it may prepare an environmental assessment ("EA") to help make that determination. 40 C.F.R. § 1501.5(a). "[I]f the agency determines, based on

---

[1] Citations to NEPA's implementing regulations are to the July 1, 2021, edition of the Code of Federal Regulations, which contains the NEPA regulations that were in effect when the Air Force submitted to Guam EPA its application to renew its Hazardous Waste Management Facility Permit for OB/OD on Tarague Beach. *See* ER-93 (¶ 2); 85 Fed. Reg. 43,304, 43,304 (July 16, 2020).

the [EA], not to prepare an [EIS] because the proposed action will not have significant effects," then the agency must prepare a "finding of no significant impact" ("FONSI"). *Id.* § 1501.6(a). If the EA indicates that the federal action "[i]s likely to have significant effects," the agency must prepare an EIS. *Id.* § 1501.3(a)(3).

Whether an agency prepares an EIS or EA, it must take a "hard look" at its proposed action's environmental impacts and examine "alternatives that might be pursued with less environmental harm." *Lands Council*, 395 F.3d at 1027; *see Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989, 993, 1001 (9th Cir. 2004) (applying "hard look" standard to EAs); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.5(c)(2), 1502.1, 1502.14.

Agencies must identify in their NEPA regulations "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an [EA] or [EIS]." 40 C.F.R. § 1501.4(a). To invoke a categorical exclusion, the agency must make an express determination that "a categorical exclusion identified in its agency NEPA procedures covers [the] proposed action." *Id.* § 1501.4(b). Moreover, prior to relying on a categorical exclusion, the agency must "evaluate the action for extraordinary circumstances in which the normally excluded action may have a significant effect" and thus require an EA or EIS. *Id.*; *see also* 32 C.F.R. pt. 989, app. B at A2.2.

"The statutory requirement that a federal agency contemplating a major action prepare . . . an [EIS] serves NEPA's 'action-forcing' purpose in two important respects." *Robertson*, 490 U.S. at 349 (internal citations omitted). First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* Second, "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

"NEPA's public comment procedures are at the heart of the NEPA review process." *State of Cal. v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982) ("*Block*"). "This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision." *Id.* at 771. "To effectuate this aim, NEPA requires not merely public notice, but public participation in the evaluation of the environmental consequences of a major federal action." *Id.* NEPA commands federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b).

Federal agencies must "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (citation omitted). NEPA mandates that agencies "'consider every significant aspect of the environmental impact of a proposed action'" and "take a 'hard look' at [those] environmental consequences ***before*** taking a major action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citations omitted; emphasis added). Consistent with that mandate, the Air Force's NEPA regulations specify that "Air Force personnel will . . . [r]eview the specific alternatives analyzed in the [environmental impact analysis process] when evaluating the proposal ***prior to*** decisionmaking." 32 C.F.R. § 989.4(d) (emphasis added); *see also id.* § 989.3(d)(3).

B.     <u>Statement of Facts.</u>

1.     <u>The Air Force Decided, Without Conducting Any NEPA Analysis, to Open Burn and Open Detonate Hazardous Waste Munitions on Tarague Beach.</u>

On May 17, 2021, the Air Force applied to renew its Resource Conservation and Recovery Act ("RCRA") Permit to treat hazardous waste munitions through open burning and open detonation at the Explosive Ordnance Disposal Range on Andersen Air Force Base ("AFB"), which is located on Tarague Beach in northern

9

Guam. ER-93 (¶ 2); ER-105 (¶ 40); ER-63–64; ER-66–72.[2] The Air Force first received a RCRA permit for OB/OD operations on Tarague Beach in 1982. ER-108 (¶ 45). Every three years since, the Air Force has applied to renew the permit, and Guam EPA has granted each permit renewal. *Id.*[3] The Air Force's OB/OD operations have consisted of blowing up hazardous waste munitions directly on the bare sand and burning them in the open air. ER-105 (¶¶ 40-41). While the Air Force has conducted open detonation operations under each renewed permit, open burning operations have been inactive since at least before May 2002. ER-108 (¶ 45).

The Air Force's most recent RCRA permit, issued in 2018 ("2018 Permit"), was set to expire on September 3, 2021. *Id.*; ER-25–26. Prior to the 2018 Permit's expiration, the Air Force needed to decide whether to continue OB/OD operations on Tarague Beach (and, if so, apply for permit renewal) or to pursue another method and/or location for managing hazardous waste munitions. *See* 40 C.F.R. §

---

[2] RCRA governs the management of hazardous and non-hazardous solid waste. *See Ashoff v. City of Ukiah*, 130 F.3d 409, 410 (9th Cir. 1997).

[3] In 1986, the U.S. Environmental Protection Agency ("U.S. EPA") authorized the Guam hazardous waste program generally to operate in lieu of the federal RCRA program. 51 Fed. Reg. 1,370, 1,370-71 (Jan. 13, 1986). Actions that Guam EPA takes under its hazardous waste program have the same force and effect as actions taken by U.S. EPA under RCRA. *See* 42 U.S.C. § 6926(d).

270.30(b) (1991);[4] ER-37 (¶ I.E.2). The Air Force decided to continue open

detonation and to restart open burning operations on Tarague Beach. ER-93 (¶ 2).

To implement this decision, the Air Force submitted a RCRA permit renewal

application on May 17, 2021. *Id.*

The Air Force's application reflects the agency's decision to open detonate

approximately 30,000 pounds and open burn approximately 5,000 pounds of

hazardous waste munitions each year on Tarague Beach. ER-105 (¶ 40). The

application details the locations where the Air Force decided that OB/OD would

take place (including maps and photos), the design of the OB/OD units, and the

procedures for OB/OD operations. ER-105–07 (¶¶ 40-44); *see, e.g.*, ER-54; ER-61;

ER-65–72. The Air Force also specified the types of waste it plans to open burn

and open detonate, including "common military ordnance material (such as black

powder, white/red phosphorus, tear gas, ammunitions, propellants, and explosive

materials)," bombs, mortars, antipersonnel and antitank mines, and grenades. ER-

107 (¶ 43) (quoting ER-83 (¶ III.B.1)); *see also* ER-86–89.

---

[4] Guam has generally incorporated into its hazardous waste management regulations the version of the federal RCRA regulations that was in effect on July 1, 1991, except for 40 C.F.R. pt. 260, where Guam adopted the July 1, 1989, version. *See* Guam Hazardous Waste Mgmt. Regul. pt. II.A, B (1992). Citations to the federal RCRA regulations are to the version that Guam applies.

The Air Force made its decision to treat hazardous waste munitions using OB/OD on Tarague Beach uninformed by a NEPA analysis. ER-111–12 (¶¶ 56-57). Defendants neither prepared an EIS or EA nor invoked a categorical exclusion. *Id.*[5] Defendants did not provide any opportunities for the public to comment on the proposed action's impacts or reasonable alternatives before the Air Force made its final decision. ER-111–12 (¶ 57).

### 2. The Air Force Continues to Open Detonate Hazardous Waste Munitions While Its Permit Renewal Application Is Pending.

The Air Force has continued to conduct open detonations on Tarague Beach under the terms of its 2018 Permit while its permit renewal application is pending. ER-20–22; *see also* ER-18. Although the 2018 Permit was set to expire on September 3, 2021, the Air Force's permit renewal application administratively extended the 2018 Permit's life. *See* 40 C.F.R. § 270.51(d) (1991); *see also* ER-18; ER-20. The 2018 Permit authorizes precisely the same OB/OD activities, treating the same quantities and types of hazardous waste munitions at the same location, that the Air Force requests in its pending permit renewal application. *Compare* ER-

---

[5] The Air Force is responsible for complying with NEPA prior to making decisions regarding treatment of hazardous waste at Andersen AFB, and the Department of Defense has ultimate responsibility for implementing and enforcing the Air Force's compliance with NEPA. ER-98–99 (¶¶ 19, 21).

35; ER-44–46; ER-48–51 (2018 Permit) *with* ER-81–84; ER-86–89 (renewal application).[6]

### 3. The Air Force's OB/OD Operations Have the Potential for Significant Impacts on the Human Environment.

The location the Air Force has chosen to blow up and burn hazardous waste munitions lies on ancestral lands, seized from indigenous CHamoru families, and is surrounded by environmentally and culturally significant sites. ER-94–95 (¶¶ 4-5). The Explosive Ordnance Disposal Range is on Tarague Beach, less than 100 feet from the jungle on three sides and less than 200 feet from the ocean to the north. ER-105–06 (¶¶ 40-42).

OB/OD is, by definition, uncontrolled, and toxic by-products are released directly into the environment. ER-93–94 (¶ 3). For example, OB/OD could eject unexploded ordnance and fragments into the adjacent ocean and reef, threatening local families that recreate on Tarague Beach and fish offshore for food. ER-109 (¶

---

[6] Prutehi Litekyan's complaint does not contain allegations regarding the Air Force's ongoing open detonation activities. In opposing Defendants' motion to dismiss, Prutehi Litekyan requested leave to amend in the event the district court concluded the complaint requires allegations about these undisputed facts. ER-91; *see Foman v. Davis*, 371 U.S. 178, 182 (1962). The district court's order dismissing this case did not address Prutehi Litekyan's request. *Cf. Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 575 (9th Cir. 2020) ("district court's denial of leave to amend without explanation is … 'not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules'") (citation omitted).

49). OB/OD releases contaminants directly into the air, with no way to minimize releases, and fuel used during open burning can spill directly onto the beach. ER-108–09 (¶¶ 47-48). Hazardous waste constituents from OB/OD operations could reach Guam's sole source aquifer, which lies underneath the Explosive Ordnance Disposal Range, and contaminate the drinking water supply for more than 80 percent of the island's population. ER-109 (¶ 49). Explosions from OB/OD operations could subject endangered green sea turtle nests on Tarague Beach and the eggs they contain to ground shocks. ER-110 (¶ 52). The blasts also can kill or injure migratory seabirds that forage and rest within the Explosive Ordnance Disposal Range. *Id.* OB/OD operations can leave the land permanently littered with buried, unexploded ordnance and hazardous chemicals. ER-109 (¶ 51). Such long-term hazardous contamination could remain long after OB/OD activities cease, permanently contaminating these ancestral lands and jeopardizing their return to the indigenous families from which they were seized. *Id.*

4.  Alternatives to OB/OD Are Available to Treat Hazardous Waste Munitions.

Several alternative technologies exist to treat hazardous waste munitions at Andersen AFB that would be less harmful to the human environment than OB/OD. ER-110 (¶ 53). In 2019, the National Academies of Sciences, Engineering, and Medicine ("National Academies") published a report on

"Alternatives for the Demilitarization of Conventional Munitions." *Id.* The National Academies concluded that "[v]iable alternative technologies exist within the demilitarization enterprise . . . for almost all munitions currently being treated within the [Department of Defense] conventional munitions demilitarization stockpile via OB/OD." *Id.* Further, "there are no significant technical, safety, or regulatory barriers to the full-scale deployment of alternative technologies for the demilitarization of the vast majority of the conventional waste munitions, bulk energetics, and associated wastes." *Id.* The National Academies concluded that, as compared to OB/OD, all the alternative technologies it reviewed would have "lower emissions and less of an environmental and public health impact." ER-111 (¶ 54).

Also in 2019, U.S. EPA published a report on "Alternative Treatment Technologies to Open Burning and Open Detonation of Energetic Hazardous Wastes," which concluded that "safe alternatives exist and are being used to divert energetic hazardous wastes away from OB/OD." *Id.* (¶ 55). U.S. EPA further stated that it "seeks to promote the development, testing, and use of alternative technologies that are capable of safely treating munitions and other explosive waste in a manner that reduces the potential for exposure and environmental contamination, as well as keeping cleanup and closure obligations to a minimum." *Id.*

15

5.    Procedural History.

On January 15, 2022, Prutehi Litekyan filed suit, challenging Defendants' failure to comply with NEPA before deciding to "conduct[] open burning and open detonation . . . of hazardous waste munitions at the Explosive Ordnance Disposal Range . . . on Tarague Beach at Andersen Air Force Base." ER-93 (¶ 1). Because Defendants did not prepare any NEPA document (categorical exclusion, EA, or EIS), the complaint references the Air Force's application to renew its RCRA permit to establish when Defendants made their decision—uninformed by NEPA analysis—to continue OB/OD activities on Tarague Beach. *See* ER-111–12 (¶¶ 56-57, 60). In seeking to renew its RCRA permit, the Air Force was taking affirmative steps to carry out that decision. Prutehi Litekyan claims that Defendants violated NEPA by "making a decision to seek renewal of the Hazardous Waste Management Facility Permit for OB/OD operations at Andersen AFB and submitting their application to the Guam EPA" without first "prepar[ing] an EA or EIS that (1) takes the requisite 'hard look' at the environmental impacts of the proposed OB/OD operations, (2) considers a reasonable range of alternatives …, and (3) provides opportunities for public comment on the proposed operations and reasonable alternatives." ER-112–13 (¶ 61); *see also* ER-113 (¶¶ 62-63).

On April 9, 2022, Defendants filed a Motion to Dismiss. The district court held a hearing on Defendants' motion on September 28, 2022.

16

On October 6, 2022, the district court dismissed Prutehi Litekyan's lawsuit. The court concluded that it lacked subject matter jurisdiction, and, even if it did have jurisdiction, Prutehi Litekyan failed to state a claim because NEPA does not apply in this case. ER-5–17. On the same day, the court entered judgment in Defendants' favor. ER-4.

Prutehi Litekyan timely filed this appeal on October 18, 2022. ER-115–18.

## SUMMARY OF ARGUMENT

The district court's dismissal order improperly slammed shut the courthouse doors to Prutehi Litekyan's lawsuit, insulating from judicial review Defendants' failure to comply with NEPA before making their decision to blow up and burn hazardous waste munitions on Tarague Beach. The district court's holding that it lacks subject matter jurisdiction misapplied the settled tests for standing, ripeness, and finality. Its alternate holding that Prutehi Litekyan failed to state a claim disregards this Court's instruction to "make as liberal an interpretation as we can to accommodate the application of NEPA," exempting Defendants from NEPA based on a radical expansion of the functional equivalence doctrine, which this Court repeatedly has declined to adopt. *LaFlamme v. Fed'l Energy Regul. Comm'n,* 852 F.2d 389, 398 (9th Cir. 1988) (citation omitted).

The district court held that Prutehi Litekyan lacks standing based on its erroneous conclusion that Prutehi Litekyan's injuries are not fairly traceable to

Defendants' actions. The court ignored that Defendants' challenged decision is already inflicting on-the-ground harm, with Defendants using their pending RCRA permit application—submitted to implement the decision that Prutehi Litekyan challenges—to justify continued open detonations on Tarague Beach. The court further disregarded that Defendants' NEPA violations cause procedural injury. By failing to take the mandated hard look at impacts and alternatives and circumventing the "public comment procedures [that] are at the heart of the NEPA review process," Defendants' uninformed decision threatens Prutehi Litekyan with destructive OB/OD at Tarague Beach. *Block*, 690 F.2d at 770. The physical and procedural injuries that Defendants' actions have already caused more than satisfy the "relaxed" causation requirement for standing in cases challenging violations of NEPA's procedures. *WildEarth Guardians*, 795 F.3d at 1154 (citation omitted).

In holding that Prutehi Litekyan's NEPA claims are not ripe for judicial review, the district court failed to apply this Court's longstanding precedent that "procedural injuries . . . are ripe and ready for review the moment they happen." *EDC*, 36 F.4th at 871. Additionally, the district court incorrectly concluded that Prutehi Litekyan does not suffer hardship from withholding judicial review. Delaying review causes hardship in two ways: (1) depriving Prutehi Litekyan of NEPA's procedural safeguards and (2) allowing Defendants' open detonation operations at Tarague Beach to continue to inflict on-the-ground harm.

In discussing ripeness, the district court wrongly concluded that, merely because Guam EPA has not yet acted on Defendants' RCRA permit application, Prutehi Litekyan does not challenge a final agency action. The district court ignored the Supreme Court's controlling test for finality, which does not concern itself with Guam EPA's actions but focuses instead on whether Defendants' challenged action (1) "mark[ed] the 'consummation' of [their] decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). It is undisputed that Defendants completed their decision-making process as to where (Tarague Beach) and how (OB/OD) they will manage their hazardous waste munitions, satisfying the first prong of the *Bennett* test. Defendants' decision to conduct OB/OD on Tarague Beach, without complying with NEPA, also has legal consequences, satisfying *Bennett*'s second prong, because it denied Prutehi Litekyan's procedural rights under NEPA and administratively extended the 2018 Permit, allowing open detonation operations to continue at Tarague Beach.

After wrongly concluding it lacks subject matter jurisdiction, the district court compounded its error by holding that, because Defendants need a RCRA permit to conduct OB/OD, Prutehi Litekyan's NEPA challenge does not state a claim. The district court's conclusion that RCRA is the functional equivalent of

19

NEPA is a legal *non sequitur*; Prutehi Litekyan challenges Defendants' failure to comply with NEPA before making their decision about where and how to manage their hazardous waste, not any RCRA permitting decision by Guam EPA.

NEPA expressly requires federal agencies—including Defendants—that are considering whether to undertake activities that threaten environmental harm to take a hard look at potential impacts and environmentally preferred alternatives before deciding on their course of action, even if another agency must issue a permit. When the district court concluded it would be "redundant and a waste of resources" to require Defendants both to comply with NEPA and to submit a RCRA permit application, the court improperly substituted its own view of what "makes the most sense" for Congress's policy choices. ER-16. The district court failed to appreciate how compliance with NEPA's "action-forcing" procedures "focus[es] Government and public attention on the environmental effects of proposed agency action," thereby "ensur[ing] that [Defendants] will not act on incomplete information, only to regret [their] decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Had Defendants complied with NEPA, they may have decided to manage their hazardous waste in an entirely different way, potentially obviating the need to secure a permit from Guam EPA altogether. Defendants' duties under NEPA are independent of, and

logically precede, Guam EPA's evaluation of whether Defendants' permit application satisfies RCRA.

The district court's decision to adopt the functional equivalence doctrine and to apply it to exempt Defendants from NEPA is unprecedented. This Court has repeatedly declined to adopt the doctrine to excuse any agency from its duty to prepare an EA or EIS. And even jurisdictions that have adopted this "exemption from [NEPA's] literal requirements" have applied it narrowly to only some federal "environmental agencies" that are taking a subset of "environmentally protective regulatory actions." *Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*, 489 F.2d 1247, 1257 (D.C. Cir. 1973). There is universal agreement that "NEPA must be accorded full vitality as to non-environmental agencies" like the Air Force. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973). Prutehi Litekyan properly stated a claim when it alleged that Defendants violated NEPA's commands to "carefully weigh environmental considerations and consider potential alternatives to the proposed action" and "to permit informed public comment" before they made their decision to manage hazardous waste munitions by blowing them up and burning them on Tarague Beach. *Lands Council*, 395 F.3d at 1026 (emphasis added).

**ARGUMENT**

I. THE DISTRICT COURT ERRED IN HOLDING THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION

The district court dismissed Prutehi Litekyan's lawsuit for lack of subject matter jurisdiction based on its holdings that (1) Prutehi Litekyan lacks standing because its injury is "not fairly traceable" to the Air Force's RCRA permit application and (2) Prutehi Litekyan's claims are not ripe because "Guam EPA has not yet acted on the application to renew," and, thus, Prutehi Litekyan does not suffer hardship from withholding judicial review. ER-9–10. In addition, while discussing ripeness, the district court concluded that Prutehi Litekyan does not challenge a final agency action because Defendants' permit renewal application is still pending. ER-10. As discussed below, in making these rulings, the district court failed to follow settled law and ignored key facts, warranting reversal.

A. Prutehi Litekyan Has Standing.

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial opinion." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Because this case seeks to enforce NEPA's procedural requirements, "the causation and redressability requirements are relaxed." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) (citation

22

omitted). Prutehi Litekyan need "show only that [it has] a procedural right that, if exercised, **could** protect [its] concrete interests." *Id.* (citation omitted).

The district court based its decision that Prutehi Litekyan lacks standing solely on the second prong of the standing inquiry: causation. The district court's conclusion that Prutehi Litekyan's injuries are "not fairly traceable to the challenged action of Defendants," depriving Prutehi Litekyan of standing, is wrong as a matter of law and fact. ER-9. The sole reason that the Air Force continues to blow up munitions on Tarague Beach—harming Prutehi Litekyan's interests—is that the Air Force made a decision, without first complying with NEPA, to continue OB/OD on Tarague Beach and then submitted an application to carry out that decision, extending the life of the 2018 Permit. Moreover, even assuming that Defendants were awaiting the issuance of a new permit before blowing up bombs on the beach (and they are not), Prutehi Litekyan would still satisfy the relaxed causation requirement for standing in cases alleging procedural NEPA violations as there would be no risk of harm to Tarague Beach's natural and cultural resources from OB/OD operations absent Defendants' uninformed decision to seek a renewed RCRA permit. This establishes the requisite "'reasonable probability' of the challenged action's threat to [Prutehi Litekyan's] concrete interest." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (citation omitted).

1.   <u>Injury In Fact.</u>

The district court did not question that Prutehi Litekyan satisfies the injury-in-fact prong of the standing inquiry. *See* ER-9. To establish standing to bring its claim that Defendants violated NEPA, Prutehi Litekyan must show "that the procedures in question are designed to protect some threatened concrete interest … that is the ultimate basis of [its] standing." *WildEarth Guardians*, 795 F.3d at 1154 (citation omitted). Prutehi Litekyan—a Guam-based organization whose members suffer cultural, spiritual, scientific, recreational, aesthetic, economic, and other harm from OB/OD operations on Tarague Beach—easily establishes the requisite injury. *See* ER-95–98 (¶¶ 9-18).

Prutehi Litekyan challenges Defendants' failure to prepare any NEPA analysis before deciding to conduct OB/OD on Tarague Beach beyond the 2018 Permit's expiration. Because Defendants ignored their NEPA duties, they failed "to put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decision making." *Lands Council*, 395 F.3d at 1027. The lack of any NEPA analysis "deprived [Prutehi Litekyan] of the opportunity to comment … at all points in [Defendants' decisionmaking] process." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003). Prutehi Litekyan had no opportunity, before Defendants made up their minds, to urge Defendants to

consider treating hazardous waste munitions at alternate locations (including locations off Guam) that would avoid harm to Prutehi Litekyan's interests or using the alternate technologies that the National Academies and U.S. EPA identified in 2019—after Defendants secured the 2018 Permit—as viable, available, and environmentally preferred. "This deprivation violated [Prutehi Litekyan's] rights under the regulations implementing NEPA." *Id.* (citing 40 C.F.R. §§ 1501.4(b), 1506.6). "Standing may properly hinge on this type of injury." *Id.* at 971.

The NEPA procedures that Defendants violated are designed to protect the threatened concrete interests that are the ultimate basis of Prutehi Litekyan's standing. Prutehi Litekyan's procedural injury "is tied to a substantive 'harm to the environment,'" which "'consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (*with public comment*) of the likely effects of their decision on the environment.'" *Id.* (citation omitted; emphasis added); *see also Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006) ("The injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decisionmaking"); *Block*, 690 F.2d at 770-71 ("NEPA's public comment procedures … ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision"). Prutehi Litekyan further satisfies the requirement that its interest in avoiding harm to Tarague Beach's natural and

cultural resources is "concrete" because its members include fishers and local families with a "geographic nexus … to the location suffering an environmental impact." *WildEarth Guardians*, 795 F.3d at 1154 (citation omitted); *see* ER-97–98 (¶¶ 13-18). Prutehi Litekyan "adequately allege[s] injury in fact" because it "aver[s] that [its members] use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (citation omitted).

### 2. Causation.

The district court based its decision regarding standing solely on the second prong of the standing inquiry, concluding that Prutehi Litekyan's "alleged injury does not come from the submission of the [RCRA permit renewal] application." ER-9. In reaching this conclusion, the district court ignored that the Air Force has continued to conduct OB/OD on Tarague Beach precisely because it submitted the application. It is undisputed that, in the absence of a permit renewal application, the Air Force would have been required to cease open detonation activities at Tarague Beach on September 3, 2021, when the 2018 Permit was set to expire. *See* 40 C.F.R. §§ 270.1(c), 270.30(b) (1991); ER-25–26; ER-37 (¶¶ I.E.2, I.E.3). It is further undisputed that, instead of allowing the 2018 Permit to expire, Defendants decided to continue OB/OD operations and applied for permit renewal, thus

extending by operation of law the 2018 Permit while the renewal application remains pending. *See* ER-18; ER-20; 40 C.F.R. § 270.51(d) (1991). Finally, Defendants admitted that, since submitting the permit renewal application, the Air Force has continued to conduct open detonations on Tarague Beach under the administratively extended 2018 Permit. *See* ER-20. As a matter of both fact and law, Defendants' decision—without NEPA compliance—to continue OB/OD operations, and the permit renewal application submitted to carry out that decision, enabled open detonations on Tarague Beach beyond September 3, 2021, harming Prutehi Litekyan's interests and establishing the requisite causation for standing.

Consideration of the remedy Prutehi Litekyan seeks—compelling Defendants promptly to withdraw the RCRA permit renewal application that they submitted in violation of NEPA—further confirms the district court's error in concluding that Defendants' actions "do not amount to injury to Plaintiff." ER-9; *see* ER-113–14 (¶ 65(a)). A court order requiring the Air Force to withdraw the permit renewal application would end the administrative extension of the 2018 Permit, requiring ongoing open detonations on Tarague Beach—and the harm to Prutehi Litekyan's interests—immediately to cease. *See* 40 C.F.R. § 270.51(d) (1991) (permit terms continue beyond expiration date only while renewal application is pending).

27

Even if 40 C.F.R. § 270.51(d) did not apply, and the Air Force could not conduct—and was not conducting—OB/OD until Guam EPA issues a new permit, that would not mean, as the district court concluded, that Prutehi Litekyan's injuries are "not fairly traceable to the challenged action of Defendants." ER-9. Prutehi Litekyan claims that, due to Defendants' failure to conduct any NEPA analysis, "environmental consequences [were] overlooked and reasonable alternatives ignored," resulting in Defendants' uninformed decision to pursue highly destructive OB/OD in an environmentally vulnerable location. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992). Guam EPA would not be considering whether to issue a new RCRA permit "***but for*** [Defendants'] challenged decision" to conduct OB/OD at Tarague Beach. *Id.*; *see also id.* at 1518 n.19 ("if the complained of action is a 'but for' cause ... it suffices for standing purposes") (citation omitted); *Citizens for Better Forestry*, 341 F.3d at 975 (causation "requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant"). Defendants' decision is "the primary factor making possible" the threats to Prutehi Litekyan's interests from OB/OD at Tarague Beach, satisfying the relaxed causation prong for standing in cases alleging NEPA violations. *Idaho Conservation League*, 956 F.2d at 1518.

3. <u>Redressability.</u>

To establish redressability, Prutehi Litekyan "need not show that further analysis by the government would result in a different conclusion." *Hall*, 266 F.3d at 977. "It suffices that, as NEPA contemplates, [Defendants'] decision **could be influenced** by the environmental considerations that NEPA requires an agency to study." *Id.* (emphasis added); *see also Save the Bull Trout v. Williams*, 51 F.4th 1101, 1106 (9th Cir. 2022) (in case alleging procedural injury, "Plaintiffs have standing if 'there is some possibility that the requested relief will prompt the injury-causing party to reconsider' its actions") (quoting *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007)).

As the project proponent, Defendants have the authority to choose another course of action based on the information provided by a legally adequate NEPA analysis. Had Defendants complied with their duty to consider "alternatives that might be pursued with less environmental harm," they may well have opted to treat munitions at alternate locations (including locations off Guam) or use environmentally safer technologies, avoiding harm to Prutehi Litekyan. *Lands Council*, 395 F.3d at 1027. Prutehi Litekyan satisfies the "relaxed" redressability requirement that applies in cases alleging procedural injury. *WildEarth Guardians*, 795 F.3d at 1154 (citation omitted).

B.      Prutehi Litekyan's NEPA Claims Are Ripe.

"[E]valuating ripeness in the agency context requires considering '(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.'" *EDC*, 36 F.4th at 870. The district court held that Prutehi Litekyan's NEPA claims are not ripe for judicial review because "Guam EPA has not yet acted on the application to renew" and, "[a]s such, the legal rights of any of the parties have not been altered." ER-10. In reaching this conclusion, the district court misapplied binding precedent regarding ripeness in NEPA cases and further ignored the hardship that Prutehi Litekyan currently suffers from Defendants' ongoing open detonations on Tarague Beach while the permit renewal application is pending.

First, while the district court's opinion cites *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998), the court ignored the critical distinction the Supreme Court drew between cases involving substantive challenges to agency decisions and cases alleging violations of NEPA, which "simply guarantees a particular procedure, not a particular result." *Id.* at 737. The Supreme Court instructed that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes

place, for ***the claim can never get riper***." *Id.* (emphasis added). This Court has "adopted this dicta from *Ohio Forestry*," holding that cases that "rais[e] a procedural injury" are ripe, regardless of "the imminence or lack thereof of site-specific action." *Citizens for Better Forestry*, 341 F.3d at 977.

Here, Prutehi Litekyan "alleg[es] only procedural violations"—*i.e.*, that Defendants decided to conduct OB/OD on Tarague Beach without first complying with NEPA. *EDC*, 36 F.4th at 870. Prutehi Litekyan's NEPA claims became ripe the moment Defendants made their final decision, uninformed by NEPA analysis; they do not "rest[] upon future contingent events," as the district court erroneously concluded. ER-10 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

This Court recently reaffirmed that NEPA violations are ripe for judicial review, even where on-the-ground impacts will not be felt until a future permitting decision is made. In *EDC*, the plaintiffs claimed that the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement (collectively, "the Bureaus") violated NEPA when they prepared an EA, rather than an EIS, for their programmatic decision to authorize oil drilling methods known as "well stimulation treatments" off California's coast. 36 F.4th at 862-63. The Bureaus argued that, "because they will still have to approve permits from private entities wishing to use well stimulation treatments before the treatments will actually be used in the region," plaintiffs' NEPA challenge was not ripe. *Id.* at

31

868. This Court disagreed, concluding that "Plaintiffs' claims are ripe for review now," *id.* at 864, even where "the agencies have not yet issued a formal plan for well stimulation treatments or acted on site-specific permits." *Id.* at 870. The Court reiterated that "a person injured by 'a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.'" *Id.* at 871 (citation omitted). It further held that "[d]elaying review of these procedural injuries would cause hardship to Plaintiffs by denying them the fundamental safeguards provided by [NEPA]." *Id.* at 870. The same is true here.

Second, in holding that Prutehi Litekyan does not suffer hardship from delayed judicial review, the district court ignored that Defendants' decision—made in violation of NEPA—is inflicting on-the-ground harm to Prutehi Litekyan's interests now. As discussed, Defendants' decision to conduct OB/OD and the RCRA permit renewal application submitted to implement that decision have administratively extended the 2018 Permit, allowing the Air Force to continue blowing up munitions on Tarague Beach. *See* ER-18; ER-20; 40 C.F.R. § 270.51(d) (1991). Contrary to the district court's holding, Defendants' challenged conduct has "creat[ed] legal rights" for Defendants to continue open detonations, inflicting hardship on Prutehi Litekyan. ER-10 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733).

32

Prutehi Litekyan's NEPA claims also satisfy the two other ripeness factors, which the district court did not address. Judicial review of Prutehi Litekyan's NEPA claims "does not interfere with further administrative action" because "the agency's decision is at 'an administrative resting place.'" *EDC*, 36 F.4th at 870 (citation omitted). Specifically, Defendants have never disputed that they have concluded their decision-making process regarding how (OB/OD) and where (Tarague Beach) to manage their hazardous waste munitions; indeed, they are actively implementing their decision, conducting open detonations on Tarague Beach. Furthermore, there is no NEPA process that judicial review could possibly disrupt because Defendants claim that "they do not need to comply with [NEPA]." ER-13.

There also is no need for further factual development because, "for claims of procedural injury . . . the need for factual development ceases when the alleged procedural violation is complete." *EDC*, 36 F.4th. at 871. Defendants violated NEPA's procedural requirements when they decided to conduct OB/OD on Tarague Beach without first complying with NEPA and then moved ahead to implement that decision by applying to renew their RCRA permit. Prutehi Litekyan's claims of procedural injury are ripe for review now.

C.    <u>Prutehi Litekyan Challenges Final Agency Action.</u>

In discussing ripeness, the district court questioned whether Prutehi Litekyan challenges a "final agency action" because "Guam EPA has not yet acted on the application to renew." ER-10. The district court failed to apply the controlling test to determine finality, which the Supreme Court articulated in *Bennett v. Spear*. Applying this test confirms that the action Prutehi Litekyan challenges— Defendants' decision, without any NEPA analysis, to conduct OB/OD at Tarague Beach—is final.

"As a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett*, 520 U.S. at 177. "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Id.* at 177-78 (citation omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted). Courts must "focus on the practical and legal effects of the agency action: '[T]he "finality element must be interpreted in a pragmatic and flexible manner."'" *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations omitted). Defendants' decision to continue using OB/OD satisfies this test because it is undisputed that Defendants have completed their decision-making process, and Defendants' decision determined rights and

obligations by denying Prutehi Litekyan its procedural rights under NEPA and by extending the 2018 Permit.

Defendants have never disputed that they completed their decision-making process as to where and how they will manage their hazardous waste munitions, satisfying the first prong of the *Bennett* test. Indeed, nothing in the permit renewal application—which memorialized Defendants' final decision—suggests their decision is "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. Defendants have never stated an intent to revisit their decision to carry out destructive OB/OD operations after conducting the requisite NEPA review. On the contrary, Defendants claim "they do not need to comply with [NEPA]," ER-13, and the permit application states conclusively that Defendants "shall operate the OB/OD unit," notwithstanding the lack of NEPA analysis. ER-83 (¶ III.A). Defendants have gone beyond words and are taking on-the-ground action to implement their decision, conducting open detonations based on the application's submission. ER-20.

Defendants' decision to conduct OB/OD on Tarague Beach is also "one by which 'rights or obligations have been determined'" and "from which 'legal consequences … flow,'" satisfying *Bennett*'s second prong. 520 U.S. at 178 (citation omitted). Defendants' failure to comply with NEPA had the legal consequence of depriving Prutehi Litekyan of "the opportunity to analyze [the

OB/OD] proposal and submit comment" before Defendants made up their minds, "insulat[ing] [their] decision-making process from public scrutiny." *Block*, 690 F.2d at 771. Depriving Prutehi Litekyan of "the opportunity to comment on" a NEPA analysis "violated [its] rights under the regulations implementing NEPA." *Citizens for Better Forestry*, 341 F.3d at 971; *see also EDC*, 36 F.4th at 869 ("second prong of the *Bennett* test" satisfied where "the rights of Plaintiffs to further environmental review, and the obligation of the agencies to prepare a full EIS, are fully and finally determined by the FONSI and are not subject to any further administrative procedure").

Defendants have yet to produce the administrative record, so it remains unclear whether Defendants "made a conscious decision not to initiate the NEPA process" or simply did not give NEPA any thought. *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1281 (D. Mont. 2019). In either case, Defendants cannot evade judicial review for depriving Prutehi Litekyan of procedural rights under NEPA. This Court has held that an agency's decision that a proposed project qualifies for a categorical exclusion "is 'final' in that it is the culmination of the agency's administrative procedures and will not be reconsidered at any later date." *Friedman Brothers Investment Co. v. Lewis*, 676 F.2d 1317, 1319 (9th Cir. 1982). Likewise, an agency's failure "to initiate the NEPA process" in the first place "satisfies the final agency action requirement." *Citizens for Clean*

*Energy*, 384 F. Supp. 3d at 1281; *cf. Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Prot. Agency*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("When administrative inaction has the same impact on the rights of the parties as an express denial of relief, judicial review is not precluded"). A contrary holding would create a perverse incentive for federal agencies to ignore NEPA altogether, avoiding judicial review, rather than be subject to scrutiny when they try to comply with the law and their efforts fall short.

Defendants' decision to treat hazardous waste munitions using OB/OD, without complying with NEPA, further satisfies *Bennett*'s second prong because it has a "direct and immediate . . . effect on the [Air Force's] day-to-day business." *Oregon Nat. Desert Ass'n*, 465 F.3d at 987 (citation omitted); *see also id.* at 986 ("Courts have consistently interpreted *Bennett* to provide several avenues for meeting the second finality requirement"). As discussed, Defendants' decision to continue OB/OD on Tarague Beach, and the permit application the Air Force submitted to implement that decision, administratively extended the 2018 Permit, allowing Defendants to continue open detonations on Tarague Beach. Without the permit renewal application, all OB/OD operations under the 2018 Permit would have had to cease on September 3, 2021, when the permit was set to expire. The decision that Prutehi Litekyan challenges had legal consequences, allowing destructive OB/OD activities on Tarague Beach to continue.

Even assuming, *arguendo*, that Defendants' decision did not give the Air Force the legal right to continue open detonations, the decision to conduct OB/OD would still be final agency action because it "changed the status quo." *Citizens for Clean Energy*, 384 F. Supp. 3d at 1278. The status quo before Defendants' decision was that all OB/OD operations had to cease when the 2018 Permit expired on September 3, 2021. *See* ER-25–26; ER-37 (¶¶ I.E.2, I.E.3). By deciding to continue OB/OD and applying for a permit to do so, Defendants opened the door to further destructive activities on Tarague Beach. *See Citizens for Clean Energy*, 384 F. Supp. 3d at 1280 (lifting of coal leasing moratorium had legal consequences, making federal land "subject to lease applications," even though lifting moratorium did not by itself grant any coal leases). "To deny judicial review of [Defendants'] NEPA compliance because additional steps are required before" OB/OD can occur "would undermine the purpose of judicial review under NEPA—to 'ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.'" *Sierra Club*, 446 F.3d at 816 (quoting *Robertson*, 490 U.S. at 349).

For the reasons above, Defendants' decision to conduct OB/OD, without first complying with NEPA, satisfies *Bennett*'s test for final agency action.

## II.  THE DISTRICT COURT ERRED IN HOLDING THAT PRUTEHI LITEKYAN FAILED TO STATE A CLAIM

As an alternate ground for dismissal, the district court held that Prutehi Litekyan failed to state a claim because, in the court's view, Defendants are exempt from NEPA because they require a RCRA permit to conduct OB/OD. The district court concluded that Guam EPA's hazardous waste permitting procedures under RCRA are the "functional equivalent of [NEPA]," Defendants have "already complied with [RCRA] through [their] permit application," and, therefore, "[i]t would be redundant and a waste of resources to require Defendants to comply with [NEPA]." ER-16.

The district court's focus on "whether [RCRA] is the functional equivalent of [NEPA]" is a legal *non sequitur*. *Id.* This lawsuit challenges Defendants' failure to comply with NEPA before making the decision to use OB/OD to dispose of munitions on Tarague Beach. Prutehi Litekyan does not challenge any permitting decision under RCRA, and Defendants' duty under NEPA to "weigh environmental considerations and consider potential alternatives to the proposed action before" deciding to undertake environmentally harmful action exists regardless of whether Defendants need a RCRA permit. *Lands Council*, 395 F.3d at 1026. There was no occasion, therefore, for the district court to address the question of first impression in this Circuit whether NEPA applies to RCRA permitting. *See* ER-13 ("no Ninth Circuit caselaw on the issue").

39

In concluding that "[i]t makes the most sense" to exempt Defendants from NEPA, the district court improperly substituted its policy preferences for Congress's. ER-16. The court failed to appreciate the substantial benefits of requiring Defendants' compliance with NEPA's "'action-forcing' procedures," which ensure Defendants will make informed decisions about where and how to manage their hazardous waste munitions. *Robertson*, 490 U.S. at 348 (citation omitted). Timely compliance with NEPA would, among other things, inform whether Defendants should treat their munitions on Guam at all, potentially obviating the need for a permit from Guam EPA.

The district court further erred in invoking the functional equivalence doctrine to exempt Defendants from NEPA. This Court has never adopted the functional equivalence doctrine to exempt ***any*** agency from NEPA's command to prepare an EIS or EA, nor should it, given the Congressional directive to apply NEPA "to the fullest extent possible," 42 U.S.C. § 4332. Even those jurisdictions that have adopted the doctrine apply it narrowly to exempt only some "environmental agencies" when they are taking some "environmentally protective regulatory actions." *Envtl. Def. Fund*, 489 F.2d at 1257. They would never use the doctrine to exempt from NEPA a non-environmental agency like the Air Force that plans to carry out environmentally destructive activities like OB/OD.

40

This Court should reject the district court's decision to adopt—and radically expand—the functional equivalence doctrine. Because NEPA applies to Defendants' decision to conduct OB/OD on Tarague Beach, Prutehi Litekyan states a claim on which relief can be granted when it challenges Defendants' failure to comply with NEPA.

### A. The RCRA Permitting Process Does Not Render Defendants' NEPA Compliance Redundant.

In concluding that "[i]t would be redundant and a waste of resources to require Defendants to comply with [NEPA]" because Defendants need a RCRA permit, the district court ignored key differences between environmental review under the two statutes. ER-16. NEPA is a purely procedural statute; it "does not work by mandating that agencies achieve particular substantive environmental results." *Marsh*, 490 U.S. at 371. Instead, "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action," thereby "ensur[ing] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* (quoting 42 U.S.C. § 4321). To achieve its ambitious goals, NEPA requires Defendants—before they decide how to manage their hazardous waste munitions—to evaluate a broad range of potential impacts to the "human

41

environment," including not only "ecological" and "health effects," but also "aesthetic, historic, cultural, economic (such as the effects on employment), [and] social" effects. 40 C.F.R. § 1508.1(g)(1); *see id.* §§ 1501.5(c)(2), 1502.16(a)(1).

RCRA, in contrast, is a substantive statute that focuses on threats to "human health and the environment." 42 U.S.C. § 6902(b); *see also id.* § 6902(a)(4). To determine whether to issue a permit, Guam EPA evaluates whether Defendants' proposed waste treatment activities satisfy "performance standards" that are "necessary to protect human health and the environment." *Id.* § 6924(a); *see id.* § 6925(c)(1). "RCRA does not require [Guam] EPA to consider every point the agency would have to consider in preparing a formal EIS under NEPA." *State of Ala. ex rel. Siegelman v. U.S. Envtl. Prot. Agency*, 911 F.2d 499, 504-05 (11th Cir. 1990).

The district court's conclusion that it would be redundant to have both Defendants and Guam EPA conduct environmental reviews further ignores that NEPA's implementing regulations expressly contemplate multiple agencies evaluating the same action, such as where "more than one Federal agency … [p]roposes or is involved in the same action." 40 C.F.R. § 1501.7(a)(1). NEPA's broad definition of "Major Federal action" that triggers environmental review includes "projects and programs entirely or partly … ***conducted***, ***regulated***, or ***approved*** by Federal agencies." *Id.* § 1508.1(q)(2) (emphasis added). NEPA

42

mandates that ***both*** the federal agency proposing to undertake an action—here, the Air Force—***and*** any federal permitting agency with "[p]roject approval or disapproval authority," *id.* § 1501.7(c)(2), must comply with NEPA to ensure that each agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349. It does not become any less important for Defendants to satisfy NEPA before they decide whether to conduct an environmentally destructive action just because a nonfederal agency like Guam EPA, which is not subject to NEPA, is tasked with issuing a permit for that action.

This Court has interpreted "the congressional mandate, to apply NEPA 'to the fullest extent possible,' 42 U.S.C. § 4332, as a direction to 'make as liberal interpretation as we can to accommodate the application of NEPA.'" *LaFlamme,* 852 F.2d at 398 (citation omitted). In exempting Defendants from NEPA based on its own view of "what is the most pragmatic approach" and what "makes the most sense," the district court improperly substituted its policy choices for Congress's. ER-16. "[T]he fact that completing an EIS might be time consuming or costly does not excuse an agency from complying with NEPA; that is a balance struck by Congress, not the courts." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644 (9th Cir. 2014) ("*Jewell*").

The district court's conclusion that environmental review of Defendants' decision to conduct OB/OD on Tarague Beach can be deferred until the RCRA permitting process conflates two different types of agency decision-making that have two distinct timing triggers under NEPA: (1) decisions by federal agencies to "directly undertake[]" actions with the potential to harm the human environment, on the one hand, and (2) decisions by permitting agencies regarding an application to conduct those activities, on the other. 40 C.F.R. § 1502.5(a); *see id.* § 1502.5(b). Here, because the Air Force will "directly undertake[]" OB/OD operations, NEPA specifies that Defendants must prepare a NEPA analysis "at the feasibility analysis (go/no-go) stage," *i.e.*, before deciding how and where to manage their hazardous waste munitions. *Id.* § 1502.5(a); *see also id.* § 1502.5 (analysis must be "prepared early enough so that it can serve as an important practical contribution to the decision-making process"). Different—and later—timing for NEPA compliance applies to any federal permitting agency from which Defendants might seek a permit for the activities they decide to carry out. A federal permitting agency must start its NEPA analysis "as soon as practicable after receiving the application." *Id.* §§ 1501.5(d), 1502.5(b).

While Guam EPA's permitting decision is not a "Federal action[]" subject to NEPA, the district court's analysis applies equally to situations in which U.S. EPA is the RCRA permitting authority. 42 U.S.C. § 4332(2)(C); *see* ER-12 ("actions

44

taken by … Guam EPA" related to RCRA have "the same force and effect as actions taken by the U.S. EPA"); ER-16 (RCRA permitting "is accomplished through the U.S. EPA, or in this case, through the Guam EPA, who has full authorization from the U.S. EPA"). Considering how the district court's reasoning plays out in situations where U.S. EPA (or another federal agency subject to NEPA) is the permitting agency highlights how the district court erred in exempting Defendants from NEPA.

*Conservation Council for Hawai'i v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210 (D. Haw. 2015) ("*CCH*")—which, like this case, involved military activities—shows how NEPA works in a situation where one agency seeks to conduct a destructive activity and another agency is responsible for a permitting decision. In *CCH*, the Navy required a Marine Mammal Protection Act permit from the National Marine Fisheries Service ("NMFS") for training and testing activities that would harm ("take") marine mammals. *Id.* at 1214-15. The court evaluated separately whether the Navy—the action agency—and NMFS—the permitting agency—violated their respective, and distinct, duties under NEPA.[7]

---

[7] The Navy was the lead agency preparing the EIS, and NMFS, as a cooperating agency, adopted it. *Id.* at 1215; *see* 40 C.F.R. §§ 1501.7(a), 1501.8(a), 1501.8(b)(8), 1506.3(a). Adoption is one of several mechanisms NEPA provides to promote efficiency when multiple agencies are reviewing the same or similar actions. *See also* 40 C.F.R. §§ 1501.11 (tiering), 1501.12 (incorporation by reference).

The court held that the Navy, which was tasked with deciding "what training or testing activities [it] should engage in," *CCH*, 97 F. Supp. 3d at 1236, failed to take "the 'hard look' required by NEPA" at alternatives that might reduce environmental impacts. *Id.* at 1238. The court further held that NMFS—whose "job was to determine whether to authorize the takes requested by the Navy"—had violated its separate NEPA duty to "consider what would be a true 'no action' alternative from NMFS's perspective": denial of "the Navy's request for an incidental take authorization." *Id.* at 1236.

*CCH* illustrates why NEPA does not exempt an agency that proposes to undertake an environmentally harmful action even if a permitting agency also will conduct some type of environmental review. Doing so would subvert Congress's intent to foster "informed decision making" by requiring "***each*** federal agency spearheading a major federal project" to take a "hard look" at "relevant environmental considerations" and to consider "any choices or alternatives that might be pursued with less environmental harm." *Lands Council*, 395 F.3d at 1027 (emphasis added). In *CCH*, NMFS's job as the permitting agency "was to determine whether to authorize the takes requested by the Navy." 97 F. Supp. 3d at

Although Guam EPA is not subject to the duty to prepare a NEPA analysis, Guam EPA can still consider the information that Defendants' NEPA analysis generates to inform the RCRA permitting decision, similarly promoting efficiency and avoiding redundancy.

1236. In contrast, the Navy's task was "to determine what training or testing activities [it] should engage in," a much more open-ended inquiry, with the Navy's ultimate decision driving the level of marine mammal take for which it needed NMFS's authorization. *Id.*

Even if Guam EPA's RCRA permitting decision were a federal action subject to NEPA (and it is not), Guam EPA's review of the RCRA application would not make redundant Defendants' NEPA-mandated vetting of impacts and alternatives for the decision on how and where to manage their hazardous waste munitions. As in *CCH*, Guam EPA's "job [is] to determine whether to authorize the [hazardous waste management activities] requested by [Defendants]" pursuant to RCRA. *Id.*

In contrast, ***before*** deciding to pursue a RCRA-regulated activity and ***before*** submitting a RCRA permit application to Guam EPA, Defendants were obliged to "carefully weigh environmental considerations and consider potential alternatives to the proposed action," as well as "permit informed public comment." *Lands Council*, 395 F.3d at 1026-27; *see* 32 C.F.R. § 989.4(d) (Air Force personnel must "review the specific alternatives analyzed in the [NEPA analysis] when evaluating the proposal ***prior to decisionmaking***") (emphasis added). Among other things, Defendants had a duty to "look at every reasonable alternative within the range dictated by the nature and scope of the propos[ed]" action. *ʻĪlioʻulaokalani Coal. v.*

47

*Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006); *see* 40 C.F.R. §§ 1501.5(c)(2), 1502.14, 1508.1(z); 32 C.F.R. §§ 989.8(a)-(b), 989.14(e). This includes analyzing "alternatives that might be pursued with less environmental harm," such as alternate technologies and alternate locations to manage hazardous waste munitions. *Lands Council*, 395 F.3d at 1027; *see* 40 C.F.R. § 1502.1; *cf.* *ʻĪlioʻulaokalani Coalition*, 464 F.3d at 1098, 1101-02 (Army violated NEPA by failing to consider locations outside Hawaiʻi to station armored brigade). NEPA pushes Defendants to think outside the box for the best way to treat their waste, requiring them to consider even alternatives that are not "within the power of the Air Force to implement," including ones that "involve another government agency or military service to assist in the project or even to become the lead agency." 32 C.F.R. § 989.8(b).

Because NEPA's mandated analysis is intended to inform Defendants' decision about which course of action to pursue and, thus, what type of RCRA permit is needed, Defendants' duties under NEPA are independent of, and logically precede, Guam EPA's determination whether Defendants' permit application complies with RCRA. Had Defendants taken a hard look at impacts and alternatives, as NEPA requires, Defendants may have chosen an environmentally

safer location than Tarague Beach to treat their hazardous waste munitions,[8] such as a location far from nesting endangered sea turtles, away from the ocean's edge, off ancestral lands, and not above the island's primary drinking water source. After evaluating the alternate treatment technologies discussed in the recent National Academies and U.S. EPA reports, Defendants may also have opted to treat their waste (or at least some of it) with technologies that have fewer adverse impacts than OB/OD. In short, had Defendants engaged in the informed decision-making that NEPA requires, they may have selected a materially different approach for managing their wastes, substantially changing the activities for which they need a permit and, consequently, the review that Guam EPA must conduct to determine if Defendants' application satisfies RCRA.

Had Defendants complied with NEPA, they may even have chosen an alternative that would not trigger Guam EPA permitting for waste treatment at all. Armed with the detailed analysis of alternatives that Congress determined was vital

---

[8] RCRA defines "treatment" to include:

any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste … or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.

40 C.F.R. § 260.10 (1989).

to "permit informed decision making," Defendants may have concluded that shipping their waste to a location outside of Guam would accomplish their mission with less environmental harm. *Lands Council*, 395 F.3d at 1027. Or Defendants may have decided that some other "government agency or military service" should take the lead on managing the Air Force's hazardous waste munitions. 32 C.F.R. § 989.8(b). Selecting either alternative would get Guam EPA out of the business of reviewing Defendants' application for a waste treatment permit altogether. *See* 51 Fed. Reg. at 1371 (delegation to Guam limited to "permitting treatment, storage and disposal facilities within its borders").[9] Far from being "redundant and a waste of resources," requiring Defendants to comply with NEPA is essential to enable them to make an informed decision about what permit, if any, to seek from Guam EPA. ER-16.

Enforcing NEPA's mandate for Defendants to examine impacts and alternatives before choosing a course of action is particularly critical here, where Defendants have not waited for Guam EPA to issue a new permit before

---

[9] Depending on the circumstances, Defendants might still require a permit from Guam EPA as a waste "generator" or "transporter," but Guam EPA would have no occasion to issue a permit for waste treatment. *See* Guam Hazardous Waste Mgmt. Regul. pt. IV (1992) (standards for generators); *id.* pt. V (standards for transporters); *id.* pt. X.A, C (generally adopting 40 C.F.R. pt. 270); 40 C.F.R. § 270.1(c)(2)(i) (1991) (exempting from permitting some generators); *id.* § 270.1(c)(2)(vi) (exempting some waste transporters).

proceeding with OB/OD on Tarague Beach. There is no support—legal or factual—for the district court's statement that, "[w]ithout the permit, Defendants would not be able to operate its hazardous waste disposable [sic] facility." ER-16–17. The mere submission of the Air Force's permit renewal application—an action taken to implement the decision that Prutehi Litekyan challenges—triggered extension of the 2018 Permit's life, allowing open detonation on Tarague Beach to continue beyond September 3, 2021. *See* 40 C.F.R. § 270.51(d) (1991); ER-18. It is undisputed that, due to that automatic permit extension, Defendants have continued to blow up bombs on the beach while their application is pending. ER-20. Allowing Defendants to inflict harm to the environment—and to Prutehi Litekyan's interests—before completing environmental review of these destructive activities subverts NEPA's core purpose: to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 371.

> B.   The District Court Erred in Applying the Functional Equivalence Doctrine to Exempt Defendants From NEPA.

Disregarding the ongoing harm to the environment that Defendants' uninformed decision to conduct OB/OD at Tarague Beach is inflicting while their permit application remains pending, the district court exempted Defendants from NEPA based on its conclusion that RCRA "is a functional equivalent" of NEPA.

ER-12. This Court has never sanctioned use of the functional equivalence doctrine to exempt any federal agency from its duty to prepare a NEPA analysis. And even those jurisdictions that have adopted the doctrine have applied it narrowly to only a subset of "environmentally protective regulatory actions" taken by federal "environmental agencies" like U.S. EPA, not decisions to conduct destructive activities made by non-environmental agencies. *Envtl. Def. Fund, Inc.*, 489 F.2d at 1257. The district court's decision here to exempt from NEPA Defendants' decision to blow up bombs on Tarague Beach is a radical—and dangerous— expansion of the functional equivalence doctrine, which this Court should squarely reject.

1. This Court Has Never Adopted the Functional Equivalence Doctrine to Exempt Any Federal Agency From Its Obligation to Prepare an EA or EIS.

In holding that Defendants are exempt from NEPA under the functional equivalence doctrine, the district court misapplied this Court's precedent. The district court wrongly concluded that this Court has previously applied the doctrine to exempt federal agencies from their duty to prepare an EA or EIS. To the contrary, this Court has "been skeptical of the 'functional equivalent' approach and [has] not used this language in [its] cases." *Jewell*, 747 F.3d at 651 n.51.

*Municipality of Anchorage v. United States*, 980 F.2d 1320 (9th Cir. 1992), does not support the district court's decision to apply the functional equivalence

52

doctrine to exempt Defendants from NEPA. *See* ER-14–15. In *Anchorage*, this Court considered whether U.S. EPA and the Army Corps of Engineers violated NEPA when they "failed to prepare an [EIS] pursuant to section 102(C) of NEPA" prior to adopting a memorandum of agreement ("MOA") regarding guidelines for the issuance of Clean Water Act dredge and fill permits. 980 F.2d at 1327; *see* 42 U.S.C. § 4332(2)(C). The Court noted that Congress expressly "carved out an exemption to NEPA for actions taken by the Administrator of the EPA pursuant to the [Clean Water Act]." *Anchorage*, 980 F.2d at 1327 (citing 33 U.S.C. § 1371(c)). Because the challenged MOA "clearly qualifies as action taken by the Administrator pursuant to the congressional directive in the [Clean Water Act] to develop guidelines" for dredge and fill permits, this Court held that the MOA was covered by the statutory exemption and was "exempt from the EIS requirement of NEPA." *Id.*

The language from *Anchorage* that the district court's opinion cites involved an entirely separate NEPA duty: the requirement "to consider alternatives as required by subsection (E) of section 102." *Id.*; *see* 42 U.S.C. § 4332(2)(E). While *Anchorage* noted decisions from other jurisdictions applying the functional equivalence doctrine, this Court's holding was based on its conclusion that the Clean Water Act's exemption provision "is sufficiently broad to remove the MOA

from the NEPA requirements in 42 U.S.C. § 4332(E)." 980 F.2d at 1328. The Court did not rely on the functional equivalence doctrine.

In this case, Prutehi Litekyan challenges Defendants' failure to comply with their duty under 42 U.S.C. § 4332(2)(C) to prepare an EA or EIS, not the separate duty under 42 U.S.C. § 4332(2)(E). *See* ER-100 (¶ 26); ER-102 (¶ 31); ER-112–13 (¶¶ 61-64). In addressing 42 U.S.C. § 4332(2)(C), *Anchorage* unambiguously applied an express statutory exemption, not functional equivalence, to relieve U.S. EPA and the Army Corps of their duty to prepare an EIS. RCRA does not expressly exempt any federal agency—applicant or permitting agency—from the command in 42 U.S.C. § 4332(2)(C) to prepare an EA or EIS.

In the absence of an express statutory exemption, this Court has relieved federal agencies of their duty to prepare a NEPA analysis—EA or EIS—in only "two circumstances": where (1) requiring NEPA compliance "'would create an irreconcilable and fundamental conflict' with the substantive statute at issue" or (2) "a substantive statute has 'displaced' NEPA's requirements." *Jewell*, 747 F.3d at 648 (citations omitted); *see also Douglas County v. Babbitt*, 48 F.3d 1495, 1504 n.10 (9th Cir. 1995) ("The 'displacement' argument asserts that Congress intended to displace one procedure with another"). The district court did not claim that either circumstance exists here. Instead, the sole basis for the district court's decision to exempt Defendants from NEPA was the functional equivalence

doctrine, which this Court has never adopted to justify relieving a federal agency of its duty to comply with 42 U.S.C. § 4332(2)(C). *See Jewell*, 747 F.3d at 651 n.51 ("We … have not used ['functional equivalent'] language in our cases"); *Merrell v. Thomas*, 807 F.2d 776, 781 (9th Cir. 1986) ("we hesitate to adopt the 'functional equivalence' rationale"); *cf. Douglas Cnty.*, 48 F.3d at 1504 n.10 ("the 'displacement' argument defendants make is [not] the same as the 'functional equivalent' test").[10]

There is no reason for this Court to adopt the functional equivalence doctrine now to relieve Defendants of their duty to consider impacts and environmentally preferred alternatives before deciding how to manage hazardous waste munitions. Doing so would be inconsistent with this Court's longstanding view that Congress intended courts to "make as liberal an interpretation as we can to accommodate the application of NEPA." *LaFlamme,* 852 F.2d at 398 (citation omitted). The district court's views about what "makes the most sense" cannot override Congress's policy choices. ER-16. As the Supreme Court has noted:

> NEPA's instruction that all federal agencies comply with the impact statement requirement … "to the fullest extent possible" is neither accidental nor hyperbolic. Rather, the phrase is a deliberate command

---

[10] Notably, *Trout Unlimited v. Lohn*, No. CV05-1128-JCC, 2007 WL 1730090 (W.D. Wash. June 13, 2007), on which the district court relied, is a displacement case. *See id.* at *15 (adopting "the Ninth Circuit's reasoning in *Douglas County* that the [Endangered Species Act] procedures have displaced those in NEPA").

that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle.

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 787

(1976) (quoting 42 U.S.C. § 4332).

   2. <u>Jurisdictions That Have Adopted the Functional Equivalence Doctrine Apply It Narrowly to Only A Subset of Environmentally Protective Regulatory Actions Taken by Environmental Agencies.</u>

In exempting from NEPA Defendants' decision to blow up and burn munitions on Tarague Beach, the district court radically expanded the functional equivalence doctrine. Even appellate courts that have adopted the doctrine have never invoked it to exempt federal agencies that propose to undertake environmentally destructive activities. Rather, those courts recognize that the doctrine is "a narrow exemption from [NEPA's] literal requirements" that applies to only a subset of "environmentally protective regulatory actions" taken by federal "environmental agencies" like U.S. EPA. *Envtl. Def. Fund*, 489 F.2d at 1257; *see, e.g.*, *Siegelman*, 911 F.2d at 504-05. The D.C. Circuit has emphasized that "NEPA must be accorded full vitality as to non-environmental agencies" like the Air Force, to which the functional equivalence doctrine does not apply. *Portland Cement Ass'n*, 486 F.2d at 387.

Every case that the district court cites in discussing functional equivalence narrowly held that U.S. EPA was exempt from NEPA because it was an

56

environmental agency acting in its role as an environmental regulator. *See Wyoming v. Hathaway*, 525 F.2d 66, 71-72 (10th Cir. 1975), *cert. denied*, 426 U.S. 906 (1976) ("an organization like EPA whose regulatory activities are necessarily concerned with environmental consequences need not stop in the middle of its proceedings in order to issue a separate and distinct impact statement");[11] *Indiana & Michigan Elec. Co. v. Envtl. Prot. Agency*, 509 F.2d 839, 843 (7th Cir. 1975) (noting there is "little need in requiring a NEPA statement from an agency whose raison d'etre is the protection of the environment") (citation omitted); *Env't Def. Fund*, 489 F.2d at 1257 ("We conclude that where an agency is engaged primarily in an examination of environmental questions, where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, but functional compliance is sufficient."). The Eleventh Circuit—the only appellate court to apply the functional equivalence doctrine in the RCRA context—held only that U.S. EPA need not prepare an EIS when it is deciding whether to issue a RCRA permit. *Siegelman*, 911 F.2d at 501, 505. It so held because "the agency is engaged primarily in an

---

[11] Notably, while the Tenth Circuit in *Wyoming* applied the functional equivalence doctrine to exempt from NEPA U.S. EPA's registration decisions under the Federal Insecticide, Fungicide, and Rodenticide Act, this Court in *Merrell* declined to do so. 807 F.2d at 781. Instead, *Merrell* was a "displacement" case. *Jewell*, 747 F.3d at 651 n.51.

examination of environmental questions," and "'the agency's organic legislation mandate[s] specific procedures for considering the environment that [are] functional equivalents of the impact statement process.'" *Id.* at 504 (citations omitted).

The Eleventh Circuit never suggested that a federal agency that is applying for a RCRA permit to conduct destructive activities should be exempt from NEPA. In *Siegelman*, the permit applicant was a private corporation, so the Eleventh Circuit had no occasion to rule on the sole question presented here: whether a federal agency must comply with NEPA before deciding how to manage its hazardous waste and before submitting a RCRA permit application. *See id.* at 501.

Even in jurisdictions that have adopted the functional equivalence doctrine, the Air Force would not satisfy the qualifications for an exemption from NEPA. Unlike U.S. EPA, the Air Force is not an agency "engaged primarily in an examination of environmental questions," *id.* at 504 (citation omitted), or "whose raison d'etre is the protection of the environment," *Indiana & Michigan Elec. Co.*, 509 F.2d at 843 (citation omitted). The Air Force is a national defense agency "responsible for the preparation of the air forces necessary for the effective prosecution of war." 10 U.S.C. § 9062(c). Nor does the Air Force's "organic legislation mandate specific procedures for considering the environment that [are] functional equivalents of the impact statement process." *Siegelman*, 911 F.2d at

58

504 (citation omitted). Rather, the Air Force conducts environmental review within the United States only as mandated by NEPA and its implementing regulations. *See* 32 C.F.R. § 989.1(a); 40 C.F.R. §§ 1500.1(b), 1500.3(a). Finally, far from taking an "environmentally protective regulatory action[]," the Air Force seeks to blow up hazardous waste munitions on the bare sand and burn them in the open air. *Envtl. Def. Fund*, 489 F.2d at 1257. Thus, even if this Court were to adopt the functional equivalence doctrine (and for the reasons stated above, it should not), the doctrine would not apply to Defendants' decision to conduct OB/OD, to which "NEPA must be accorded full vitality." *Portland Cement Ass'n*, 486 F.2d at 387.

## CONCLUSION

This Court should reverse the district court's dismissal of Prutehi Litekyan's lawsuit, reaffirm that Defendants must comply with NEPA before deciding where and how to manage their hazardous waste munitions, and remand for a decision on the merits of Prutehi Litekyan's claim that Defendants violated NEPA when they decided to conduct OB/OD on Tarague Beach without first preparing an EA or EIS that takes the requisite "hard look" at environmental impacts, considers a reasonable range of alternatives, and provides opportunities for public comment.

Dated at Honolulu, Hawaiʻi, January 26, 2023.

/s/ David L. Henkin
DAVID L. HENKIN
THIEN T. CHAU
EARTHJUSTICE

Attorneys for Plaintiffs-Appellants

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellant certifies that it is not aware of any related case pending in this Court.

Dated at Honolulu, Hawaiʼi, January 26, 2023.

/s/ David L. Henkin
DAVID L. HENKIN
THIEN T. CHAU

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16613

I am the attorney or self-represented party.

**This brief contains** | 13,135 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [                    ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ David L. Henkin | **Date** | January 26, 2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

# ADDENDUM

## ADDENDUM

## TABLE OF CONTENTS

**Page Numbers(s)**

### FEDERAL STATUTES

10 U.S.C. § 9062(c) ............................................................................... A-1

33 U.S.C. § 1371(c) ............................................................................... A-2

42 U.S.C. § 4321 .................................................................................... A-3

42 U.S.C. § 4332(2)(C) .......................................................................... A-4

42 U.S.C. § 4332(2)(E) .......................................................................... A-4

42 U.S.C. § 6902(a)(4) ........................................................................... A-5

42 U.S.C. § 6902(b) ............................................................................... A-5

42 U.S.C. § 6924(a) ............................................................................... A-6

42 U.S.C. § 6925(c)(1) ........................................................................... A-8

42 U.S.C. § 6926(d) ............................................................................... A-9

### FEDERAL REGULATIONS

32 C.F.R. § 989.1(a) (2021) ................................................................... A-10

32 C.F.R. § 989.3(d)(3) (2021) .............................................................. A-11

32 C.F.R. § 989.4(d) (2021) ................................................................... A-12

32 C.F.R. § 989.8(a) (2021) ................................................................... A-13

32 C.F.R. § 989.8(b) (2021) ................................................................... A-13

32 C.F.R. § 989.14(e) (2021) ................................................................. A-14

**Page Numbers(s)**

## FEDERAL REGULATIONS (continued)

32 C.F.R. pt. 989, app. B at A2.2 (2021) ............................................. A-15

40 C.F.R. § 260.10 (definition of "treatment") (1989) ...................................... A-16

40 C.F.R. § 270.1(c)(2)(i) (1991) ............................................. A-17

40 C.F.R. § 270.1(c)(2)(vi) (1991) ............................................. A-17

40 C.F.R. § 270.30(b) (1991) ............................................. A-18

40 C.F.R. § 270.51(d) (1991) ............................................. A-19

40 C.F.R. § 1500.1(b) (2021) ............................................. A-20

40 C.F.R. § 1500.3(a) (2021) ............................................. A-21

40 C.F.R. § 1501.3(a) (2021) ............................................. A-22

40 C.F.R. § 1501.4 (2021) ............................................. A-23

40 C.F.R. § 1501.5(a) (2021) ............................................. A-24

40 C.F.R. § 1501.5(c) (2021) ............................................. A-24

40 C.F.R. § 1501.5(d) (2021) ............................................. A-24

40 C.F.R. § 1501.6(a) (2021) ............................................. A-25

40 C.F.R. § 1501.7(a) (2021) ............................................. A-26

40 C.F.R. § 1501.7(a)(1) (2021) ............................................. A-26

40 C.F.R. § 1501.7(c)(2) (2021) ............................................. A-26

40 C.F.R. § 1501.8(a) (2021) ............................................. A-27

40 C.F.R. § 1501.8(b)(8) (2021) ............................................. A-27

40 C.F.R. § 1501.11 (2021) ............................................. A-28

40 C.F.R. § 1501.12 (2021) ............................................. A-29

**Page Numbers(s)**

## FEDERAL REGULATIONS (continued)

40 C.F.R. § 1502.1 (2021) ............................................................... A-30

40 C.F.R. § 1502.5 (2021) ............................................................... A-31

40 C.F.R. § 1502.5(a) (2021) ........................................................... A-31

40 C.F.R. § 1502.5(b) (2021) ........................................................... A-31

40 C.F.R. § 1502.14 (2021) ............................................................. A-32

40 C.F.R. § 1502.16(a)(1) (2021) ..................................................... A-33

40 C.F.R. § 1506.3(a) (2021) ........................................................... A-34

40 C.F.R. § 1506.6 (2021) ............................................................... A-35

40 C.F.R. § 1508.1(g)(1) (2021) ....................................................... A-37

40 C.F.R. § 1508.1(q)(2) (2021) ....................................................... A-37

40 C.F.R. § 1508.1(z) (2021) ........................................................... A-37

## GUAM HAZARDOUS WASTE MANAGEMENT REGULATIONS

Guam Hazardous Waste Mgmt. Regul. pt. II.A (1992) ..................... A-38

Guam Hazardous Waste Mgmt. Regul. pt. II.B (1992) ..................... A-38

Guam Hazardous Waste Mgmt. Regul. pt. IV (1992) ...................... A-39

Guam Hazardous Waste Mgmt. Regul. pt. V (1992) ....................... A-46

Guam Hazardous Waste Mgmt. Regul. pt. X.A (1992) ..................... A-48

Guam Hazardous Waste Mgmt. Regul. pt. X.C (1992) ..................... A-48

10 U.S.C. § 9062(c)

[Subtitle D – Air Force and Space Force]

§ 9062. Policy; composition; aircraft authorization

\*    \*    \*    \*    \*

**(c)** In general, the Air Force includes aviation forces both combat and service not otherwise assigned. It shall be organized, trained, and equipped primarily for prompt and sustained offensive and defensive air operations. It is responsible for the preparation of the air forces necessary for the effective prosecution of war except as otherwise assigned and, in accordance with integrated joint mobilization plans, for the expansion of the peacetime components of the Air Force to meet the needs of war.

\*    \*    \*    \*    \*

33 U.S.C. § 1371(c)

[Clean Water Act]

§ 1371. Authority under other laws and regulations

\*     \*     \*     \*     \*

**(c) Action of the Administrator deemed major Federal action; construction of the National Environmental Policy Act of 1969**

**(1)** Except for the provision of Federal financial assistance for the purpose of assisting the construction of publicly owned treatment works as authorized by section 1281 of this title, and the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this title, no action of the Administrator taken pursuant to this chapter shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (83 Stat. 852); and

**(2)** Nothing in the National Environmental Policy Act of 1969 (83 Stat. 852) shall be deemed to—

**(A)** authorize any Federal agency authorized to license or permit the conduct of any activity which may result in the discharge of a pollutant into the navigable waters to review any effluent limitation or other requirement established pursuant to this chapter or the adequacy of any certification under section 1341 of this title; or

**(B)** authorize any such agency to impose, as a condition precedent to the issuance of any license or permit, any effluent limitation other than any such limitation established pursuant to this chapter.

\*     \*     \*     \*     \*

A-2

42 U.S.C. § 4321

[National Environmental Policy Act]

§ 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4332(2)(C), (E)

[National Environmental Policy Act]

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \*

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

\* \* \* \* \*

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

A-4

42 U.S.C. § 6902(a)(4), (b)

[Resource Conservation and Recovery Act]

§ 6902. Objectives and national policy

**(a) Objectives**

The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—

\* \* \* \* \*

**(4)** assuring that hazardous waste management practices are conducted in a manner which protects human health and the environment;

\* \* \* \* \*

**(b) National policy**

The Congress hereby declares it to be the national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

42 U.S.C. § 6924(a)

[Resource Conservation and Recovery Act]

§ 6924. Standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities

**(a) In general**

Not later than eighteen months after October 21, 1976, and after opportunity for public hearings and after consultation with appropriate Federal and State agencies, the Administrator shall promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter, as may be necessary to protect human health and the environment. In establishing such standards the Administrator shall, where appropriate, distinguish in such standards between requirements appropriate for new facilities and for facilities in existence on the date of promulgation of such regulations. Such standards shall include, but need not be limited to, requirements respecting--

**(1)** maintaining records of all hazardous wastes identified or listed under this chapter which is treated, stored, or disposed of, as the case may be, and the manner in which such wastes were treated, stored, or disposed of;

**(2)** satisfactory reporting, monitoring, and inspection and compliance with the manifest system referred to in section 6922(5) of this title;

**(3)** treatment, storage, or disposal of all such waste received by the facility pursuant to such operating methods, techniques, and practices as may be satisfactory to the Administrator;

**(4)** the location, design, and construction of such hazardous waste treatment, disposal, or storage facilities;

**(5)** contingency plans for effective action to minimize unanticipated damage from any treatment, storage, or disposal of any such hazardous waste;

**(6)** the maintenance of operation of such facilities and requiring such additional qualifications as to ownership, continuity of operation, training for personnel, and

A-6

financial responsibility (including financial responsibility for corrective action) as may be necessary or desirable; and

**(7)** compliance with the requirements of section 6925 of this title respecting permits for treatment, storage, or disposal.

No private entity shall be precluded by reason of criteria established under paragraph (6) from the ownership or operation of facilities providing hazardous waste treatment, storage, or disposal services where such entity can provide assurances of financial responsibility and continuity of operation consistent with the degree and duration of risks associated with the treatment, storage, or disposal of specified hazardous waste.

\*     \*     \*     \*     \*

A-7

42 U.S.C. § 6925(c)(1)

[Resource Conservation and Recovery Act]

§ 6925. Permits for treatment, storage, or disposal of hazardous waste

\* \* \* \* \*

**(c) Permit issuance**

**(1)** Upon a determination by the Administrator (or a State, if applicable), of compliance by a facility for which a permit is applied for under this section with the requirements of this section and section 6924 of this title, the Administrator (or the State) shall issue a permit for such facilities. In the event permit applicants propose modification of their facilities, or in the event the Administrator (or the State) determines that modifications are necessary to conform to the requirements under this section and section 6924 of this title, the permit shall specify the time allowed to complete the modifications.

\* \* \* \* \*

A-8

42 U.S.C. § 6926(d)

[Resource Conservation and Recovery Act]

§ 6926. Authorized State hazardous waste programs

\*　　\*　　\*　　\*　　\*

**(d) Effect of State permit**

Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter.

\*　　\*　　\*　　\*　　\*

32 C.F.R. § 989.1(a) (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

§ 989.1 Purpose.

(a) This part implements the Air Force Environmental Impact Analysis Process (EIAP) and provides procedures for environmental impact analysis both within the United States and abroad. Because the authority for, and rules governing, each aspect of the EIAP differ depending on whether the action takes place in the United States or outside the United States, this part provides largely separate procedures for each type of action. Consequently, the main body of this part deals primarily with environmental impact analysis under the authority of the National Environmental Policy Act of 1969 (NEPA) (Public Law 91–190, 42 United States Code (U.S.C.) Sections 4321 through 4347), while the primary procedures for environmental impact analysis of actions outside the United States in accordance with Executive Order (E.O.) 12114, Environmental Effects Abroad of Major Federal Actions, are contained in §§ 989.37 and 989.38.

32 C.F.R. § 989.3(d)(3) (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

§ 989.3 Responsibilities.

\*       \*       \*       \*       \*


(d) *Proponent*. Each office, unit, single manager, or activity at any level that initiates Air Force actions is responsible for:


\*       \*       \*       \*       \*


(3) Identifying key decision points and coordinating with the EPF on EIAP phasing to ensure that environmental documents are available to the decision-maker before the final decision is made and ensuring that, until the EIAP is complete, resources are not committed prejudicing the selection of alternatives nor actions taken having an adverse environmental impact or limiting the choice of reasonable alternatives.


\*       \*       \*       \*       \*

A-11

32 C.F.R. § 989.4(d) (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

§ 989.4 Initial considerations.

Air Force personnel will:

*     *     *     *     *

(d) Review the specific alternatives analyzed in the EIAP when evaluating the proposal prior to decisionmaking.

*     *     *     *     *

32 C.F.R. § 989.8(a), (b) (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

§ 989.8 Analysis of alternatives.

(a) The Air Force must analyze reasonable alternatives to the proposed action and the "no action" alternative in all EAs and EISs, as fully as the proposed action alternative.

(b) "Reasonable" alternatives are those that meet the underlying purpose and need for the proposed action and that would cause a reasonable person to inquire further before choosing a particular course of action. Reasonable alternatives are not limited to those directly within the power of the Air Force to implement. They may involve another government agency or military service to assist in the project or even to become the lead agency. The Air Force must also consider reasonable alternatives raised during the scoping process (see § 989.18) or suggested by others, as well as combinations of alternatives. The Air Force need not analyze highly speculative alternatives, such as those requiring a major, unlikely change in law or governmental policy. If the Air Force identifies a large number of reasonable alternatives, it may limit alternatives selected for detailed environmental analysis to a reasonable range or to a reasonable number of examples covering the full spectrum of alternatives.

\*    \*    \*    \*    \*

32 C.F.R. § 989.14(e) (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

§ 989.14 Environmental assessment.

\*　　\*　　\*　　\*　　\*

(e) The format for the EA may be the same as the EIS. The alternatives section of an EA and an EIS are similar and should follow the alternatives analysis guidance outlined in § 989.8.

\*　　\*　　\*　　\*　　\*

A-14

32 C.F.R. pt. 989, app. B at A2.2 (2021)

[Air Force Environmental Impact Analysis Process (EIAP) Regulations]

APPENDIX B TO PART 989—CATEGORICAL EXCLUSIONS

\*     \*     \*     \*     \*

A2.2. Additional Analysis

Circumstances may arise in which usually categorically excluded actions may have a significant environmental impact and, therefore, may generate a requirement for further environmental analysis. Examples of situations where such unique circumstances may be present include:

A2.2.1. Actions of greater scope or size than generally experienced for a particular category of action.

A2.2.2. Potential for degradation (even though slight) of already marginal or poor environmental conditions.

A2.2.3. Initiating a degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

A2.2.4. Use of unproved technology.

A2.2.5. Use of hazardous or toxic substances that may come in contact with the surrounding environment.

A2.2.6. Presence of threatened or endangered species, archaeological remains, historical sites, or other protected resources.

A2.2.7. Proposals adversely affecting areas of critical environmental concern, such as prime or unique agricultural lands, wetlands, coastal zones, wilderness areas, floodplains, or wild and scenic river areas.

A2.2.8. Proposals with disproportionately high and adverse human health or environmental effects on minority populations or low-income populations.

\*     \*     \*     \*     \*

A-15

40 C.F.R. § 260.10 (definition of "treatment") (1989)

[Resource Conservation and Recovery Act Regulations]

§ 260.10 Definitions.

When used in parts 260 through 265 of this chapter, the following terms have the meanings given below:

\* \* \* \* \*

*Treatment* means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.

\* \* \* \* \*

40 C.F.R. § 270.1(c)(2)(i), (vi) (1991)

[Resource Conservation and Recovery Act Regulations]

§ 270.1 Purpose and scope of the regulations in this part.

\*     \*     \*     \*     \*

(c) *Scope of the RCRA permit requirement.* RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR part 261. The terms "treatment," "storage," "disposal," and "hazardous waste" are defined in § 270.2. Owners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit. Owners and operators of surface impoundments, landfills, land treatment units, and waste pile units that received waste after July 26, 1982, or that certified closure (according to § 265.115) after January 26, 1983, must have post-closure permits, unless they demonstrate closure by removal as provided under § 270.1(c)(5) and (6). If a post-closure permit is required, the permit must address applicable part 264 Groundwater Monitoring, Unsaturated Zone Monitoring, Corrective Action, and Post-closure Care Requirements of this chapter. The denial of a permit for the active life of a hazardous waste management facility or unit does not affect the requirement to obtain a post-closure permit under this section.

\*     \*     \*     \*     \*

(2) *Specific exclusions.* The following persons are among those who are not required to obtain a RCRA permit:

(i) Generators who accumulate hazardous waste on-site for less than the time periods provided in 40 CFR 262.34.

\*     \*     \*     \*     \*

(vi) Transporters storing manifested shipments of hazardous waste in containers meeting the requirements of 40 CFR 262.30 at a transfer facility for a period of ten days or less.

\*     \*     \*     \*     \*

A-17

40 C.F.R. § 270.30(b) (1991)

[Resource Conservation and Recovery Act Regulations]

§ 270.30 Conditions applicable to all permits.

The following conditions apply to all RCRA permits, and shall be incorporated into the permits either expressly or by reference. If incorporated by reference, a specific citation to these regulations (or the corresponding approved State regulations) must be given in the permit.

\*     \*     \*     \*     \*

(b) *Duty to reapply*. If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must apply for and obtain a new permit.

\*     \*     \*     \*     \*

A-18

40 C.F.R. § 270.51(d) (1991)

[Resource Conservation and Recovery Act Regulations]

§ 270.51 Continuation of expiring permits.

\*    \*    \*    \*    \*


(d) *State continuation*. In a State with an hazardous waste program authorized under 40 CFR part 271, if a permittee has submitted a timely and complete application under applicable State law and regulations, the terms and conditions of an EPA-issued RCRA permit continue in force beyond the expiration date of the permit, but only until the effective date of the State's issuance or denial of a State RCRA permit.


\*    \*    \*    \*    \*

40 C.F.R. § 1500.1(b) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1500.1 Purpose and policy.

\*     \*     \*     \*     \*

(b) The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

40 C.F.R. § 1500.3(a) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1500.3 NEPA compliance.

(a) *Mandate*.  This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91-190, 42 U.S.C. 4321 et seq.) (NEPA or the Act), except where compliance would be inconsistent with other statutory requirements. The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91-224, 42 U.S.C. 4371 et seq.); section 309 of the Clean Air Act, as amended (42 U.S.C. 7609); Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977); and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 15, 2017). The regulations in this subchapter apply to the whole of section 102(2) of NEPA. The provisions of the Act and the regulations in this subchapter must be read together as a whole to comply with the law.

\*     \*     \*     \*     \*

A-21

40 C.F.R. § 1501.3(a) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.3 Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

\*      \*      \*      \*      \*

A-22

40 C.F.R. § 1501.4 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.4 Categorical exclusions.

(a) For efficiency, agencies shall identify in their agency NEPA procedures (§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

(2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

40 C.F.R. § 1501.5(a), (c)-(d) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.5 Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

\*       \*       \*       \*       \*

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

(d) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

\*       \*       \*       \*       \*

A-24

40 C.F.R. § 1501.6(a) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.6 Findings of no significant impact.

(a) An agency shall prepare a finding of no significant impact if the agency determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action will not have significant effects.

\*     \*     \*     \*     \*

40 C.F.R. § 1501.7(a), (c) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.7 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement or a complex environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

\* \* \* \* \*

(c) If an action falls within the provisions of paragraph (a) of this section, the potential lead agencies shall determine, by letter or memorandum, which agency will be the lead agency and which will be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval or disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement

\* \* \* \* \*

40 C.F.R. § 1501.8(a), (b)(8) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.8 Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

\*      \*      \*      \*      \*

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

\*      \*      \*      \*      \*

A-27

40 C.F.R. § 1501.11 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.11 Tiering.

(a) Agencies should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review. Tiering may also be appropriate for different stages of actions.

(b) When an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the entire program or policy (such as a project- or site-specific action), the tiered document needs only to summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action. The tiered document shall state where the earlier document is available.

(c) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(1) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

40 C.F.R. § 1501.12 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1501.12 Incorporation by reference.

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document and briefly describe its content. Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

40 C.F.R. § 1502.1 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1502.1 Purpose of environmental impact statement.

The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs Federal agency decision making and the public.

40 C.F.R. § 1502.5(a), (b) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1502.5 Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this chapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (go/no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the application. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

\*       \*       \*       \*       \*

40 C.F.R. § 1502.14 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1502.14 Alternatives including the proposed action.

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

40 C.F.R. § 1502.16(a)(1) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1502.16 Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

\*     \*     \*     \*     \*

A-33

40 C.F.R. § 1506.3(a) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1506.3 Adoption.

(a) *Generally*. An agency may adopt a Federal draft or final environmental impact statement, environmental assessment, or portion thereof, or categorical exclusion determination provided that the statement, assessment, portion thereof, or determination meets the standards for an adequate statement, assessment, or determination under the regulations in this subchapter.

\*       \*       \*       \*       \*

40 C.F.R. § 1506.6 (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1506.6 Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).

(b) Provide public notice of NEPA–related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

(1) In all cases, the agency shall notify those who have requested notice on an individual action.

(2) In the case of an action with effects of national concern, notice shall include publication in the Federal Register. An agency may notify organizations that have requested regular notice.

(3) In the case of an action with effects primarily of local concern, the notice may include:

(i) Notice to State, Tribal, and local agencies that may be interested or affected by the proposed action.

(ii) Notice to interested or affected State, Tribal, and local governments.

(iii) Following the affected State or Tribe's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(x) Notice through electronic media (e.g., a project or agency website, email, or social media).

(c) Hold or sponsor public hearings, public meetings, or other opportunities for public involvement whenever appropriate or in accordance with statutory requirements applicable to the agency. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When selecting appropriate methods for public involvement, agencies shall consider the ability of affected entities to access electronic media.

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

40 C.F.R. § 1508.1(g)(1), (q)(2), (z) (2021)

[Council on Environmental Quality National Environmental Policy Act Regulations]

§ 1508.1 Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

\* \* \* \* \*

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

\* \* \* \* \*

(q) *Major Federal action* or *action* means an activity or decision subject to Federal control and responsibility subject to the following:

\* \* \* \* \*

(2) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

\* \* \* \* \*

(z) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant.

Guam Hazardous Waste Management Regulations pt. II.A, B (1992)[1]

PART II:  <u>HAZARDOUS WASTE MANAGEMENT SYSTEM:  GENERAL</u>

A.      Federal and State regulations cited in these Regulations are those adopted as of July 1,1991. Title 40, Code of Federal Regulations (CFR) Parts 124, 260 through 266, 268 and 270 are adopted by reference when so noted.

B.      All of Title 40 CFR Part 260 and accompanying appendices, as amended as of July 1, 1989, with the exception of 40 CFR 260.20, 260.21, 260.22, is hereby adopted and incorporated by reference (Appendix A) and modified by the following subparts.

\*      \*      \*      \*      \*

---

[1] Please note that the version of Guam's Hazardous Waste Management Regulations that is available on Westlaw is not the current version. The current version of Guam's Hazardous Waste Management Regulations, adopted in 1992, is available on the Guam Environmental Protection Agency website at: http://epa.guam.gov/wp-content/uploads/2021/11/1-500-Guam-Hazardous-Waste-Management-Regulations.pdf (Volume 1); http://epa.guam.gov/wp-content/uploads/2021/11/501-1000-Guam-Hazardous-Waste-Management-Regulations.pdf (Volume 2); http://epa.guam.gov/wp-content/uploads/2021/11/1001-1195-Guam-Hazardous-Waste-Management-Regulations.pdf (Volume 3) (last viewed January 23, 2023).

Guam Hazardous Waste Management Regulations pt. IV (1992)

PART IV:  <u>STANDARDS APPLICABLE TO GENERATORS OF HAZARDOUS
WASTE</u>

A.  All of Title 40 CFR Part 262 and accompanying appendices, as amended as of July 1, 1991, is hereby adopted and incorporated by reference (appendix C) and modified by the following subparts of Part IV.

B.  In the above adopted Federal Regulations:

1)  "Section 3008 of the Act" means 10 GCA Chapter 51, Section 51103(10).

2)  "Section 2002(a) of the Act" means 10 GCA Chapter 51, Sections 51101 and 51103.

3)  "Section 3002(6) of the Act" means 10 GCA Chapter 51, Sections 51101(9) and 51103(7).

C.  40 CFR 262.20(e) is amended as follows:

(e)  The requirements of Subpart B of Part 262, do not apply to hazardous waste produced by generators of greater than 50 kg. but less than 100 kg. in a calendar month where:

(1)  The waste is reclaimed under a contractual agreement pursuant to which:

(i)  The type of waste and frequency of shipments are specified in the agreement;

(ii)  The vehicle used to transport the waste to the recycling facility and to deliver regenerated material back to the generator is owned and operated by the reclaimer of the waste; and

(2)  The generator maintains a copy of the reclaimation [sic] agreement in his files for a period of at least three years after termination or expiration of the agreement.

D.  40 CFR 262.34(a) is amended by adding the following as (a)(5):

(a)(5) The generator records all inspections in an inspection logbook. At a minimum, these records must include the date and time of the inspection, the name of the inspector, a notation of the observations

made, and the date and nature of any repairs or other remedial actions. The generator must keep these records for at least eighteen (18) months on-site.

E.    40 CFR 262.34(c)(1) is amended as follows:

(c)(l)   A generator may accumulate as much as 55 gallons of hazardous waste or one quart of acutely hazardous waste listed in §261.33(e) in containers at or near any point of generation where wastes initially accumulate, which is under the control of the operator of the process generating the waste, without a permit or interim status and without complying with 262.34(a) provided he:

(i)   Complies with §§265.171, 265.172, 265.173, and 265.174 of these Regulations, see Part VII; and

(ii)   Marks his containers either with the words "Hazardous Waste" or with the other words that identify the contents of the containers.

F.    40 CFR 262.34(d)(l) is amended as follows:

(d)   A generator who generates greater than 50 kilograms but less than 100 kilograms of hazardous waste in a calendar month may accumulate hazardous waste on-site for 180 days or less without a permit or without having interim status provided that:

(1)   The quantity of the waste accumulated on-site never exceeds 600 kilograms;

G.    40 CFR 262.34(e) and (f) are amended as follows:

(e)   A generator who generates greater than 50 kilograms but less than 100 kilograms of hazardous waste in a calendar month and who must transport his waste, or offer his waste for transportation, over a distance of 200 miles or more for off-site treatment, storage or disposal may accumulate hazardous waste on-site for 270 days or less without a permit or without having interim status provided that he complies with the requirements of 262.34(d), as amended in these regulations, see Part IV.E.

(f)   A generator who generates greater than 50 kilograms but less than 100 kilograms in a calendar month and who accumulates hazardous waste in quantities exceeding 600 kg. or accumulates hazardous waste for more than 180 days (or for more than 270 days if he must transport his

A-40

waste or offer his waste for transportation over a distance of 200 miles or more) is an operator of a storage facility and is subject to the requirements of 40 CFR Parts 264 and 265, (see Parts VI-VII), and the permit requirements of 40 CFR Part 270 (see Part X) unless he has been granted an extension to the 180 day (or 270 day if applicable ) period. Such extension may be granted by Guam EPA if hazardous waste must remain on-site for longer than 180 days (or 270 days if applicable) due to unforeseen temporary, and uncontrollable circumstances. An extension of up to 30 days may be granted at the discretion of the Administrator on a case-by-case basis.

H.  40 CFR 262.40 is amended by adding the following as (e):

(e)  A generator must keep a copy of the notification and the Administrator's Consent for all imports of hazardous wastes for a period of at least five (5) years.

I.  40 CFR 262. 41 is amended as follows:

40 CFR 262. 41 report.

(a)  A generator who ships any hazardous waste off-site to a disposal facility within the United States must prepare and submit a single copy of an annual report to the Administrator by no later than March 1 for the previous calendar year. The report must be submitted on GEPA Form 8700-13A according to the instructions for the form and must cover generator activities during the previous calendar year, and must include the following information:

(1)  Name, mailing address, location and EPA identification number of the generator;

(2)  The calendar year covered by the report;

(3)  Name, mailing address, and EPA identification number for each off-site treatment, storage, or disposal facility in the United States to which waste was shipped during the reporting year;

(4)  The name, mailing address and EPA identification number of each transporter used by the generator during the reporting year for shipments to a treatment storage or disposal facility within the United States;

(5)  A waste description, EPA hazardous waste number (from 40 CFR Part 261 Subpart C or D, see Part III), Department of Transportation (D.O.T.) hazard class, concentration, physical

state and quantity of each hazardous waste shipped off-site for shipments to a treatment, storage or disposal facility within the United States. This information must be listed by EPA identification number of each off-site facility to which waste was shipped.

(6) A description of the efforts undertaken during the year to reduce the volume and toxicity of waste generated.

(7) A description of the changes in volume and toxicity of waste actually achieved during the year in comparison to previous years to the extent such information is available for years prior to 1984.

(8) The certification signed by the generator or his authorized representative, and the date the report was prepared.

(9) A waste description, EPA hazardous waste number, concentration, physical state, quantity and handling method of each hazardous waste handled on-site in elementary neutralization or wastewater treatment units.

(10) Name and telephone number of facility contact responsible for information contained in the report.

(11) Any generator who treats, stores or disposes of hazardous waste on-site, and is subject to the HWM facility requirements of Parts VI, VII and/or VIII must submit an annual report covering those wastes in accordance with the provisions of Part 270, Part 266, §264.75, see Part VI and, §265.75, see Part VII.

J. The time span "60 days" shall be deleted from 40 CFR 262.42(b) and "45 days" from 40 CFR 262.55(a) and each replaced with "75 days", see Part IV.A.

K. 40 CFR 262.44 is amended as follows:

A generator who generates greater than 50 kilograms but less than 100 kilograms of hazardous waste in a calendar month is exempt from the requirements under Subpart D of Part 262, except for recordkeeping requirements in §262.40(a), (c), (d), and additional reporting requirements of §262.43.

L.    40 CFR 262.54(g)(2) is amended as follows:

(2)    Instruct the transporter to return the waste to the primary exporter in the Territory of Guam or designate another facility within the United States; and

M.    40 CFR §262.56(b) is amended as follows:

(b)    Reports shall be sent to the following address: Solid/Hazardous Waste Management Program, Guam Environmental Protection Agency, IT&E Harmon Plaza Complex Unit D-107, 130 Rojas Street, Harmon, Guam 96911.

N.    40 CFR §262.60(a) has been amended by adding the following:

(a)    Any person who imports hazardous wastes into Guam from a foreign source must comply with the requirements of this Part and the special requirements of this Subpart.

1.    Notification must be given in accordance with the following:

i.    The primary importer of hazardous waste must notify GEPA of an intended import before such waste is scheduled to leave its initial point of embarkation. A complete notification must be submitted sixty (60) days before the initial shipment is intended to be shipped off-site. This notification may cover import activities extending over a six (6) month or lesser period. The notification must be in writing, signed by the primary importer, and include the following information:

A.    Name, mailing address, telephone number and EPA ID number of the primary importer;

B.    A description of each hazardous waste and the EPA hazardous waste number (from 40 CFR Part 261, Subparts C And D), U.S. DOT proper shipping number (UN/NA) for each hazardous waste as identified in 49 CFR Parts 171 through 177;

C.    The estimated frequency or rate at which such waste is to be imported and the period of time over which such waste is to be imported;

A-43

D. The estimated total quantity of the hazardous waste in units as specified in the instructions to the Uniform Hazardous Waste Manifest Form (8700-22);

E. All points of entry to and departure from each Port through which the hazardous waste will pass enroute to Guam;

F. A description of the means by which each shipment of the hazardous waste will be transported (e.g. highway, rail, water, etc.), type(s) of container (drums , boxes, tanks, etc.);

G. A description of the manner in which the hazardous waste will be treated, stored, or disposed of on Guam (e.g., land or ocean incineration, other land disposal, recycling, storage, other treatment);

H. The name and site address of the treatment, storage, or disposal facility on Guam, and any alternate facility; and

I. The name of any transit Port through which the hazardous waste will be sent and a description of the approximate length of time the hazardous waste will remain in such Port and the nature of its handling while there;

ii. Notification shall be sent to the Guam Environmental Protection Agency, Solid and Hazardous waste [sic] Management Program, IT&E Harmon Plaza Complex, Unit D-107, 130 Rojas Street, Harmon, Guam 96911 with "Attention: "Notification to Import" prominently displayed on the front of the envelope.

iii. Except for changes to the telephone number in paragraph (a)(1)(i)(A) of this section, changes to paragraph (a)(1)(i)(C) of this section and decreases in the quantity indicated pursuant to paragraph (a)(1)(i)(E) of this section[,] when the conditions specified on the original notification change (including any exceedance of the estimate of the quantity of hazardous waste specified in the original notification[)], the primary importer must provide EPA with a written notification of the change.

A-44

The shipment cannot take place until consent of the Administrator to the changes (except for changes to paragraph (a)(1)(i)(A) of this section) have been obtained and the primary importer receives the Administrator's Consent reflecting the Administrator's approval of the changes.

iv. Upon request by EPA, a primary importer shall furnish to EPA any additional information which the Administrator requests in order to respond to a notification.

2. The importer may accept the hazardous waste only after receiving the Administrator's Consent to the shipment. The Administrator will give consent, on the basis of a thorough evaluation, to the importation of the hazardous waste. The Administrator's consent will be given whenever that evaluation determines that the primary importer complies with all applicable local and federal regulations; the conditions delineated in all applicable licenses or permits issued to the designated hazardous waste generator, transporter(s), and receiving treatment, storage, and/or disposal facility; and the requirement of (a)(l) of this section.

3. A copy of the Administrator's Consent to the shipment must accompany the hazardous waste shipment and be attached to the manifest, or shipping paper for exports by water (bulk shipment).

4. The hazardous waste shipment must meet the terms and conditions of the Administrator's Consent.

5. Imported hazardous waste containers may only be opened by the Treatment, Storage, and/or Disposal (TSD) Facility representatives at the receiving facility. All containers must be sealed when exported and seals must be intact in its [sic] original state at the time of importation.

Guam Hazardous Waste Management Regulations pt. V (1992)

PART V:  <u>STANDARDS APPLICABLE TO TRANSPORTERS OF HAZARDOUS WASTE</u>

A.  All of Title 40 CFR Part 263, as amended as of July 1, 1991, is hereby adopted and incorporated by reference (appendix D).

B.  It shall be prohibited for any person to knowingly transport any hazardous waste to an unpermitted facility.

C.  40 CFR 263.20(e)(2) is amended as follows:

(e)(2) A shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator certification, and signatures); for exports, an EPA Acknowledgement of Consent; and for imports, the Administrator's Consent accompanies the hazardous waste; and

D.  40 CFR 263.20(h) is amended as follows:

(h)  A transporter transporting hazardous waste from a generator who generates greater than 50 kilograms but less than 100 kilograms of hazardous waste in a calendar month need not comply with the requirements under this section or those of §263.22 provided that:

(1)  The waste is being transported pursuant to a reclamation agreement as provided for in §262.20(e);

(2)  The transporter records, on a log or shipping paper, the following information for each shipment;

(i)  The name, address, and U.S. EPA Identification Number of the generator of the waste;

(ii)  The quantity of waste accepted;

(iii)  All DOT-required shipping information;

(iv)  The date the waste is accepted; and

A-46

(3)     The transporter carries this record when transporting waste to the reclamation facility; and

(4)     The transporter retains these records for a period of at least three years after termination or expiration of the agreement.

Guam Hazardous Waste Management Regulations pt. X.A, C (1992)

PART X:  <u>THE HAZARDOUS WASTE PERMIT PROGRAM</u>

A.    All of Title 40 CFR Part 270 and the accompanying appendix, as amended as of July 1, 1991, with the exception of §§270.2, 270.10(f)(3) and 270.60(b) is hereby adopted and incorporated by reference (Appendix I) and modified by the following:

\*      \*      \*      \*      \*

C.    In §270.1(c), the reference to 270.2 is amended to read §260.10, see Part II.

\*      \*      \*      \*      \*