No. 22-16613

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PRUTEHI LITEKYAN: SAVE
RITIDIAN,
*Plaintiff/Appellant*,

v.

UNITED STATES DEPARTMENT OF THE AIR FORCE; FRANK KENDALL,
Secretary of the Air Force; UNITED STATES DEPARTMENT OF DEFENSE;
LLOYD AUSTIN, Secretary of Defense,
*Defendants/Appellees*.

Appeal from the United States District Court of Guam
No. 1:22-cv-00001 (Hon. Frances Tydingco-Gatewood)

**APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*

Of Counsel:                          AMELIA G. YOWELL
                                     ROBERT P. STOCKMAN
MARVIN W. TUBBS, II                  *Attorneys*
*Environmental Litigation Attorney*  Environment and Natural Resources Division
U.S. Air Force                       U.S. Department of Justice
                                     Post Office Box 7415
                                     Washington, D.C. 20044
                                     (202) 353-3527
                                     Robert.Stockman@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

GLOSSARY ........................................................................................................ xiv

INTRODUCTION ................................................................................................... 1

STATEMENT OF JURISDICTION ....................................................................... 3

STATEMENT OF THE ISSUES ............................................................................ 3

PERTINENT STATUTES AND REGULATIONS ................................................. 3

STATEMENT OF THE CASE ................................................................................ 4

      A.     Statutory and regulatory background ................................................... 4

            1.     RCRA ........................................................................................ 4

            2.     NEPA ........................................................................................ 5

      B.     Factual background ............................................................................... 7

            1.     AAFB's treatment of waste ordnance ..................................... 7

            2.     AAFB's RCRA permit and Application ................................... 8

            3.     Guam EPA's ongoing processing of the Application ............................................................................... 12

      C.     Proceedings below ............................................................................. 13

SUMMARY OF ARGUMENT ............................................................................. 14

STANDARD OF REVIEW ................................................................................... 18

ARGUMENT ......................................................................................................... 19

I.     The complaint either challenges the Application or is time-barred. ................................................................................................... 19

A.  Any challenge to the earlier decisions to operate this Facility would be time-barred. ..............................................19

B.  The Application is the sole agency document challenged in the complaint. .......................................................21

II.  The district court correctly ruled that it lacked jurisdiction over Plaintiff's claim. .................................................24

A.  Plaintiff does not challenge final agency action. ................................24

1.  The Application is not final agency action. .............................25

2.  Defendants did not take an identifiable final agency action within the last six years, and day-to-day conduct and operations are not final agency action. .......................................................29

3.  NEPA claims are subject to the final agency action requirement. ..............................................33

B.  Plaintiff does not have standing and its challenge to the Application is not ripe. ..........................................37

III.  NEPA does not apply to RCRA's permitting processes for hazardous waste facilities. ..............................................45

A.  This Court has applied the "functional equivalence" approach, but this Court's more recent "displacement" approach would have the same outcome............................46

B.  RCRA's specific requirements to consider the environment and ensure public involvement mean NEPA does not apply...............................................48

C.  RCRA's text and history confirm that NEPA does not apply to RCRA permitting processes..................................53

D.  Plaintiff's arguments that NEPA applies here are unpersuasive. ..............................................55

CONCLUSION .................................................................................................. 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*In re Aiken Cnty.*,
    645 F.3d 428 (D.C. Cir. 2011).................................................................42, 44

*Allegany Envtl. Action v. Westinghouse Elec. Corp.*,
    1998 U.S. Dist. LEXIS 1892 (W.D. Pa. 1998)..............................................50

*Baltimore Gas & Elec. Co. v NRDC*,
    462 U.S. 87 (1983).........................................................................................6, 48

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002).........................................................................................55

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................56

*Bennett v. Spear*,
    520 U.S. 154 (1997).............................................................................25, 26, 32

*In re Border Infrastructure Env't Litig.*,
    915 F.3d 1213 (9th Cir. 2019).......................................................................33

*California v. Texas*,
    141 S. Ct. 2104 (2021)...................................................................................41

*California Dep't of Educ. v. Bennett*,
    833 F.2d 827 (9th Cir. 1987).....................................................................43, 44

*Cellular Phone Taskforce v. FCC*,
    205 F.3d 82 (2d Cir. 2000).......................................................................56, 57

*Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dep't of the Army*,
    111 F.3d 1485 (10th Cir. 1997).....................................................................29

*Citizens for Clean Energy v. DOI*,
    384 F. Supp. 3d 1264 (D. Mont. 2019)..........................................................35

*City of Chicago v. EDF*,
    511 U.S. 328 (1994)..................................................................4, 48

*City of Las Vegas, Nevada v. Clark Cnty., Nevada*,
    755 F.2d 697 (9th Cir. 1984) .......................................................30

*City of San Diego v. Whitman*,
    242 F.3d 1097 (9th Cir. 2001) .....................................................27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)................................................................41, 43

*Columbia Riverkeeper v. U.S. Coast Guard*,
    761 F.3d 1084 (9th Cir. 2014) .....................................................27

*Conservation Council for Hawaii v. Nat'l Marine Fisheries Serv.*,
    97 F. Supp. 3d 1210 (D. Haw. 2015)...........................................60

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006).....................................................34

*Ctr. for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023) ..................................................24, 34

*Ctr. for L. & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005)...................................................39

*Davis v. Nordstrom, Inc.*,
    755 F.3d 1089 (9th Cir. 2014) .....................................................61

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)......................................................................6

*Do Sung Uhm v. Humana, Inc.*,
    620 F.3d 1134 (9th Cir. 2010) .....................................................54

*Douglas Cnty. v. Babbitt*,
    48 F.3d 1495 (9th Cir. 1995) .......................................45, 51, 52, 54

*Eason Land Co., LLC v. DOI*,
    703 F. App'x 498 (9th Cir. 2017).................................................32

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ........................................................22

*EDF v. EPA*,
    489 F.2d 1247 (D.C. Cir. 1973) ...................................................57

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) .........................................................35

*Flathead Irrigation Dist. v. Zinke*,
    725 F. App'x 507 (9th Cir. 2018) .................................................30

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ......................................................................54

*Fourco Glass Co. v. Transmirra Prod. Corp.*,
    353 U.S. 222 (1957) ......................................................................45

*Friedman Bros. Inv. Co. v. Lewis*,
    676 F.2d 1317 (9th Cir. 1982) ......................................................35

*FTC v. Standard Oil Co. of California*,
    449 U.S. 232 (1980)...........................................................26, 28, 44

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) .......................................................24

*Gonzales v. Gorsuch*,
    688 F.2d 1263 (9th Cir. 1982) ......................................................43

*Greenpeace, Inc. v. Waste Techs. Indus.*,
    9 F.3d 1174, 1178 (6th Cir. 1993) ................................................29

*Greenpeace, Inc. v. Waste Techs. Indus.*,
    No. 4:93CV0083, 1993 WL 134861 (N.D. Ohio 1993)................50

*Gros Ventre Tribe v. United States*,
    469 F.3d 801 (9th Cir. 2006) .......................................................20

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) .......................................................35

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
  593 F.3d 923 (9th Cir. 2010) ......................................................... 36

*Hilao v. Est. of Marcos*,
  393 F.3d 987 (9th Cir. 2004) ......................................................... 25

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) .................................................. 29, 30

*Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*,
  408 F.3d 638 (9th Cir. 2005) .................................................. 26, 28

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
  861 F.3d 944 (9th Cir. 2017) ......................................................... 27

*Kaiser v. Cascade Cap., LLC*,
  989 F.3d 1127 (9th Cir. 2021) ....................................................... 36

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 38

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................. 32, 34

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ..................................................... 30

*Merrell v. Thomas*,
  807 F.2d 776 (9th Cir. 1986) ............................... 45, 51, 52, 53, 54

*Montana Env't Info. Ctr. v. Stone-Manning*,
  766 F.3d 1184 (9th Cir. 2014) .................................................. 37, 40

*Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*,
  314 F.3d 1146 (9th Cir.2003) ....................................................... 32

*Mun. of Anchorage v. United States*,
  980 F.2d 1320 (9th Cir. 1992) ............................................ 46, 57, 58

*Nevada Ass'n of Ctys. v. DOI*,
  686 F. App'x 407 (9th Cir. 2017) .................................................. 30

*Northside Sanitary Landfill, Inc. v. Thomas*,
  804 F.2d 371 (7th Cir. 1986) ......................................................40, 41, 43, 44

*Norton v. Southern Utah Wilderness All. (SUWA)*,
  542 U.S. 55 (2004)....................................................................26, 31, 32

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
  457 F.3d 941 (9th Cir. 2006) ...................................................38, 42

*ONRC Action v. Bureau of Land Mgmt.*,
  150 F.3d 1132 (9th Cir. 1998) ..................................................31, 34

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ....................................................32, 33

*Portland Cement Ass'n v. Ruckelshaus*,
  486 F.2d 375 (D.C. Cir. 1973).................................................46, 52, 59

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
  970 F.2d 916 (D.C. Cir. 1992)..................................................34

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) .................................................24, 35

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)...................................................................5

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022) ..................................................6

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ....................................................47

*San Luis Unit Food Producers v. United States*,
  709 F.3d 798 (9th Cir. 2013) ....................................................32

*Sierra Club v. FERC*,
  754 F.2d 1506 (9th Cir. 1985) ..................................................60

*Sierra Club v. Penfold*,
  857 F.2d 1307 (9th Cir. 1988) ..................................................19

*State of Alabama ex rel. Siegelman v. EPA,*
    911 F.2d 499 (11th Cir. 1990) .................................... 2, 14, 45, 46, 48, 50, 52

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................38, 39

*Trustees for Alaska v. Hodel,*
    806 F.2d 1378 (9th Cir. 1986) ......................................................................44

*United States v. Ingham,*
    486 F.3d 1068 (9th Cir. 2007) ......................................................................58

*United States v. Washington,*
    573 F.3d 701 (9th Cir. 2009) ........................................................................19

*Upper Snake River Chapter of Trout Unlimited v. Hodel,*
    921 F.2d 232 (9th Cir. 1990) ........................................................................61

*W. Nebraska Res. Council v. EPA,*
    943 F.2d 867 (8th Cir. 1991) ........................................................................51

*W. Radio Servs. Co. v. Glickman,*
    123 F.3d 1189 (9th Cir. 1997) ......................................................................43

*In re Westgate-California Corp.,*
    642 F.2d 1174 (9th Cir. 1981) ......................................................................19

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
    5 F.4th 997 (9th Cir. 2021) ...........................................................18, 33, 36, 38

*Wild Fish Conservancy v. Jewell,*
    730 F.3d 791 (9th Cir. 2013) .....................................................24, 25, 30, 31

*Wilderness Soc., Inc. v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ......................................................................39

*Wilson v. Huuuge, Inc.,*
    944 F.3d 1212 (9th Cir. 2019) ......................................................................62

**Statutes and Court Rules**

Administrative Procedure Act (APA)

5 U.S.C. § 551(6) ........................................................................26, 28

5 U.S.C. § 551(8) ........................................................................26, 28

5 U.S.C. § 551(11)(C) ........................................................................28

5 U.S.C. § 551(13) ...........................................24, 26, 28, 31, 32

5 U.S.C. § 558(c) ........................................................................28

5 U.S.C. § 704 ...........................................................1, 3, 24, 27

5 U.S.C. § 706(1) ........................................................................36

5 U.S.C. § 706(2) ........................................................................36

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 2401(a) ........................................................................19

National Environmental Policy Act (NEPA)

42 U.S.C. § 4332 ........................................................................60

42 U.S.C. § 4332(2)(C) ...................................6, 18, 53, 59

42 U.S.C. § 4332(2)(E) ........................................................................59

Resource Conservation and Recovery Act (RCRA)

42 U.S.C. § 6901 ........................................................................53

42 U.S.C. § 6902 ........................................................................48

42 U.S.C. § 6902(b) ........................................................................51

42 U.S.C. § 6905(b)(1) ........................................................................53

42 U.S.C. § 6921-6934 ........................................................................4

x

42 U.S.C. § 6924(a) ...................................................................4, 49

42 U.S.C. § 6925 ............................................................................4

42 U.S.C. § 6925(c)(1) .........................................................4, 48, 52

42 U.S.C. § 6925(c)(3) ...............................................................4, 48

42 U.S.C. § 6926(b) .........................................................................5

42 U.S.C. § 6926(f) .........................................................................49

42 U.S.C. § 6929 ..............................................................................5

42 U.S.C. § 6937(a) ........................................................................49

42 U.S.C. § 6974 ..............................................................................5

42 U.S.C. § 6974(b) ..................................................................12, 50

42 U.S.C. § 6974(b)(2) ...................................................................49

42 U.S.C. § 6974(b)(2)(A) ..............................................................50

42 U.S.C. § 6974(b)(2)(B) ..............................................................50

42 U.S.C. § 6976(b) ........................................................................29

Pub. L. 94-580, 90 Stat 2795 (October 21, 1976) ...................................53

Pub. L. 102-386, 106 Stat 1505 (October 6, 1992) ..................................55

Fed. R. App. P. 4(a)(1)(B) .......................................................................3

**Federal Regulations**

Resource Conservation and Recovery Act Regulations

    40 C.F.R. Parts 124 ........................................................5

    40 C.F.R. § 124.9(b)(6) ...........................................2, 14, 18, 54

    40 C.F.R. Parts 260-270 ...............................................5, 49

    40 C.F.R. Part 270 ........................................................5

    40 C.F.R. § 270.30(b) (1991) ......................................5, 23

    40 C.F.R. § 270.51(d) (1991) ..........................................42

    40 C.F.R. § 270.61 (1991) .............................................41

40 C.F.R. Part 1500 (2021) .................................................6

40 C.F.R. § 1500.1(a) (2021) ...............................................48

40 C.F.R. § 1501.1(a)(6) (2021) ............................................47

40 C.F.R. § 1501.7(g) (2021)............................................59, 60

40 C.F.R. § 1501.9(f)(4) (2021) ............................................60

40 C.F.R. § 1502.24(a) (2021) ..............................................59

40 C.F.R. § 1508.1(q)(1)(iii) (2021) ........................................61

**Federal Register**

44 Fed. Reg. 34,244 (June 14, 1979) .......................................53

45 Fed. Reg. 33,290-01(May 19, 1980).................................18, 53, 54

51 Fed. Reg. 1370 (Jan. 13, 1986) ..........................................5

52 Fed. Reg. 46,946-01 (Dec. 10, 1987)......................................4

54 Fed. Reg. 21,953 (May 22, 1989) ..................................................5

62 Fed. Reg. 6622-01 (Feb. 12, 1997) .............................................41

72 Fed. Reg. 53,652-01 (Sept. 19, 2007) .........................................54

80 Fed. Reg. 46,252-01 (August 2015) ............................................21

85 Fed. Reg. 43,304 (July 16, 2020).......................................6, 47, 60

87 Fed. Reg. 23,453 (May 20, 2022) ..................................................6

## Legislative History

H.R. Rep. 102-111, 2, 1992 U.S.C.C.A.N. 1287 (June 13, 1991)..........................54

115 Cong. Rec. 40,418.......................................................................61

## Other Authorities

22 Guam R. & Regs. 6-§ 30109(m)....................................................5

Guam Hazardous Waste Management Regulations VOL.1, *available
    at* http://epa.guam.gov/rules-regs/regulations/ ................................5

Guam EPA, Notice of 45-Day Public Comment Period & Public
    Hearing, http://epa.guam.gov/wp-
    content/uploads/2021/08/ODOD-NEWPAPER-PRINT.pdf;
    https://notices.guam.gov/notice_detail/324 ...................................12

# GLOSSARY

| | |
|---|---|
| AAFB | Andersen Air Force Base |
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| EIS | Environmental Impact Statement |
| EOD range | Explosive Ordinance Disposal range |
| EPA | Environmental Protection Agency |
| FFCA | Federal Facility Compliance Act |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| Guam EPA | Guam Environmental Protection Agency |
| NEPA | National Environmental Policy Act |
| OB | Open Burn |
| OD | Open Detonation |
| RCRA | Resource Conservation and Recovery Act |

**INTRODUCTION**

World War II left unexploded ordnance (such as tear gas, ammunitions, propellants, and explosive materials) on Guam that may still be dangerous, and other expired munitions are present as well.  For decades, the Air Force has operated an open burn/open detonation (OB/OD) facility (Facility) at Andersen Air Force Base (AAFB) on Guam to render unserviceable ordnance harmless, to train personnel in explosive ordnance disposal, and for emergency purposes.  AAFB has long had a Resource Conservation and Recovery Act (RCRA) permit to treat hazardous waste at this Facility.  The Guam Environmental Protection Agency (Guam EPA) administers the RCRA permitting process and reviews permits every three years as part of its renewal process.  In May 2021, AAFB applied for the renewal of its RCRA permit (Application).  Guam EPA has not made a decision on the Application.

Plaintiff Prutehi Litekyan sued the Department of Defense, the Air Force, and the Secretaries thereof, alleging that AAFB violated the National Environmental Policy Act (NEPA) by not preparing a NEPA analysis before submitting the Application to Guam EPA.  The district court dismissed the complaint for lack of jurisdiction because Plaintiff identified no "final agency action" of Defendants reviewable under the Administrative Procedure Act (APA). 5 U.S.C. § 704.

1

Plaintiff now attempts to recharacterize its complaint and relies on facts not alleged therein to avoid the lack of final agency action, but the Court should reject this attempt to swerve. Plaintiff also failed to establish standing or a ripe claim.

In addition, the district court correctly concluded that Plaintiff failed to state a claim because NEPA does not apply to the RCRA permitting process, as held in *State of Alabama ex rel. Siegelman v. EPA*, 911 F.2d 499, 505 (11th Cir. 1990). RCRA specifically addresses environmental concerns and public involvement in the context of permitting hazardous waste facilities. RCRA required Defendants to "engage[] primarily in an examination of environmental questions" and "mandates specific procedures for considering the environment that are functional equivalents of the" NEPA process. ER-15 (quoting *Siegelman*, 911 F.2d at 504). The U.S. Environmental Protection Agency's (EPA's) RCRA regulations have long provided that "all RCRA" permits are not subject to the relevant NEPA provision, 40 C.F.R. § 124.9(b)(6), and Congress has acquiesced in that interpretation by repeatedly revising the statute without changing it. Thus, if this dispute is justiciable, this Court should reject Plaintiff's attempt to add a duplicative NEPA overlay to RCRA's detailed system of environmental review.

## STATEMENT OF JURISDICTION

(a)     The district court lacked subject matter jurisdiction because Plaintiff did not challenge final agency action as necessary for jurisdiction under the APA. 5 U.S.C. § 704.  In addition, Plaintiff lacks standing and its claim is not ripe.

(b)     The district court's judgment was final because it disposed of all claims against all defendants.  ER-4-17.  This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     The judgment was entered on October 6, 2022.  ER-4.  Plaintiff filed its notice of appeal 12 days later, on October 18.  ER-116.  The appeal is timely. Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether AAFB's Application for a RCRA permit is a final agency action.

2.     Whether Plaintiff has standing to challenge the Application, and whether that challenge is ripe.

3.     Whether NEPA applies when a federal agency applies for a RCRA permit.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are in the Addenda following the Opening Brief or this Brief.

3

## STATEMENT OF THE CASE

**A.    Statutory and regulatory background**

**1.    RCRA**

"RCRA is a comprehensive environmental statute that empowers EPA to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management procedures of Subtitle C, 42 U.S.C. §§ 6921-6934." *City of Chicago v. EDF*, 511 U.S. 328, 331 (1994). RCRA requires any facility that treats, stores, or disposes of hazardous waste to obtain a permit. 42 U.S.C. § 6925. EPA establishes "performance standards" applicable to these facilities "as may be necessary to protect human health and the environment." *Id.* § 6924(a). RCRA authorizes EPA or an authorized state to issue a permit only upon determining that the facility complies with those standards, and each permit "shall contain such terms and conditions as [EPA] (or the State) determines necessary to protect human health and the environment." *Id.* § 6925(c)(1), (3). EPA has also promulgated detailed regulations for the permitting of "miscellaneous units," including "units for open burning or open detonation of waste explosives." 52 Fed. Reg. 46,946-01, 46,952 (Dec. 10, 1987); *see also* 1-SER-225.

RCRA provides that a state may administer a hazardous waste program, including permitting, "in lieu of the Federal program" if EPA authorizes the state's

4

program upon finding, among other things, that it "is … equivalent to the Federal program." 42 U.S.C. § 6926(b). A state's regulations must be at least as stringent as federal law. *Id.* § 6929. EPA authorized Guam EPA's hazardous waste program in January 1986. 51 Fed. Reg. 1370 (Jan. 13, 1986); *see also* 54 Fed. Reg. 21,953 (May 22, 1989). With limited exceptions, Guam EPA has incorporated EPA's permitting regulations as effective in 1991 into its own regulations. *See* Guam Hazardous Waste Management Regulations VOL.1, *available at* http://epa.guam.gov/rules-regs/regulations/.[1]

Guam EPA's regulations ensure that permittees must reapply for permits every three years. *See* 22 Guam R. & Regs. 6-§ 30109(m); 40 C.F.R. § 270.30(b) (1991). Federal agencies comply with state permitting programs. *See* 42 U.S.C. § 6961(a). The RCRA permitting process requires the development and consideration of extensive environmental information, as well as the disclosure of information to the public and an opportunity for public comment. *See, e.g.*, 40 C.F.R. Parts 124, 260-270; 42 U.S.C. § 6974.

## 2. NEPA

"NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

---

[1] For ease of reference, we cite to EPA's regulations at 40 C.F.R. Part 270 (1991) except when Guam EPA's regulatory language differs.

350 (1989).  NEPA's "twin aims" are to ensure agencies consider the environmental impacts of their proposed actions and inform the public of that consideration.  *Baltimore Gas & Elec. Co. v NRDC*, 462 U.S. 87, 97 (1983).

NEPA requires that federal agencies prepare an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Not every major federal action requires an EIS, and an agency may prepare "a more limited document, an Environmental Assessment," to determine whether to prepare an EIS.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).  Agencies may also "classify particular activities that generally do not significantly impact the environment as categorical exclusions," typically not requiring an EIS or Environmental Assessment.  *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1166 (9th Cir. 2022).

NEPA established the Council of Environmental Quality (CEQ), which has promulgated regulations interpreting NEPA.  CEQ recently amended those regulations twice.  85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (May 20, 2022).  Plaintiff contends that the applicable CEQ regulations are from 2021, when Defendants submitted the Application.  Opening Br. 6 n.1.  Since no other federal document could be the subject of this suit, Defendants assume that version of the regulations would apply if NEPA applied.  This Brief cites solely the CEQ regulations at 40 C.F.R. Part 1500 (2021).

6

### B.  Factual background

AAFB, located in the northern portion of Guam, is one of the largest U.S. Air Force airfields.  The Navy provides administrative support for AAFB, including ensuring compliance with environmental laws and regulations.

### 1.  AAFB's treatment of waste ordnance

AAFB has engaged in OB/OD of waste ordnance/munitions materials at the Explosive Ordnance Disposal (EOD) range for decades, since at least 1980, and the area has "been in constant use since its inception."  1-SER-9, 33.  "Its mission is to render unserviceable ordnance and other pyrotechnic devices harmless by either suppressed detonation or open burning.  In addition, the EOD range has been used for EOD training purposes and emergency purposes."  1-SER-33, 150.

Under the RCRA permit, AAFB may treat hazardous wastes that "consist of common military ordnance material (such as black powder, white/red phosphorus, tear gas, ammunitions, propellants, and explosive materials)."  1-SER-34.  The permit specifies processes and environmental performance standards for operations.  1-SER-224-39.  Because of the explosive nature of the materials, "human health and safety is the overriding concern."  1-SER-137.  While AAFB has a permit for both OB and OD operations, OB operations have been inactive for decades, and AAFB currently only performs OD operations.  ER-108.  Generally, OD operations require carefully placing the ordnance/munitions in the pit—along

7

with an explosive charge to detonate the materials (if required) and an igniter to initiate the detonator—and then initiating the detonation from a bunker. 1-SER-33.

The EOD range is isolated, located at the extreme eastern reach of Tarague Beach, bounded by the Pacific Ocean to the north and the jungle and limestone to the east, south, and west. 1-SER-33; *see also* 1-SER-152, 217-23 (maps and pictures); 1-SER-176 (map of Guam and range). Surrounding the active treatment area is a 2,400 foot-radius safety zone. 1-SER-33. On top of the security provided by fencing, gates, guards, and signs, several features contribute to safety. 1-SER-119. As for the Pacific Ocean, the area is encircled by a continuous reef around 200 feet offshore, so neither boats nor swimmers can approach the area. 1-SER-120. On the other three sides, the range is "totally enclosed" by AAFB, and the "nearest public or private property is several miles off base." 1-SER-120. Because of the isolation, "[h]uman receptors are limited to EOD personnel." 2-SER-294.

### 2. AAFB's RCRA permit and Application

AAFB first received a RCRA permit for operations at this Facility in 1982. ER-108. Consistent with Guam EPA's regulations, AAFB has applied to renew its permit every three years, and Guam EPA has renewed the permit. ER-108. In May 2021, AAFB applied to renew the RCRA permit. The Application (including the requested permit), which runs over 350 pages, requests a permit much like the 2018 permit that currently governs operations at the Facility. *Compare* 1-SER-2 to

8

2-SER-355, *with* 2-SER-359 to 3-SER-713. Both the 2018 permit and Application thoroughly consider environmental information and impose requirements for protecting human health and the environment, consistent with RCRA. For ease of reference and because Plaintiff challenges the Application, this Brief primarily discusses the Application, but the 2018 permit includes all the same requirements envisioned by the Application, and AAFB complies with them.

For instance, the Application extensively considers and addresses potential contamination and residues. 1-SER-35, 240-54. The Application sets maximum amounts of metals and sulfur that can be treated per event. 1-SER-108. It includes a residue management plan requiring the management of "all residues on the EOD range," including ash, unexploded ordnance, metal fragments, and miscellaneous materials. 1-SER-242, 240-53. "Any ash or secondary source of contamination due to OD airborne contaminants, which come to rest on the ground surface, will be … disposed of." 1-SER-251; *see also* 1-SER-224-39. Personnel inspect the area both before and after operations "to detect any unexploded ordnance, metal fragments, and/or other discharges that could affect human health or the environment," 1-SER-123, and they collect and manage any such materials within an hour of an OD operation, 1-SER-234, 236, 250-51. Once per quarter, personnel inspect the beach, the reef, and the area between the two. 1-SER-235. AAFB must also notify Guam EPA of "any release of hazardous waste or hazardous

9

constituents that has the potential to migrate off-site" within 24 hours of discovery. 1-SER-57.

The Application also includes a detailed closure and post-closure plan developed in the 1990s. 1-SER-36, 149-215. Based on previous studies and experiences with similar operations, the plan aims to achieve clean closure through soil removal and decontamination, consistent with health-based criteria. 1-SER-151, 153. This process will include multiple sweeps of the beach and ocean for metallic debris or unexploded ordnance, 1-SER-157-58, and extensive sampling of the land, surface water, and ocean for contamination, 1-SER-168-214.

The Application includes a longstanding "groundwater monitoring program" to detect "any release of hazardous waste" to the groundwater and directs that if such a release were detected, AAFB would submit "plans for corrective actions." 2-SER-292, 285-354. AAFB continues to monitor the groundwater and reports the results of that monitoring in detail to Guam EPA semiannually. 2-SER-307. AAFB must also report to Guam EPA about any "release of any hazardous waste that may cause an endangerment to public drinking water supplies" within 8 hours of becoming aware of it. 1-SER-23. And the groundwater in this area likely is "brackish" and flows in a direction "that eventually discharges into the Pacific Ocean." 2-SER-294, 299.

The Application contains a biological mitigation plan that addresses wildlife including green sea turtles and migratory birds. 2-SER-278-81. That plan explains that AAFB entered a cooperative management agreement in 1994 and consulted with the U.S. Fish and Wildlife Service in 2004 for this action. 2-SER-280. AAFB must engage in visual surveys before operations, must "tailor" the operations to avoid shocks to green turtles' nests, and must deter migratory birds from entering the area during operations. 2-SER-279-81. By using bull horns or other devices, personnel will deter birds from entering the area during blast activities and "[n]o birds will be harmed." 2-SER-280. Several documents in the Application also discuss measures to avoid potentially impacting cultural resources, such as not digging too deep nor driving on the beach to the extent practicable, and one cites the Final Integrated Cultural Resource Management Plan for AAFB. 1-SER-179, 188, 2-SER-265, 309.

Finally, the Application discusses potential alternatives to the processes currently used. 1-SER-225-26. It explains that these types of explosives have historically been treated by these processes as they are "the most appropriate from a health and safety standpoint," particularly since "[m]any types of military ordnances are designed so that they cannot be easily and safely disassembled." 1-SER-225. "The effectiveness of other forms of treatment of waste energetic material is for the most part, unknown." 1-SER-225. While the military has

11

researched alternatives, it concluded that "most are still years away from being a viable alternative," and some that show promise "are only applicable to a small subset of the total universe of wastes" present at AAFB.  1-SER-225; 1-SER-233 (explaining that concerns about alternatives were even stronger in context of OD).  OB/OD operations are "very safe for waste handlers," and "one of the key limitations to implementing alternative technologies is that the quality of worker safety provisions is not verified."  1-SER-225-26.

### 3.    Guam EPA's ongoing processing of the Application

Guam EPA received the Application and had a forty-five-day public comment period on the draft permit, including at least one public hearing.  *See* Guam EPA, Notice of 45-Day Public Comment Period & Public Hearing, http://epa.guam.gov/wp-content/uploads/2021/08/ODOD-NEWPAPER-PRINT.pdf; https://notices.guam.gov/notice_detail/324; *see, e.g.*, 42 U.S.C. § 6974(b).  Plaintiff may not have used this comment opportunity; it sent a letter to Guam EPA *after* the comment period closed.  ER-96.  In October 2021, Guam EPA wrote AAFB stating that it had not decided about renewal yet, explaining that it had "received significant comments" that it needed to address.  3-SER-714.  Guam EPA explained that under its regulations, the "terms and conditions" of the 2018 permit continued in force until it acted on the Application.  3-SER-714.

12

### C.    Proceedings below

In 2022, Plaintiff filed a complaint alleging a single claim that Defendants violated NEPA by submitting the RCRA permit Application without preparing a separate NEPA analysis.  ER-112.  Defendants moved to dismiss under Rule 12(b)(1) and (6).  Chief Judge Tydingco-Gatewood granted the motion.  ER-5-17.

The district court first ruled that it lacked jurisdiction.  The court held that Plaintiff had not identified "final agency action" under the APA because "Guam EPA has not yet acted on the application to renew," and AAFB's Application for renewal of the permit had not "altered" the rights of the parties.  ER-10.  The court concluded that Plaintiff's challenge was not ripe as a result.  ER-10.  And the court held that Plaintiff had failed to establish standing because any alleged "injury in fact" from the "continued operation of the facility" "does not come from the submission of the application—the very action that is being challenged."  ER-9.

In an alternative holding, the court ruled that Plaintiff failed to state a claim. ER-11.  The court held that RCRA is the "functional equivalent" of NEPA and thus NEPA does not apply in this case.  ER-12-17.  "The Ninth Circuit is in line with other circuits that a [NEPA] exemption is likely when the exempt statute is designed to protect the environment."  ER-14.  The court cited the Eleventh Circuit's holding in *Siegelman* that NEPA does not apply to the RCRA permitting process.  ER-15.  The court adopted *Siegelman*'s reasoning that "specific statutes

prevail over general statutes," and here RCRA is the specific statute addressing hazardous waste facilities. ER-15; *see also* ER-16. "[A]n agency need not comply with NEPA where the agency is engaged primarily in an examination of environmental questions and where the agency's organic legislation mandates specific procedures for considering the environment that are functional equivalents of the impact statement process." ER-15 (quoting *Siegelman*, 911 F.2d at 504). In addition, the court relied on EPA's longstanding regulation providing that "all RCRA permits … are not subject to the [EIS] provisions of … [NEPA]." ER-15 (quoting *Siegelman*, 911 F.2d at 502 n.6) (quoting 40 C.F.R. § 124.9(b)(6)). The court ended by noting that "[o]ther than a brief discussion in a footnote, Plaintiff mostly ignores Defendants' argument." ER-17.

## SUMMARY OF ARGUMENT

Before addressing the issues on appeal, Defendants clarify two things. First, Defendants decided to operate and to continue operating this Facility at least three decades ago. Any challenge to the earlier decisions to operate this Facility would be time-barred by the statute of limitations. Plaintiff's complaint attempts but fails to circumvent that bar. Second, Plaintiff's arguments have been a moving target, sometimes appearing to challenge the Application and sometimes insisting that it is *not* challenging the Application. Plaintiff challenges either the Application or

nothing; the complaint lacks the factual allegations necessary to challenge anything else.

1.      Plaintiff does not challenge final agency action as necessary for jurisdiction under the APA.  The Application is not a final agency action.  An application to renew a permit is not analogous to any of the terms falling within the ambit of the APA's definition of "agency action."  The Application *initiates* a decisionmaking process, it does not "mark the consummation" of such a process, as necessary for finality.  This Court has repeatedly held that preliminary or interim steps in a permitting process are not themselves final agency action.  The Application also does not determine rights or obligations; Defendants are now operating the Facility under the 2018 permit, not under the Application.  While Guam EPA's (longstanding and unchallenged) regulations maintain the status quo pending the agency's administrative process reviewing the Application, these types of practical consequences necessary to accommodate an administrative process are not legal consequences establishing finality.  Plaintiff also cannot sidestep the strict jurisdictional limits on challenging RCRA permits by challenging a preliminary step in the permitting process.

Plaintiff insists it is not challenging the Application itself.  Plaintiff now characterizes the challenged final agency action as the "decision … to conduct OB/OD at Tarague Beach."  Opening Br. 33, 35.  But Plaintiff does not identify

any document or allege any facts that Defendants made that decision—separate from applying to renew the RCRA permit—within the six-year statute of limitations. Ongoing implementation of an earlier decision and the resulting day-to-day activities are not reviewable agency actions. And Plaintiff's arguments that the absence of a NEPA process effectively is final agency action are foreclosed by precedent.

  2. Plaintiff also has not shown standing or that its claim is ripe. Only some of Plaintiff's alleged injuries could sustain Article III jurisdiction, and those alleged injuries flow from Defendants' operation of the Facility. But Plaintiff does not challenge any identifiable decision to operate the Facility. As for RCRA, Guam EPA issued the 2018 permit that currently governs the operation of the Facility, but Plaintiff does not challenge that permit, and Guam EPA is not a party to this suit. Under these circumstances, Plaintiff's challenge is not justiciable. Plaintiff's complaint has not established that any harm is directly traceable to the Application because, regardless of the Application, Defendants engage in many of these operations under other authorities. It is also speculative whether the requested relief—that Defendants withdraw the Application—would redress Plaintiff's alleged injuries. Plaintiff has pointed to nothing showing how Guam EPA would interpret a request to withdraw the Application or its effect on the currently governing 2018 permit. And allowing Plaintiff's suit would implicate a

core concern addressed by the ripeness doctrine—the proper relationship between the judiciary and other branches of the government.

3. Alternatively, the district court correctly ruled that NEPA does not apply to RCRA's permitting processes for hazardous waste facilities—whether one uses the language of "functional equivalence" or "displacement." Many Circuits, including this one, have held that when an agency proceeds under certain complex statutes already addressing environmental issues in specific terms, the agency need not comply with NEPA, even in the absence of an explicit statutory exemption. RCRA specifically addresses the precise issue here—the safe treatment of hazardous materials and the processes that are required to ensure that result. RCRA is comprehensive in its field of application and includes substantive and procedural standards that ensure agencies fully consider, assisted by meaningful public comment, environmental issues involved in the permitting process. RCRA thus fulfills NEPA's two purposes of considering environmental impacts and informing the public. The RCRA scheme comprehensively addresses *what* environmental information should be considered and *how* to assess it when deciding on a permit application. To the limited extent RCRA's processes and NEPA's processes differ, the more specific statute governs. Indeed, applying NEPA to RCRA's detailed and comprehensive permitting process would undercut

the delicate machinery that Congress designed in RCRA and the compromises made to address hazardous waste.

A careful examination of RCRA's text and history confirms that NEPA does not apply to RCRA permitting processes. When Congress enacted RCRA, it expressly addressed how RCRA and other statutes would interact and directed EPA to integrate RCRA with the administration of several other statutes, but not NEPA. Moreover, after Congress passed RCRA in 1976, EPA codified regulations providing that "all RCRA … permits are not subject to the [EIS] provisions of [§ 4332(2)(C)] of [NEPA]." 45 Fed. Reg. 33,290-01, 33,488 (May 19, 1980); 40 C.F.R. § 124.9(b)(6). Since EPA codified that interpretation, Congress revisited RCRA multiple times, but it has never disagreed with EPA's interpretation or precedent adopting that interpretation. Congress is presumed to be aware of settled administrative and judicial interpretations of a statute, and its re-enactment of a statute without change ratified that interpretation here. Plaintiff's arguments that NEPA applies here are unpersuasive and inconsistent with many precedents.

## STANDARD OF REVIEW

This Court "review[s] dismissals under Rules 12(b)(1) and 12(b)(6) de novo." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021). This Court "may affirm the dismissal on any ground supported by the record," including any of the jurisdictional or merits grounds

discussed herein. *United States v. Washington*, 573 F.3d 701, 706 (9th Cir. 2009); *see also In re Westgate-California Corp.*, 642 F.2d 1174, 1176-77 (9th Cir. 1981) (explaining that when court rests judgment alternatively upon two or more grounds, relitigating either is precluded).

## ARGUMENT

**I.** **The complaint either challenges the Application or is time-barred.**

**A.** **Any challenge to the earlier decisions to operate this Facility would be time-barred.**

NEPA challenges brought under the APA are generally governed by the six-year statute of limitations set forth in 28 U.S.C. § 2401(a). *Sierra Club v. Penfold*, 857 F.2d 1307, 1315-16 (9th Cir. 1988). Plaintiff has crafted its complaint to try to circumvent this time-bar, but examining the factual background and a careful reading of the complaint help explain why Plaintiff cannot identify final agency action giving rise to a justiciable controversy.

AAFB has operated the Facility for over four decades. As Plaintiff's complaint concedes: AAFB "first received a Hazardous Waste Management Facility Permit for its OB/OD operations at the EOD Range in 1982." ER-108. AAFB has renewed the permit every three years as required by Guam's regulations. ER-108. Since at least the 1993 permit, the permit has included a closure and post-closure plan. *See* 1-SER-163 (explaining that this plan was submitted 50 years prior to 2043); 1-SER-173 (plan was prepared in mid-1990s).

19

In that closure plan, AAFB stated that: "the OB/OD units will be operated until the Air Force Base ceases operation." 1-SER-154; 1-SER-163 ("It is assumed that the EOD Range will be required to operate as long as ordnance are maintained at Andersen AFB. It is expected that ordnance will be maintained until the base is closed."). Thus, Defendants decided both to operate and to *continue operating* this Facility three decades ago, and any challenge to those decisions is time-barred. *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006). Defendants regularly renew the RCRA permit, but that does not mean Defendants revisited the decision to operate the Facility each time. Defendants did not.

Furthermore, in 2015, the Navy prepared an EIS analyzing the environmental impacts of training and testing in the Mariana Islands area. The EIS depicts AAFB and its EOD range. 2015 EIS at 2-15.[2] The EIS considered land demolitions of ordnance as part of its alternatives analysis, including alternatives that assessed 36 events of "unexploded ordnance and neutralization" at "Air Force Disposal Sites. (Guam)"—i.e., the activities at the Facility at AAFB. 2015 EIS at 2-86; 2015 EIS at 3.6-47 ("Explosive ordnance demolitions also occur on land… These activities occur at [AAFB]."), 3.10-54. The government published a Record

---

[2]     The 2015 EIS is available at https://mitt-eis.com/Documents/2015-Mariana-Islands-Training-and-Testing-EIS-OEIS-Documents/Final-EIS-OEIS. Citations to "2015 EIS" are to the documents available at this hyperlink. Both parties cited this EIS in district court, and this Court can take judicial notice of an EIS.

of Decision selecting an alternative, including those activities at AAFB, in 2015 and published notice of that selection in the Federal Register. 80 Fed. Reg. 46,252-01 (August 2015). Any challenge to that decision would also be time-barred because Plaintiff did not file its complaint until 2022.

### B. The Application is the sole agency document challenged in the complaint.

Throughout its Brief, Plaintiff contends that it challenges "Defendants' decision to conduct OB/OD operations,"[3] Opening Br. 4, and, when convenient, Plaintiff distinguishes this invented "decision" from the application for a RCRA permit renewal. *See, e.g.*, Opening Br. 39 ("This lawsuit challenges Defendants' failure to comply with NEPA before making the decision …. [Plaintiff] does not challenge any permitting decision under RCRA."). But this approach fundamentally mischaracterizes the facts and the complaint. Factually, as explained *supra* at pp. 19-21, Defendants decided to operate this Facility several decades ago, and no allegation in the complaint or evidence in the record suggests that Defendants reopened that issue and made a new decision within the six-year statute of limitations. Instead, the complaint challenges Defendants' Application under RCRA. For this reason, the district court correctly analyzed *that* claim, not

---

[3]     As explained *infra* at Part II.A.2, ongoing conduct and day-to-day operations implementing prior decisions are not final agency action.

the one presented by Plaintiff on appeal. *See, e.g.*, ER-9 ("[T]he submission of the application—the very action that is being challenged here."); ER-10.

In the complaint, Plaintiff identified the "decision to submit an application on May 17, 2021, seeking a three-year renewal of the … Permit" as the "major federal action" under NEPA, an element of its NEPA claim. ER-112 (Compl. ¶ 60). It identified no other "major federal action" allegedly requiring NEPA compliance. The complaint repeatedly characterized the violation as submitting the application without preparing a NEPA analysis. ER-93, 111-13 (Compl. ¶¶ 2, 56-57, 61-63). As for Defendants' documents, the complaint cites solely the Application and the original permit from 1982, no other document that could represent the challenged "major federal action" under NEPA or final agency action under the APA.

While these facts might be consistent with Defendants having revisited the question of operating the Facility and making a new decision, they are also completely consistent with the "obvious alternative explanation" for Defendants' behavior: continuing to implement the earlier decisions to operate the Facility and continuing the status quo. *See Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). These allegations are plainly not sufficient to plead that Defendants made a separate, reviewable decision to operate the Facility; they simply establish that Defendants submitted the Application.

Plaintiff's complaint lacks the factual allegations necessary to challenge any supposed "decision" independent from the Application (which does not exist). And as explained *infra* at p. 61 n.10, Plaintiff has waived any right to seek leave to amend. Defendants did not make a new decision; they simply continued to implement a longstanding one.

In its Opening Brief, Plaintiff has radically recharacterized its argument, attempting to recast its suit as a challenge to a decision that does not exist rather than the Application. Plaintiff never identifies any factual allegations suggesting that Defendants made a recent decision to operate the Facility separate from the Application. Plaintiff cites to Guam EPA's regulations to try to establish that Defendants made such a decision, but the regulation (and existing permit) does not require a new decision. Opening Br. 10-11. Instead, they direct a permittee "to reapply … [i]f the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit." 40 C.F.R. § 270.30(b) (1991); ER-37. That language does not (and cannot) require Defendants to revisit and reopen the original decision to operate the Facility. And Plaintiff's Brief unintentionally reveals that it must be challenging the Application, or nothing. For example, Plaintiff states that the "application" "memorialized Defendants' final decision" (Opening Br. 35) and relies on the date of the Application to determine which NEPA regulations allegedly applied (Opening Br. 6 n.1).

**II.  The district court correctly ruled that it lacked jurisdiction over Plaintiff's claim.**

**A.  Plaintiff does not challenge final agency action.**

The APA grants "jurisdiction to review only '[a]gency action made reviewable by statute and final agency action.'"  *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 416 (9th Cir. 2023) (quoting 5 U.S.C. § 704).  NEPA does not provide for judicial review, so Plaintiff must challenge final agency action to establish jurisdiction.  *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) ("Absent final agency action, there was no jurisdiction … to review the NEPA claim.").

"The APA defines reviewable 'agency action' to include 'the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'"  *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (quoting 5 U.S.C. § 551(13)).  "While this definition is 'expansive,' federal courts 'have long recognized that the term agency action is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.'"  *Id.* at 800-01 (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).  To qualify as "final," the agency action challenged must "mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations

have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

### 1.     The Application is not final agency action.

The only recent federal document that Plaintiff identifies in its complaint is AAFB's Application to renew its RCRA permit, but this Application is not final agency action.  Indeed, in the district court briefing, Plaintiff repeatedly insisted that it is not challenging the Application: "[T]he challenged action is not the RCRA application itself."  3-SER-718; *see also* 3-SER-718 ("The complaint does not … challenge the application itself.").  And on appeal, when convenient, Plaintiff appears to disavow challenging the RCRA Application.  Opening Br. 39 ("[Plaintiff] does not challenge any permitting decision under RCRA.").  A party "is bound by concessions made in its brief," *Hilao v. Est. of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004), so Plaintiff cannot now assert that the Application is itself the challenged final agency action.

Moreover, an application to renew a permit is neither "agency action" nor "final."  An application to renew a permit is not "fairly analogous" to any of the terms falling "within the ambit of § 551(13)."  *Wild Fish*, 730 F.3d at 801.  An application for a permit renewal is a request for *another* entity—here, a non-federal entity—to issue an "order" or "license," but it is not itself an order or license.  An "order" is "a *final* disposition, whether affirmative, negative, injunctive, or

declaratory" and a "license" includes "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(6), (8) (emphasis added). An application for renewal of a permit does not finally dispose of a matter; it requests permission, it does not grant it. And an application bears no similarity to the other terms within the ambit of "agency action." 5 U.S.C. § 551(13). It is not a "rule," "sanction," "relief, or the equivalent or denial thereof, or a failure to act." *Id.*; *see also Norton v. Southern Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004). Plaintiff has identified no precedent finding an application for a permit is final agency action.

An application for a permit initiates a decisionmaking process, it does not "mark the consummation" of such a process. *Bennett*, 520 U.S. at 177-78; *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (finding agency decision was "merely the beginning of the decision-making process" when another agency had to act on it). Requesting action by another agency is plainly of a "tentative or interlocutory nature," *Bennett*, 520 U.S. at 178, because, as here, the legal effect depends on the other agency's actions with respect to the application. Agency activities that initiate an administrative process are not final agency action, even if they have practical consequences. *See, e.g.*, *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980) (finding agency's

issuance of complaint was not final agency action even though it imposed a "substantial" "burden" on plaintiff).

As for permits, preliminary or interim steps in a permitting process are not themselves final agency action. *See, e.g.*, *City of San Diego v. Whitman*, 242 F.3d 1097, 1098 (9th Cir. 2001) (holding letter setting forth agency's legal position about renewal of permit was not final agency action and review would be available upon final decision on permit); *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1093 (9th Cir. 2014) (holding agency recommendation to another agency on permit not final); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952-53 (9th Cir. 2017) (finding report was not final agency action even though it "clear[ed] the way" for permits); 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling … is subject to review on the review of the final agency action."). An application initiating a permitting process is even less final than the preliminary and interim steps that this Court has regularly found unreviewable.

The Application also does not determine rights or obligations. Defendants are now operating the Facility under the 2018 permit, not under the Application. As Guam EPA has explained, if a permittee submits a timely and complete renewal application (as here), the "terms and conditions" of the *previously* issued permit "continue[] in force" until Guam EPA grants or denies the application. 3-SER-

27

714. Thus, it is the 2018 permit that establishes Defendants' rights and obligations, not the Application. While the regulation maintains the status quo pending Guam EPA's administrative process reviewing the Application, these types of practical consequences necessary to accommodate an administrative process are not legal consequences under *Bennett*'s second prong. *Cf. Indus. Customers*, 408 F.3d at 647; *Standard Oil*, 449 U.S. at 242. The APA has a similar provision providing that when a "licensee has made timely and sufficient application for a renewal," then "a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." 5 U.S.C. § 558(c). Despite that consequence of an "application," "applications" are not within the APA's definition of "agency action," but rather it defines "agency action" to include various *final dispositions* on applications. *See* 5 U.S.C. § 551(13), (11)(C), (6), (8). In any event, these consequences flow from Guam EPA's regulation governing the RCRA permitting regime.

The alleged facts also undermine Plaintiff's suggestion that an application for renewal changes the status quo. AAFB has operated this Facility for decades and long ago stated that it would continue operating this Facility until closure of AAFB. And Plaintiff concedes that Guam EPA has approved permit renewals every three years for decades and "open detonation has been occurring under each permit renewal." ER-108. Ongoing operations are thus the status quo.

Furthermore, Plaintiff's challenge to the Application tries to sidestep the jurisdictional limits on review of RCRA permits, including limits on collateral attacks on permit decisions. *See, e.g.*, *Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dep't of the Army*, 111 F.3d 1485, 1492 (10th Cir. 1997); *Greenpeace, Inc. v. Waste Techs. Indus.*, 9 F.3d 1174, 1178, 1181 (6th Cir. 1993). "[RCRA] does not allow collateral attacks on [EPA] permit decisions or those of state agencies with federally-delegated authority." *CWWG*, 111 F.3d at 1492 (10th Cir. 1997) (citing 42 U.S.C. § 6976(b)). Plaintiff cannot evade the limitations on judicial review of RCRA permits by attempting to challenge a preliminary document in that process.

### 2. Defendants did not take an identifiable final agency action within the last six years, and day-to-day conduct and operations are not final agency action.

Plaintiff characterizes the challenged final agency action as the "decision … to conduct OB/OD at Tarague Beach," Opening Br. 33, 35, but Plaintiff does not identify any document or plead any facts demonstrating that Defendants made that decision within the six-year statute of limitations. As explained above, decades ago Defendants decided to operate the Facility as long as AAFB remained open, and there is no evidence or factual allegation that they revisited that question recently. When an agency continues to implement a consistent position, it does not take new final agency action subject to review. *Cf. Indep. Equip. Dealers Ass'n v.*

29

*EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) ("Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated.") (Roberts, J.).[4]

There is no "final agency action" when a plaintiff "does not identify any document setting forth" the alleged decision, because in those circumstances "there is no 'underlying agency action' in the record … for us to review." *Wild Fish*, 730 F.3d at 802. This Court has repeatedly rejected APA challenges when, as here, a plaintiff fails to identify a "particular agency action or administrative record for the court to review." *City of Las Vegas, Nevada v. Clark Cnty., Nevada*, 755 F.2d 697, 704 (9th Cir. 1984); *see also, e.g.*, *Flathead Irrigation Dist. v. Zinke*, 725 F. App'x 507, 510 (9th Cir. 2018); *Nevada Ass'n of Ctys. v. DOI*, 686 F. App'x 407, 408 (9th Cir. 2017).

Plaintiff asserts that it meets *Bennett*'s first prong because Defendants "never stated an intent to revisit their decision" to operate the Facility. Opening Br. 35. But the record reveals that Defendants made those decisions years ago, not in the last six years. Plaintiff wishes that Defendants had revisited the decision and changed the status quo. But this Court has correctly rejected the argument that a

---

[4]    Consistent implementation of prior decisions also does not restart the statute of limitations. *See Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014).

"decision not to change the status quo is a final agency action challengeable under the APA" when the agency "never entered into the decisionmaking process because it never intended to consider a change of the status quo." *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135, 1136 (9th Cir. 1998).  A plaintiff cannot proceed when "there is no identifiable agency order, regulation, policy or plan that may be subject to challenge as a final agency action." *Id.* at 1136.  Since final agency action must "mark the 'consummation' of the agency's decisionmaking process," this "impl[ies] that a process of decisionmaking must be underway." *Id.* (citation omitted).  No allegation suggests Defendants began a decisionmaking process about operating the Facility in the six years before the complaint.

To the extent that Plaintiff challenges Defendants' implementation of decisions previously made or the ongoing operations at the Facility, Plaintiff "does not identify a discrete 'agency action' that fits within the APA's definition of that term." *Wild Fish*, 730 F.3d at 801 (citing 5 U.S.C. § 551(13); *SUWA*, 542 U.S. at 62-63).  While the ongoing operations may have "immediate physical consequences, such action is not fairly analogous to a 'rule, order, license, sanction, [or] relief.'" *Id.* (quoting 5 U.S.C. § 551(13)).  Activities continuing to implement prior decisions do not "'mark the consummation of the agency's decisionmaking process,' because they constitute day-to-day operations that

31

merely implement operational plans." *Id.* (quoting *Bennett*, 520 U.S. at 177-78).

"The APA's requirement of final agency action precludes our undertaking 'a general judicial review of the [agency's] day-to-day operations.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990)).

Under both prongs of the *Bennett* test, a plaintiff cannot establish final agency action by challenging an agency's implementation of earlier decisions, even when the agency's implementation has practical effects. *See, e.g.*, *id.*; *Eason Land Co., LLC v. DOI*, 703 F. App'x 498, 500 (9th Cir. 2017) ("The actions that an agency takes to implement a decision are not, themselves, agency actions."); *Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir.2003), *vacated on other grounds*, 542 U.S. 917 (2004) (holding agency's "routine maintenance work" is not final agency action because these activities "implement [the agency's] travel management and forest plans"); *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013) ("no final agency action" when plaintiff challenged how agency "generally operates" the project).

Plaintiff mischaracterizes this Court's precedents by asserting that final agency action includes any activity with a "'direct and immediate ... effect on the [Air Force's] day-to-day business." Opening Br. 27 (quoting *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (modification in Plaintiff's Brief)). Those cases actually state that an action has legal consequences

when it has a "'direct and immediate ... effect on the day-to-day *business' of the subject party*." *Oregon Nat. Desert*, 465 F.3d at 987 (emphasis added and citation omitted). In *Oregon Natural Desert*, the Court found final agency action because it concluded that the challenged documents were *not* "merely part of the [agency's] 'day-to-day operation,'" but imposed "substantive legal constraints" on the "permit holder"—not just the agency. *Id.* at 985 n.10, 990. As discussed above and by the Supreme Court in *Lujan*, not every activity with an effect on the day-to-day operations of an agency is reviewable final agency action. Indeed, such a broad interpretation of final agency action would essentially eliminate the requirement and allow plaintiffs to reorder agencies' priorities at their whim.

### 3. NEPA claims are subject to the final agency action requirement.

Plaintiff argues that when an agency does not prepare a NEPA analysis or offer a chance to comment, the *absence* of such an administrative process constitutes a reviewable final agency action. *See* Opening Br. 35-37. First, this argument is foreclosed by precedent. Even when a plaintiff alleges that an agency has "never undertaken the environmental assessments required by NEPA," this Court has found that a plaintiff still must identify specific final agency action for purposes of APA review—the lack of the NEPA analysis or opportunity to comment was not sufficient. *Whitewater Draw*, 5 F.4th at 1010; *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019). And in *Lujan*,

plaintiff alleged that the agency had "fail[ed] to provide required public notice" and "fail[ed] to provide adequate [EISs]," but the Supreme Court still held that plaintiff had failed to identify "a 'final agency action' within the meaning of § 704." 497 U.S. 871, 890-91. The "refusal to prepare an EIS is not itself a final agency action for purposes of APA review." *Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992).

Second, the alleged absence of a NEPA analysis or opportunity to comment meets neither prong of the *Bennett* test. Plaintiff's allegations indicate that the agency "never entered into the decisionmaking process," not that it consummated one. *ONRC Action*, 150 F.3d at 1135, 1136. And lack of a NEPA analysis or opportunity to comment does not establish any legal rights or obligations or have any concrete legal consequences. Indeed, courts regularly find no final agency action even when the agency's activities denied plaintiffs notice of a proposal and a desired comment period. *See, e.g.*, *Ctr. for Biological Diversity*, 58 F.4th at 420 (holding denial of petition to amend Recovery Plan was not final agency action even though granting petition would have provided opportunity for public comment); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (holding no final agency action even though plaintiffs alleged a lack of comment opportunity). Once again, Plaintiff's argument would

effectively eliminate the final agency action requirement codified in § 704 and allow plaintiffs to dictate agencies' priorities.

While this Circuit has sometimes suggested in dicta that the decision not to prepare an EIS is final agency action, in those cases the Court also identified final agency action separate from the NEPA analysis or lack thereof. *See, e.g.*, *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1318 (9th Cir. 1982) ("grant of funds and concurrent decision to exempt the project [from EIS requirement] together constituted final agency action"); *Rattlesnake Coal.*, 509 F.3d at 1099, 1104 (finding, in dicta, final agency action when agency had awarded five-million-dollar federal grant but not when agency had not yet made final decision on application); *Hall v. Norton*, 266 F.3d 969, 971, 975 n.5 (9th Cir. 2001) (decision not to prepare EIS in conjunction with decision to exchange land with developer is final agency action); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868-69 (9th Cir. 2022) (finding final NEPA documents were final agency action when 51 already-approved permits would not be revisited and Court found the NEPA documents lifted an existing "moratorium on well stimulation treatments"); *see also Citizens for Clean Energy v. DOI*, 384 F. Supp. 3d 1264, 1280 (D. Mont. 2019) (finding Secretarial Order that lifted "moratorium" and subjected all BLM land to coal leasing without preparing NEPA analysis was final agency action).

Finally, Plaintiff has only argued that it challenges final agency action reviewable under 5 U.S.C. § 706(2), not that the failure to conduct a NEPA analysis is an agency action unlawfully withheld under 5 U.S.C. § 706(1). Plaintiff has never cited § 706(1), the precedent relevant to a "failure to act" claim, nor the relevant test: that an "agency failed to take a *discrete* agency action that it is *required to take*"—i.e., a "specific legislative command." *See, e.g.*, *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930-33 (9th Cir. 2010) (citation omitted). Plaintiff has therefore forfeited any such argument. *See, e.g.*, *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1135 n.12 (9th Cir. 2021) (finding argument forfeited when party merely "gestured" at it and did not raise issues "specifically and distinctly"). In any event, Plaintiff cannot rely on § 706(1)'s inaction provision to circumvent the APA's finality requirement or the statute of limitations. *See, e.g.*, *Hells Canyon*, 593 F.3d at 933-34; *Whitewater Draw*, 5 F.4th at 1011 n.6 (finding plaintiffs cannot "avoid the requirement of identifying a discrete agency action by arguing that they 'simply seek to compel'" NEPA analysis).

\*      \*      \*      \*      \*

Because the district court correctly ruled that Plaintiff did not challenge final agency action as necessary for jurisdiction under the APA, this Court need go no further to affirm the district court's judgment.

### B.     Plaintiff does not have standing and its challenge to the Application is not ripe.

Under Article III of the Constitution, a plaintiff must demonstrate standing and that its claim is ripe.  *See, e.g.*, *Montana Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014).  In *Stone-Manning*, this Court explained that "[r]ipeness and standing are closely related," and in this context, "[r]egardless of whether we use the verbal formulations developed for standing or the ones developed for ripeness, our analysis is materially unchanged."  *Id.* at 1188-89.  As explained below, *Stone-Manning* is on-point: this Court found a lack of standing and ripeness when a plaintiff challenged the failure to prepare an allegedly required environmental analysis for a permit pending before, but not yet granted by, a state agency.  *Id.* at 1188-90.  As in *Stone-Manning*, Plaintiff here lacks standing, and its claim is not ripe.

To establish standing, a plaintiff must show: (1) it has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant, not an independent third party not before the court; and (3) it is likely, rather than merely speculative, that the injury will be redressed by a favorable decision.  *See*

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* at 562.

Plaintiff relies on "procedural injury" cases to contend that causation and redressability are "relaxed." Opening Br. 22. But this Court has "recognized that [its] analysis of Article III standing is 'not fundamentally changed' by the fact that a petitioner asserts a 'procedural,' rather than a 'substantive' injury." *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006) (citation omitted). Procedural injuries only relax the showing about the relationship between the procedure and the defendant agency's actions, they do not relax causation and redressability for the effects of that action or the likely response of a third party to those effects. Thus, a "procedural right" "can loosen the strictures of the redressability prong" for whether plaintiffs would be "successful in persuading" the agency to make a different decision. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). But where the challenged activity does not cause the injury or there is a third party (as here), plaintiffs still must "show[] that the choices of independent actors not before the courts have been or will be made in such manner as to produce causation and permit redressability of injury." *Whitewater Draw*, 5 F.4th at 1013 (citation omitted). The court "assumes

the causal relationship between the procedural defect and the final agency action," but plaintiffs "must still demonstrate a causal relationship between the final agency action and the alleged injuries." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005).

Plaintiff identifies two types of alleged injuries. Neither ultimately establishes a justiciable challenge. First, Plaintiff primarily alleges injuries resulting from the absence of a NEPA analysis, such as an alleged absence of an opportunity to comment and to review an environmental analysis. Opening Br. 24-25.[5] But the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *See, e.g.*, *Summers*, 555 U.S. at 496-97; *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Thus, these alleged injuries cannot sustain Article III jurisdiction.

Second, Plaintiff alleges that some members visit Tarague Beach and fish nearby, and allegedly these activities are harmed by operation of the Facility. ER-97-98. But Plaintiff has challenged no actual, existing decision to operate the Facility, and as explained above, such a challenge would be time-barred. As for RCRA, Guam EPA issued the 2018 permit, which currently governs the operation

---

[5]    Because of the extensive environmental analysis in the Application and Guam EPA's comment opportunity, it is not clear that these injuries occurred. *See supra* at pp. 8-13.

of the Facility, 3-SER-714, but Plaintiff does not challenge that permit. Plaintiff also did not sue Guam EPA; Gaum EPA is not a party to this suit. Instead, Plaintiff selectively challenges the Application when helpful to its position (Opening Br. 18) (relying on Application for causation) but not when it hurts (Opening Br. 33) (asserting no interference with an administrative process even though Application remains pending before state agency). But a plaintiff cannot mix and match to establish jurisdiction.

This Court found that a challenge to a state agency's failure to prepare an environmental analysis when considering an application for mining was not justiciable while the application was "currently pending." *Stone-Manning*, 766 F.3d at 1189. As here, plaintiffs did not challenge past approvals; they only challenged the pending application. *Id.* The Court found that plaintiffs lacked standing and their challenge was not ripe because the application would not injure them until the state agency acted on it. *Id.* at 1189-91. The Court also explained that plaintiffs had not alleged the necessary facts to establish that the grant of the application was "nearly certain" or "inevitable" as necessary to make a "firm prediction" that the application would be granted. *Id.* at 1190-91. Here, Plaintiff lacks standing or a ripe claim to challenge the pending Application for much the same reasons, and the complaint includes no allegations establishing that Guam EPA will necessarily grant the new permit. *See Northside Sanitary Landfill, Inc. v.*

*Thomas*, 804 F.2d 371, 385 (7th Cir. 1986) (finding no jurisdiction despite plaintiff arguing that state agency would simply "rubber stamp" federal order). Indeed, Guam EPA has deferred its decision and is considering comments. 3-SER-714.

Regardless of the Application, Defendants engage in many of these operations under other authorities, undermining both causation and redressability. For example, EPA has "clarif[ied] that EPA considers immediate or time-critical responses to explosives or munitions emergency responses to be an immediate response to a discharge or imminent and substantial threat of a discharge of a hazardous waste" and "therefore, exempt from RCRA permitting." 62 Fed. Reg. 6622-01, 6643 (Feb. 12, 1997); *see also* 62 Fed. Reg. at 6642 (explaining that EPA was "codifying a long standing Agency policy"). RCRA also does not apply to training of military personnel in the destruction of munitions because this activity involves the use of a product, rather than management of a waste. 62 Fed. Reg. at 6628. Or Defendants might engage in many of these operations under emergency RCRA permits. *See* 40 C.F.R. § 270.61 (1991). Thus, Plaintiff cannot show that the alleged injury "is directly traceable" to the Application. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Similarly, the Supreme Court held in *Clapper* that plaintiffs failed to establish causation when the government might rely on other authorities to achieve the feared outcome. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013). And this Court found no standing in a NEPA case when

41

petitioners failed to establish that their "concrete interest [was] threatened by *the challenged regulation*" rather than the general problem addressed by that regulation. *Nuclear Regul. Comm'n.*, 457 F.3d at 954.

It is also speculative whether the requested relief (Opening Br. 27)—that the district court enter an injunction requiring Defendants to withdraw the Application—would redress Plaintiff's alleged injuries. Contrary to Plaintiff's assertion that the regulation turns on whether an application is "pending" (Opening Br. 27), the regulation quoted by Guam EPA provides that:

> [I]f a permittee has submitted a timely and complete application under applicable State law and regulations, the terms and conditions of an EPA-issued RCRA permit continue in force beyond the expiration date of the permit, but only until the effective date of the State's issuance or denial of a State RCRA permit.

3-SER-714 (quoting 40 C.F.R. § 270.51(d) (1991)). The regulations do not specify what would happen if Defendants tried to withdraw the permit. Plaintiff has pointed to nothing showing how Guam EPA would interpret such a request or its effect on the 2018 permit. *See, e.g.*, *In re Aiken Cnty.*, 645 F.3d 428, 435 (D.C. Cir. 2011) (holding court lacked jurisdiction to review one agency's motion to withdraw an application when another agency still had not ruled definitively on it). EPA authorized Guam EPA to administer the RCRA program, not Defendants, and Guam EPA is not a party here. Plaintiff has not established that the relief would redress its injuries because it is unclear how Guam EPA would react to a motion to

withdraw. *See Clapper*, 568 U.S. at 414 (declining to "endorse standing theories that rest on speculation about the decisions of independent actors"); *see also Northside Sanitary Landfill*, 804 F.2d at 381-82. And as explained above, Defendants may proceed with many of the operations under other authorities as well. "[I]f the wrong parties are before the court, or if the requested relief would worsen the plaintiff's position, or if the court is unable to grant the relief that relates to the harm, the plaintiff lacks standing." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982).

A consideration of the ripeness precedent also reveals no justiciable controversy. Even NEPA claims are not ripe when a federal agency has not yet taken final agency action. *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1196-97 (9th Cir. 1997). Plaintiff cites (Opening Br. 30-33) NEPA cases generally involving a completed NEPA process and recognizable final agency action, neither of which are present here. As for the hardship factor, as explained above, Plaintiff has not established that the Application causes the alleged harms.

Allowing Plaintiff's suit also implicates a core concern addressed by the ripeness doctrine—the proper relationship between the judiciary and other branches of the government. *California Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987). "The ripeness doctrine 'is intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in

abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir. 1986)). Courts have generally found that challenges are unripe when one agency is still processing an application, even when the separate, challenged agency has made a potentially definitive statement as part of the process. *See, e.g.*, *Northside Sanitary Landfill*, 804 F.2d at 385-86; *Aiken Cnty.*, 645 F.3d at 435-36. Here, judicial intervention would inappropriately interfere with Guam EPA's consideration of the Application, and in passing RCRA, Congress set forth a comprehensive system of factors for state agencies, such as Guam EPA, to consider in determining whether to grant a permit. Guam EPA may request additional information from Defendants; it also could modify or deny the Application, potentially obviating the need for review. "[O]ne of the principal reasons to await the termination of agency proceedings is to obviate all occasion for judicial review." *Standard Oil*, 449 U.S. at 244.

Because the district court correctly found it lacked jurisdiction because Plaintiff lacked standing and a ripe claim, this Court should affirm.

**III.    NEPA does not apply to RCRA's permitting processes for hazardous waste facilities.**

When an agency proceeds under certain complex statutes already addressing environmental issues in specific terms, the agency need not comply with NEPA, even in the absence of an explicit statutory exemption.  *See, e.g.*, *Merrell v. Thomas*, 807 F.2d 776, 781 (9th Cir. 1986) ("NEPA does not apply to pesticides registered under [the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)]"); *Douglas Cnty. v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995) (holding NEPA does not apply to designations of critical habitat under the Endangered Species Act).  While courts have used various language to describe this concept, it "stems, in part, from the traditional view that specific statutes prevail over general statutes dealing with the same basic subjects." *Siegelman*, 911 F.2d at 504 (citing *Merrell*, 807 F.2d at 778-79); *see also, e.g.*, *Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 228-29 (1957).

NEPA does not apply to the RCRA permitting process because RCRA is the "more specific counterpart of NEPA." *Siegelman*, 911 F.2d at 505.  And RCRA is "comprehensive in its field of application" and includes "substantive and procedural standards [that] are intended to ensure" that the implementing agency "considers fully, with the assistance of meaningful public comment, environmental issues involved in the permitting of hazardous waste management facilities." *Id.* In *Siegelman*, the Eleventh Circuit correctly held that "RCRA is the functional

(though not the structural or literal) equivalent and more specific counterpart of NEPA," and thus NEPA did not apply to the RCRA permitting process. *Id.* This Court should hold the same.

> **A.   This Court has applied the "functional equivalence" approach, but this Court's more recent "displacement" approach would have the same outcome.**

In *Siegelman*, the Eleventh Circuit relied on the language of "functional equivalence," whereas this Court usually uses the term "displacement" for a similar type of analysis. But this Court has adopted "functional equivalence" on occasion. In interpreting the Clean Water Act, this Court adopted the "functional equivalent" language, quoted the seminal case, and reasoned that "we are convinced that here, as in *Portland Cement*, the duties and obligations imposed on the EPA by Congress under the [Act] will insure that any action … will have been subjected to the 'functional equivalent' of NEPA requirements." *Mun. of Anchorage v. United States*, 980 F.2d 1320, 1329 (9th Cir. 1992) (citing *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384 (D.C. Cir. 1973) (holding NEPA does not apply to promulgation of certain standards under Clean Air Act)). In *Anchorage*, this Court held that NEPA did not apply, explaining that the Clean Water Act required both "the EPA and the Corps to consider many of the same things that NEPA would require." *Id.* This Court has never overturned *Anchorage* nor rejected functional equivalency. *See also Siegelman*, 911 F.2d at 505 (11th

Cir. 1990) ("[C]ourts in at least seven other circuits have recognized the functional equivalency doctrine … and no court to our knowledge has rejected it.").

Nonetheless, in a footnote in a later opinion, this Court expressed "skeptic[ism]" of this "approach." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 651 n.51 (9th Cir. 2014). But applying a similar approach, this Court has reasoned that NEPA does not apply when a "substantive statute has 'displaced' NEPA." *Id.* at 648. This Court explained that it would consider the "same" "factors" in conducting either analysis. *Id.* at 651 n.51.[6]

Under either approach, NEPA does not apply to the RCRA permitting process. Considering *Siegelman* and RCRA's text and history, NEPA does not apply both because RCRA is the "functional equivalent" of NEPA and because RCRA "displaced" NEPA under the reasoning of this Court in *Merrell* and *Douglas County*.[7]

---

[6] Since this Court last opined on functional equivalence, CEQ promulgated regulations recognizing and codifying both functional equivalence and displacement. *See* 40 C.F.R. § 1501.1(a)(6); 85 Fed. Reg. at 43,320-21. While CEQ currently is considering revising those regulations, Plaintiff asserts the regulations containing this codification apply here. Opening Br. 6 n.1. Of course, this Court has also applied functional equivalence and displacement analysis under the pre-2020 CEQ regulations.

[7] While *Merrell* has been characterized as a "displacement" case, that word never appears in the opinion, highlighting that the terminology is not crucial.

**B.     RCRA's specific requirements to consider the environment and ensure public involvement mean NEPA does not apply.**

NEPA serves two purposes.  "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns." *Baltimore Gas*, 462 U.S. at 97; 40 C.F.R. § 1500.1(a).  Courts have reasoned that "an agency need not comply with NEPA where the agency is engaged primarily in an examination of environmental questions and where the agency's organic legislation mandates specific procedures for considering the environment that are functional equivalents of the impact statement process." *Siegelman*, 911 F.2d at 504 (cleaned up).  Because the facts here involve only Defendants' Application for renewal of a RCRA permit, the relevant legislation is RCRA.  And RCRA sets forth specific procedures and requirements for considering the environment and ensuring public disclosure and participation.

"RCRA is a comprehensive environmental statute that empowers EPA to regulate hazardous wastes from cradle to grave." *City of Chicago*, 511 U.S. at 331. RCRA's purposes focus on human health, the environment, and environmental concerns.  42 U.S.C. § 6902.  RCRA requires EPA to "promulgate regulations establishing such performance standards, applicable to … facilities for … hazardous waste … as may be necessary to protect human health and the

environment." *Id.* § 6924(a). Owners and operators of facilities must obtain

permits under RCRA, and each "permit issued … shall contain such terms and

conditions as [EPA] (or the State) determines necessary to protect human health

and the environment." *Id.* § 6925(c)(3). And the review of permit renewal

applications "consider[s] improvements in the state of control and measurement

technology." *Id.* "Upon a determination by [EPA] (or a State, if applicable), of

compliance by a facility for which a permit is applied … with the requirements of

this section and section 6924 of this title, [EPA] (or the State) shall issue a permit

for such facilities." *Id.* § 6925(c)(1). Pursuant to its authority under RCRA, EPA

has promulgated detailed regulations implementing these provisions and requiring

extensive environmental information for processing permits. *See, e.g.*, 40 C.F.R.

Parts 260-270. Thus, the RCRA scheme comprehensively addresses *what*

environmental information should be considered and *how* to assess it when

deciding on a permit application. As explained *supra* at pp. 8-12, Defendants

thoroughly considered environmental issues in developing and submitting the

Application.

      RCRA also discloses environmental information to the public and provides

an opportunity for public input or comment as part of the permitting process. 42

U.S.C. § 6974(b)(2); *see also* 42 U.S.C. §§ 6926(f), 6937(a). RCRA requires the

publication of notice in major local newspapers and broadcast over local radio

before issuing any permit under section 6925. *Id.* § 6974(b)(2)(A). The permitting agency must also transmit written notice "to each unit of local government having jurisdiction over the area … and to each State agency having any authority under State law with respect to the construction or operation of such facility." *Id.* § 6974(b)(2)(B). If anyone informs the agency of opposition within 45 days, the agency must hold an "informal public hearing (including an opportunity for presentation of written and oral views)." *Id.* § 6974(b). This provision applies to both EPA and authorized states. *Id.* Guam EPA had a forty-five-day public comment period on the draft permit, including at least one public hearing. *See supra* at p. 12. If, for example, Plaintiff wanted the agencies to consider alternatives, Plaintiff needed to raise them as part of the public comment period.

Thus, "RCRA's substantive and procedural standards" already ensure the full consideration of, with "meaningful public comment, environmental issues involved in the permitting of hazardous waste management facilities," and NEPA does not apply. *Siegelman*, 911 F.2d at 505. Two district courts have reached the same conclusion. *See Greenpeace, Inc. v. Waste Techs. Indus.*, No. 4:93CV0083, 1993 WL 134861, at *9 (N.D. Ohio Mar. 5, 1993) ("NEPA does not apply to RCRA actions."); *Allegany Envtl. Action v. Westinghouse Elec. Corp.*, 1998 U.S. Dist. LEXIS 1892, *21 (W.D. Pa. Jan. 20, 1998) ("RCRA's remedial process displaces any NEPA requirements."). Several Circuits have found that NEPA does

not apply to similar statutory schemes. *See, e.g.*, *W. Nebraska Res. Council v. EPA*, 943 F.2d 867, 872 (8th Cir. 1991) (holding NEPA does not apply to decision under Safe Drinking Water Act because "the procedures employed and the analysis undertaken by EPA in this proceeding covered the core NEPA concerns").

NEPA also does not apply to RCRA permitting under the reasoning of *Merrell* and *Douglas County*. Congress's enactment of a complex and comprehensive statutory scheme—without mentioning NEPA—requiring thorough consideration of environmental concerns and procedures for public involvement makes application of "NEPA superfluous." *Merrell*, 807 F.2d at 778; *Douglas Cnty*, 48 F.3d at 1503. Nor is applying NEPA simply superfluous. As in *Merrell* and *Douglas*, "applying NEPA to" RCRA's detailed and comprehensive permitting "process would 'sabotage the delicate machinery that Congress designed.'" *Douglas Cnty.*, 48 F.3d at 1503 (quoting *Merrell*, 807 F.2d at 779). "Congress through debate and compromise forged a specific process," and such a compromise "leaves little room for the imposition of the NEPA requirements." *Id.* In passing RCRA, Congress sought to reduce the generation of hazardous waste, but it also recognized that some waste would "nevertheless [be] generated." 42 U.S.C. § 6902(b). Congress enacted RCRA, in part, to regulate the management of that waste "to minimize the present and future threat to human health and the environment." *Id.*

Under both approaches, the fact that RCRA's analysis of environmental effects differs in some specifics from that required by NEPA—such as different approaches to considering alternatives—*favors* holding that NEPA does not apply to the RCRA permitting process. *See, e.g.*, *Douglas Cnty.*, 48 F.3d at 1503; *Siegelman*, 911 F.2d at 504-05. In *Merrell*, this Court noted that FIFRA did not allow EPA to deny a pesticide registration based on whether alternatives existed, which this Court saw as at odds with the implications of NEPA's direction that an agency consider alternatives. 807 F.2d at 781. The Court reasoned that applying NEPA would impermissibly engraft NEPA's goals onto FIFRA. *Id.* Analogously, in RCRA Congress directed that if EPA or the state makes a "determination" that a facility complies with RCRA's specified requirements, the agency "shall issue a permit." 42 U.S.C. § 6925(c)(1). In *Siegelman*, the Eleventh Circuit explained that "RCRA does not require EPA to consider every point the agency would have to consider in preparing a formal EIS under NEPA; thus, NEPA and RCRA conflict." *Siegelman*, 911 F.2d at 504-05. Thus, *Siegelman* held NEPA did not apply because the "RCRA permitting procedures 'strike a workable balance between some of the advantages and disadvantages of full application of NEPA.'" 911 F.2d at 505 (quoting *Portland Cement*, 486 F.2d at 386).

### C.    RCRA's text and history confirm that NEPA does not apply to RCRA permitting processes.

Congress enacted RCRA in 1976, substantially amending the Solid Waste Disposal Act of 1965.  *See* 42 U.S.C. §§ 6901 et seq.  As with FIFRA interpreted in *Merrell*, this enactment came after the passage of NEPA, "[y]et Congress gave no indication that it thought NEPA would apply."  807 F.2d at 778.  The silence is telling because Congress expressly addressed how RCRA interacted with many other statutes and directed EPA to "integrate" RCRA administration with several other specific statutory authorities and "other Acts of Congress … grant[ing] regulatory authority to" EPA.[8]  42 U.S.C. § 6905(b)(1); Pub. L. 94-580, 90 Stat 2795 (October 21, 1976).

After Congress passed RCRA in 1976, EPA codified regulations providing that "all RCRA … permits are *not* subject to the [EIS] provisions of [§ 4332(2)(C)] of [NEPA]."  45 Fed. Reg. 33,290-01, 33,488 (May 19, 1980) (emphasis added).  In proposing that regulation, EPA "determined that the *permitting process* under [§ 6925] is not subject to the EIS requirement of [§ 4332(2)(c)] of [NEPA]" and that the "permitting process … fully allows and encourages involvement of the public."  44 Fed. Reg. 34,244, 34,254 (June 14, 1979) (emphasis added).  No commenters opposed that interpretation, several supported it, 45 Fed. Reg. at

---

[8]    NEPA does not grant regulatory authority to EPA.

33,406, and EPA has retained that regulation to this day. 40 C.F.R. § 124.9(b)(6);
*see also* 72 Fed. Reg. 53,652-01, 53,654 (Sept. 19, 2007).

Since EPA codified that interpretation, Congress has revisited RCRA
multiple times—in the Hazardous and Solid Waste Amendments of 1984, the
Federal Facility Compliance Act of 1992 (FFCA), and the Land Disposal Program
Flexibility Act of 1996. But nothing in the text or legislative history of those
amendments suggested that Congress disagreed with *either* EPA's regulation *or*
the Eleventh Circuit's later holding in *Siegelman* that NEPA did not apply to the
RCRA permitting process. "[I]t is well established that 'Congress is presumed to
be aware of an administrative or judicial interpretation of a statute and to adopt that
interpretation when it re-enacts a statute without change.'" *Do Sung Uhm v.
Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010) (quoting *Forest Grove Sch.
Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009)). And, as both *Merrell* and *Douglas
County* recognized, when Congress later amends the relevant statutes without
responding to the agencies' earlier interpretations that NEPA did not apply,
Congress's inaction is "persuasive evidence" that Congress agreed with that
interpretation. *Douglas Cnty*, 48 F.3d at 1504; *Merrell*, 807 F.2d at 779.

Indeed, FFCA focused on *federal* facilities, with the goal of "ensur[ing]
greater compliance by federal facilities with requirements of [RCRA]." H.R. Rep.
102-111, 2, 1992 U.S.C.C.A.N. 1287, 1288 (June 13, 1991). Yet Congress again

did not respond to the then-longstanding agency interpretation that NEPA did not apply to the RCRA permitting process, nor to *Siegelman*. And Congress passed FFCA alongside another Act in a single public law. Pub. L. 102-386, 106 Stat 1505 (October 6, 1992). That Act (the Metropolitan Washington Waste Management Study Act) addressed the sanitary landfill in Lorton, Virginia, which Congress found was on federal land. *Id.* Congress provided that, subject to an exception, the landfill could be expanded only if EPA approved an "[EIS], pursuant to NEPA." *Id.* Thus, Congress considered whether to apply NEPA to federal facilities handling waste when developing this public law. Congress chose to expressly apply it in one specific circumstance but did not modify RCRA to apply it to the RCRA permitting processes, against the backdrop of EPA's and *Siegelman*'s interpretation that it did not apply. When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002).

### D. Plaintiff's arguments that NEPA applies here are unpersuasive.

Plaintiff presents several arguments that the district court erred, but those arguments mischaracterize the facts and law. In general, Plaintiff quotes many NEPA cases and regulations that do not involve displacement or functional

equivalence, and under Plaintiff's arguments, seemingly *Merrell*, *Douglas County*, *Siegelman*, *Anchorage*, and many other appellate precedents across several circuits are incorrect. But as explained above, both the precedent and history of RCRA support the district court's conclusion that NEPA does not apply to the RCRA permitting process. We respond to Plaintiff's points in turn.

First, much of Plaintiff's argument turns on the theory that it challenges Defendants' supposed "decision to use OB/OD" separate from the Application to renew the RCRA permit. Opening Br. 39. If Defendants had acted under their own organic statutes and made a decision that was final agency action, and *then* applied for a RCRA permit, it would present a very different case. But that is not what happened, and Plaintiff's complaint does not allege any facts indicating that it happened. "It is not ... proper to assume that [plaintiff] can prove facts that it has not alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (citation omitted).

Second, Plaintiff errs in asserting (Opening Br. 40, 52, 56) that the precedent supporting this conclusion involves solely environmentally protective agencies. Relying on the very case cited by Plaintiff, the Second Circuit found NEPA did not apply to the Federal Communications Commission's orders governing radio frequency radiation because its process "satisf[ied] the functional compliance test." *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 94 (2d Cir. 2000). "[W]here an

56

agency is engaged primarily in an examination of environmental questions, where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, but functional compliance is sufficient." *Id.* (quoting *EDF v. EPA*, 489 F.2d 1247, 1257 (D.C. Cir. 1973)). Generally, environmentally protective agencies engage in such processes and are governed by such statutes, but when other agencies do the same under environmental statutes, the same reasoning applies.

Factually, Defendants were complying with RCRA's substantive and procedural requirements in applying for the RCRA permit renewal, and RCRA ensures full and adequate consideration of environmental issues. Defendants thoroughly considered environmental issues in preparing the Application (and did so in the past each time they applied to renew the RCRA permit). *See supra* at pp. 8-12. Defendants' compliance with RCRA is environmentally protective as revealed by the Application. Guam EPA will consider environmental issues in detail in reviewing the Application and provided an opportunity for public comment. And in *Anchorage*, this Court applied the functional equivalence doctrine to *both* EPA and the Army Corps of Engineers when the agencies' actions under the Clean Water Act, but particularly EPA's, ensured a thorough consideration of environmental impacts. *Anchorage*, 980 F.2d at 1329. The Court reasoned that because "the duties and obligations imposed on the EPA by Congress

under the [Clean Water Act] will insure that any action taken … will have been subjected to the 'functional equivalent' of NEPA requirements," neither EPA *nor* the Corps had violated NEPA in taking the challenged action. *Id.*

Third, Plaintiff contends that *Anchorage* "did not rely on the functional equivalence doctrine." Opening Br. 54. This assertion is incorrect; Plaintiff never cites the full page of the opinion discussing and adopting that doctrine. *Compare* Opening Br. 52-54, *with Anchorage*, 980 F.2d at 1329. To be sure, *Anchorage* involved a statutory exemption from NEPA, and the decision relied on it in part, but this Court also relied on the functional equivalence rationale and precedent. *Anchorage*, 980 F.2d at 1329. Both parties had presented competing interpretations of the statutory exemption, but the Court expressed skepticism of both and adopted neither. *See id.* at 1328. The Court then turned to functional equivalence, devoted a page to reasoning flowing from that approach, and repeatedly cited and quoted the seminal functional equivalence case *Portland Cement*. *Id.* at 1329 (quoting 486 F.2d at 383, 384-86). The Court relied on this reasoning to reach its "conclusion," stating twice this reasoning "convinced" it and concluding that this discussion "therefore" led to its "hold[ing]." *Id.* This is not dicta: it was the panel's considered basis for its final holding, at the end of the opinion, and adopted instead of alternative theories. *See United States v. Ingham*, 486 F.3d 1068, 1079 n.8 (9th Cir. 2007) (defining dicta).

While Plaintiff is correct that *Anchorage*'s specific functional equivalence holding involved the NEPA requirement under 42 U.S.C. § 4332(2)(E) instead of its neighboring subparagraph § 4332(2)(C), Plaintiff does not explain why that matters. The "functional equivalence" approach the Court adopted in *Anchorage* applies equally to both subparagraphs within this single section of NEPA. Indeed, the Court repeatedly cited and quoted *Portland Cement* where the D.C. Circuit applied the approach to § 4332(2)(C). 486 F.2d 375, 379 n.11. *Siegelman* also applied the approach to § 4332(2)(C).

Fourth, Plaintiff argues (Opening Br. 44) that, when both a federal agency and a federal permitting authority must comply with NEPA, each must engage in independent NEPA analyses, and Plaintiff asserts that the federal agency applying for a permit must complete its NEPA analyses "before submitting a … permit application." Opening Br. 47. This is not so. CEQ's regulations provide that to "the extent practicable, if a proposal will require action by more than one Federal agency," "the lead and cooperating agencies" should prepare a "single" NEPA analysis and make "joint" findings. 40 C.F.R. § 1501.7(g). The regulations require that to "the fullest extent possible, agencies shall prepare" NEPA analyses "concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws." *Id.* § 1502.24(a). CEQ interprets these regulations as "integrat[ing] NEPA

requirements with other planning and review procedures to run *concurrently* rather than *consecutively*." 85 Fed. Reg. 43,304-01, 43,317 (emphases added); *see also* 40 C.F.R. § 1501.9(f)(4). The express terms of the regulations direct federal agencies to complete a single, concurrent NEPA analysis, integrated with analyses under other environmental laws. *See* 40 C.F.R. § 1501.7(g); *see also Sierra Club v. FERC*, 754 F.2d 1506, 1509 (9th Cir. 1985).

The sole case Plaintiff cites (Opening Br. 45-47) for these propositions also establishes the opposite. The agencies in that case prepared a *single* EIS and they completed the EIS on August 30, 2013, almost a year *after* the Navy had applied for the authorization. *Conservation Council for Hawaii v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1215 (D. Haw. 2015). And neither the court nor plaintiffs saw any error in the agencies preparing a single NEPA analysis integrated with the authorization process under the other, substantive environmental statute; rather, the court found a NEPA violation based on the agencies' failure to analyze a no action alternative. *Id.* at 1236. In any event, none of this reasoning establishes that NEPA applies to the RCRA permitting process, nor does it address functional equivalence nor displacement.

Fifth, Plaintiff relies heavily on NEPA's direction for agencies to comply with certain duties "to the fullest extent possible," 42 U.S.C. § 4332, but the legislative history of this language supports the functional equivalence and

displacement approaches. According to the legislative history, when agencies had environmental responsibilities under other authorities, this provision was "not designed to result in any change in the manner in which they carry out their environmental protection authority" but was "designed to assure consideration of environmental matters" by agencies with "little or no legislative authority to take environmental considerations into account." 115 Cong. Rec. 40,418 (Dec. 20, 1969). This history suggests that Congress did not intend to layer NEPA on top of environmentally protective regimes, such as the one established by RCRA.[9]

## CONCLUSION

For the foregoing reasons, this Court should affirm.[10] But if the Court were to reverse, it should limit its rulings to the issues on appeal and remand.

---

[9]     In district court, Defendants also argued that Plaintiff's claim failed because it did not challenge a "major federal action" under NEPA. When a plaintiff does not challenge "final agency action," it does not challenge a "major federal action" under NEPA. 40 C.F.R. § 1508.1(q)(1)(iii). In addition, this Court has repeatedly recognized that federal activities are not a "major federal action" when they "would not change the status quo," as here. *E.g.*, *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990). The district court did not address this issue, and if this Court found for Plaintiff on the issues presented, the district court should have the opportunity to address it first. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094 (9th Cir. 2014).

[10]     Plaintiff has waived any argument that the Court should remand and provide leave to amend by not arguing specifically and distinctly for that result. The Opening Brief contains a single footnote on the issue (Opening Br. 13 n.6), and it in turn faults the district court for not responding to a "two-line footnote in a reply brief" requesting leave to amend. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220

Respectfully submitted,

/s/ *Robert P. Stockman*

TODD KIM
*Assistant Attorney General*

AMELIA G. YOWELL
ROBERT P. STOCKMAN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-3527
Robert.Stockman@usdoj.gov

Of Counsel:

MARVIN W. TUBBS, II
*Environmental Litigation Attorney*
U.S. Air Force

March 28, 2023
90-1-4-16527

---

(9th Cir. 2019). A party waives a request by presenting it in such a cursory manner. *Id.*

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**          22-16613

      I am the attorney or self-represented party.

      **This brief contains 13,977 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
    29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
    *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Robert P. Stockman

**Date**        March 28, 2023

# ADDENDUM

# ADDENDUM

**Federal Statutes:**

5 U.S.C. § 551 (excerpts).........................................................................1a

5 U.S.C. § 704...........................................................................................2a

42 U.S.C. § 6902.......................................................................................2a

42 U.S.C. § 6905 (excerpts)......................................................................4a

42 U.S.C. § 6925 (excerpts)......................................................................5a

42 U.S.C. § 6974(b) (excerpts) .................................................................7a

**Federal Regulations:**

40 C.F.R. § 124.9(b)(6)..............................................................................8a

40 C.F.R. § 1500.1(a) (2021).....................................................................8a

40 C.F.R. § 1501.7(g) (2021).....................................................................9a

40 C.F.R. § 1502.24(a) (2021)...................................................................9a

**Guam Regulation:**

22 Guam R. & Regs. 6-§ 30109(m) ..........................................................9a

## 5 U.S.C. § 551. Definitions

…

(6)     "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7)     "adjudication" means agency process for the formulation of an order;

(8)     "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

…..

(11)    "relief" includes the whole or a part of an agency--

(A)     grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B)     recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C)     taking of other action on the application or petition of, and beneficial to, a person;

….

(13)    "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

….

## 5 U.S.C. § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 42 U.S.C. § 6902. Objectives and national policy

(a) Objectives

The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by--

(1)     providing technical and financial assistance to State and local governments and interstate agencies for the development of solid waste management plans (including resource recovery and resource conservation systems) which will promote improved solid waste management techniques (including more effective organizational arrangements), new and improved methods of collection, separation, and recovery of solid waste, and the environmentally safe disposal of nonrecoverable residues;

(2)     providing training grants in occupations involving the design, operation, and maintenance of solid waste disposal systems;

(3)     prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health;

(4)     assuring that hazardous waste management practices are conducted in a manner which protects human health and the environment;

(5)     requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date;

(6)     minimizing the generation of hazardous waste and the land disposal of hazardous waste by encouraging process substitution, materials recovery, properly conducted recycling and reuse, and treatment;

(7)     establishing a viable Federal-State partnership to carry out the purposes of this chapter and insuring that the Administrator will, in carrying out the provisions of subchapter III of this chapter, give a high priority to assisting and cooperating with States in obtaining full authorization of State programs under subchapter III;

(8)     providing for the promulgation of guidelines for solid waste collection, transport, separation, recovery, and disposal practices and systems;

(9)     promoting a national research and development program for improved solid waste management and resource conservation techniques, more effective organizational arrangements, and new and improved methods of collection, separation, and recovery, and recycling of solid wastes and environmentally safe disposal of nonrecoverable residues;

(10)    promoting the demonstration, construction, and application of solid waste management, resource recovery, and resource conservation systems which preserve and enhance the quality of air, water, and land resources; and

(11)    establishing a cooperative effort among the Federal, State, and local governments and private enterprise in order to recover valuable materials and energy from solid waste.

(b) National policy

The Congress hereby declares it to be the national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

**42 U.S.C. § 6905. Application of chapter and integration with other Acts**

(a) Application of chapter

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972, or the Atomic Energy Act of 1954 except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

(b) Integration with other Acts

(1) The Administrator shall integrate all provisions of this chapter for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Safe Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972, and such other Acts of Congress as grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this chapter and in the other acts referred to in this subsection.

….

**42 U.S.C. § 6925. Permits for treatment, storage, or disposal of hazardous waste**

(a) Permit requirements

Not later than eighteen months after October 21, 1976, the Administrator shall promulgate regulations requiring each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter to have a permit issued pursuant to this section. Such regulations shall take effect on the date provided in section 6930 of this title and upon and after such date the treatment, storage, or disposal of any such hazardous waste and the construction of any new facility for the treatment, storage, or disposal of any such hazardous waste is prohibited except in accordance with such a permit. No permit shall be required under this section in order to construct a facility if such facility is constructed pursuant to an approval issued by the Administrator under section 2605(e) of Title 15 for the incineration of polychlorinated biphenyls and any person owning or operating such a facility may, at any time after operation or construction of such facility has begun, file an application for a permit pursuant to this section authorizing such facility to incinerate hazardous waste identified or listed under this subchapter.

(b) Requirements of permit application

Each application for a permit under this section shall contain such information as may be required under regulations promulgated by the Administrator, including information respecting--

(1)     estimates with respect to the composition, quantities, and concentrations of any hazardous waste identified or listed under this subchapter, or combinations of any such hazardous waste and any other solid waste, proposed to be disposed of, treated, transported, or stored, and the time, frequency, or rate of which such waste is proposed to be disposed of, treated, transported, or stored; and

(2)     the site at which such hazardous waste or the products of treatment of such hazardous waste will be disposed of, treated, transported to, or stored.

(c) Permit issuance

    (1)    Upon a determination by the Administrator (or a State, if applicable), of compliance by a facility for which a permit is applied for under this section with the requirements of this section and section 6924 of this title, the Administrator (or the State) shall issue a permit for such facilities. In the event permit applicants propose modification of their facilities, or in the event the Administrator (or the State) determines that modifications are necessary to conform to the requirements under this section and section 6924 of this title, the permit shall specify the time allowed to complete the modifications.

    ….

    (3)    Any permit under this section shall be for a fixed term, not to exceed 10 years in the case of any land disposal facility, storage facility, or incinerator or other treatment facility. Each permit for a land disposal facility shall be reviewed five years after date of issuance or reissuance and shall be modified as necessary to assure that the facility continues to comply with the currently applicable requirements of this section and section 6924 of this title. Nothing in this subsection shall preclude the Administrator from reviewing and modifying a permit at any time during its term. Review of any application for a permit renewal shall consider improvements in the state of control and measurement technology as well as changes in applicable regulations. Each permit issued under this section shall contain such terms and conditions as the Administrator (or the State) determines necessary to protect human health and the environment.

(d) Permit revocation

Upon a determination by the Administrator (or by a State, in the case of a State having an authorized hazardous waste program under section 6926 of this title) of noncompliance by a facility having a permit under this chapter with the requirements of this section or section 6924 of this title, the Administrator (or State, in the case of a State having an authorized hazardous waste program under section 6926 of this title) shall revoke such permit.

….

6a

**42 U.S.C. § 6974. Petition for regulations; public participation**

….

(b) Public participation

(1)   Public participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish minimum guidelines for public participation in such processes.

(2)   Before the issuing of a permit to any person with any respect to any facility for the treatment, storage, or disposal of hazardous wastes under section 6925 of this title, the Administrator shall--

   (A)   cause to be published in major local newspapers of general circulation and broadcast over local radio stations notice of the agency's intention to issue such permit, and

   (B)   transmit in writing notice of the agency's intention to issue such permit to each unit of local government having jurisdiction over the area in which such facility is proposed to be located and to each State agency having any authority under State law with respect to the construction or operation of such facility.

   If within 45 days the Administrator receives written notice of opposition to the agency's intention to issue such permit and a request for a hearing, or if the Administrator determines on his own initiative, he shall hold an informal public hearing (including an opportunity for presentation of written and oral views) on whether he should issue a permit for the proposed facility. Whenever possible the Administrator shall schedule such hearing at a location convenient to the nearest population center to such proposed facility and give notice in the aforementioned manner of the date, time, and subject matter of such hearing. No State program which provides for the issuance of permits referred to in this paragraph may be authorized by the Administrator under section 6926 of this title unless such program provides for the notice and hearing required by the paragraph.

**40 C.F.R. § 124.9(b)(6)**

For NPDES new source draft permits only, any environmental assessment, environmental impact statement (EIS), finding of no significant impact, or environmental information document and any supplement to an EIS that may have been prepared. NPDES permits other than permits to new sources as well as all RCRA, UIC and PSD permits are not subject to the environmental impact statement provisions of section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. 4321.

**40 C.F.R. § 1500.1(a) (2021)**

The National Environmental Policy Act (NEPA) is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. Section 101 of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 102(2) of NEPA establishes the procedural requirements to carry out the policy stated in section 101 of NEPA. In particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decisionmaking process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

**40 C.F.R. § 1501.7(g)**

To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate the proposal in a single environmental impact statement and issue a joint record of decision. To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental assessment, the lead and cooperating agencies should evaluate the proposal in a single environmental assessment and, where appropriate, issue a joint finding of no significant impact.

**40 C.F.R. § 1502.24(a)**

To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the National Historic Preservation Act of 1966 (54 U.S.C. 300101 et seq.), and the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

**22 Guam R. & Regs. 6-§ 30109(m):**

(m) § 270.50 (a) is amended as follows: (a) RCRA permits shall be effective for a fixed term not to exceed 3 years.