**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PRUTEHI LITEKYAN: SAVE RITIDIAN, | No. 22-16613 |
| *Plaintiff-Appellant*, | D.C. No. 1:22-cv-00001 |
| v. | |
| UNITED STATES DEPARTMENT OF THE AIRFORCE; FRANK KENDALL, Secretary of the Air Force; UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, Secretary of Defense, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the District Court of Guam
Frances M. Tydingco-Gatewood, Chief Judge, Presiding

Argued and Submitted October 6, 2023
Honolulu, HI

Filed February 13, 2025

Before: Marsha S. Berzon, Eric D. Miller, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge VanDyke

## SUMMARY[*]

### Environmental Law /Standing / Ripeness

The panel reversed the district court's dismissal of an action brought by Prutehi Litekyan: Save Ritidian, a nonprofit organization dedicated to protecting natural and cultural resources in Guam, challenging the United States Air Force's decision to engage in hazardous waste disposal at Tarague Beach on Guam.

First, the panel held that Prutehi Litekyan had standing to challenge the Air Force's decision to go forward with Open Burning/Open Detonation (OB/OD) operations for disposing of unexploded ordnance without conducting National Environmental Policy Act (NEPA) review. Had the Air Force taken the requisite "hard look" at the environmental impacts of OB/OD and appropriately engaged the public before committing to its plan for disposal, the agency might have chosen a different place or method for handling the waste munitions. That possibility makes the injury fairly traceable to the Air Force's actions and is enough to establish Article III standing for a procedural injury under NEPA.

Second, the panel held that the Air Force engaged in final agency action that was ripe for judicial review. The Air Force's decision to apply for a Resource Conservation and Recovery Act (RCRA) permit and the details of its planned activities on Tarague Beach reflected the agency's commitment to a particular location and method of waste

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

munitions disposal, and was the endpoint in its decisionmaking process. The commitment determined the agency's legal obligations. The panel held that both prongs of the *Bennett v. Spear*, 520 U.S. 154 (1997), standard for final action were met, and the Air Force took "final agency action" for the purposes of judicial review, so Prutehi Litekyan can bring suit under the Administrative Procedure Act. The claim is also jurisdictionally and prudentially ripe.

Third, the panel held that NEPA applied to the Air Force's decision to conduct OB/OD operations at Tarague Beach, and Prutehi Litekyan can state a claim by alleging noncompliance with NEPA. RCRA's permitting process is in important respects dissimilar from the environmental review mandated by NEPA and so does not make the latter superfluous. Nor do the processes outlined in RCRA suggest that Congress did not intend NEPA to apply to the decisionmaking of operational agencies (as opposed to agencies charged with assuring environmental compliance). The panel remanded for further proceedings.

Judge VanDyke dissented because he would hold that this court lacked statutory jurisdiction to consider the merits of this case. Plaintiff's lawsuit failed to challenge any final agency action. Defendants' submission of their 2021 permit application merely facilitated ongoing operations rather than marking the culmination of any agency decisionmaking process, and did not determine the legal rights of any party.

## **COUNSEL**

David L. Henkin (argued), Earthjustice, Honolulu, Hawaii; Thien T. Chau, Earthjustice, Washington, D.C.; for Plaintiff-Appellant.

Robert P. Stockman (argued) and Amelia G. Yowell, Attorneys, Environment & Natural Resources Division, Appellate Section; Todd Kim, Former Assistant Attorney General; United States Department of Justice, Washington, D.C.; Marvin W. Tubbs II, Environmental Litigation Attorney, United States Air Force, Of Counsel; Jessica F. Cruz and Mikel W. Schwab, Assistant United States Attorneys, Office of the United States Attorney, Hagatna, Guam; for Defendants-Appellees.

## OPINION

BERZON, Circuit Judge:

Located at the northern tip of Guam, Tarague Beach is a multifaceted site for the wildlife and people of the island. Tarague Beach serves as a nesting habitat for the endangered green sea turtle and a foraging and resting spot for migratory seabirds. Local communities cultivate and gather traditional medicines nearby. Tarague Beach sits above Guam's sole-source aquifer, which provides more than eighty percent of Guam's population with drinking water. Just offshore, fishers regularly harvest food for their families.

Tarague Beach is also the site where the United States Air Force has for years disposed of unexploded ordnance (such as tear gas, ammunition, propellants, and explosive materials), some of which dates back to World War II. The Air Force has elected to dispose of these hazardous waste munitions through Open Burning/Open Detonation (OB/OD) operations, which entail burning the munitions in open air or blowing them up on bare sand.

This appeal concerns a challenge by Prutehi Litkeyan: Save Ritidian ("Prutehi Litekyan"), a nonprofit organization dedicated to protecting natural and cultural resources in Guam, to the Air Force's decision to engage in hazardous waste disposal at Tarague Beach. Prutehi Litekyan contends that the Air Force failed to comply with its environmental review obligations under the National Environmental Policy Act (NEPA).[1] The Air Force responded by invoking another

---

[1] Prutehi Litekyan has also sued the Secretary of the Air Force and the Secretary of the U.S. Department of Defense, the Air Force's parent agency. We refer to these Defendants collectively as "the Air Force."

federal statute, the Resource Conservation and Recovery Act (RCRA), which governs hazardous waste disposal in part through a permitting process.

On the Air Force's motion to dismiss the complaint, the district court held that: (1) the nonprofit lacked standing to challenge the Air Force's permit application because its injury was not fairly traceable to the Air Force's conduct; (2) the Air Force had not engaged in final agency action, and Prutehi Litekyan's challenge was therefore not ripe; and (3) even if the court had subject matter jurisdiction over the case, Prutehi Litekyan had failed to state a claim because RCRA's permitting process made NEPA review "redundant" and a "waste of resources."

We reverse each holding, as we conclude as follows. *First*, Prutehi Litekyan had standing to challenge the Air Force's decision to move forward with OB/OD operations without conducting NEPA review. Had the Air Force taken the requisite "hard look" at the environmental impacts of OB/OD and appropriately engaged the public before committing to its plan for disposal, the agency might have chosen a different place or method for handling the waste munitions. That possibility makes the injury fairly traceable to the Air Force's actions and is enough to establish Article III standing for a procedural injury under NEPA.

*Second*, the Air Force's decision to apply for a RCRA permit and the details of its planned activities on Tarague Beach, described in the permit application, reflected the agency's commitment to a particular location for and method of waste munitions disposal, and so was the endpoint in its decisionmaking process. That commitment also determined the agency's legal obligations. The Air Force thus engaged in final agency action that was ripe for judicial review.

*Third*, RCRA's permitting process is in important respects dissimilar from the environmental review mandated by NEPA and so does not make the latter superfluous. Nor do the processes outlined in RCRA suggest that Congress did not intend NEPA to apply to the decisionmaking of operational agencies (as opposed to agencies charged with assuring environmental compliance). NEPA therefore applies to the Air Force's decision to conduct OB/OD operations at Tarague Beach, and the nonprofit can state a claim by alleging noncompliance with NEPA.

We reverse the district court's dismissal and remand for proceedings consistent with this opinion.

## I. BACKGROUND

This case concerns Prutehi Litekyan's procedural rights under NEPA, as well as the interplay between NEPA and another federal statute, RCRA. Given the complexities of these statutes, we begin with a brief overview of relevant NEPA and RCRA provisions and then turn to the factual details of this case.[2]

### A

NEPA is a federal statute designed, in relevant part, to "encourage productive and enjoyable harmony between man and his environment [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42

---

[2] The facts in this section are drawn from allegations in the complaint. As this appeal comes to the Court from the district court's grant of a motion to dismiss, we take the facts alleged in the complaint as true. *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015); *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 998 n.1 (9th Cir. 2013).

U.S.C. § 4321. Primarily a procedural statute, NEPA achieves its "sweeping policy goals . . . through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at [the] environmental consequences'" of their actions, and "provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). NEPA "does not mandate particular results; it simply prescribes the necessary process" for assessing the environmental impact of agency action. *Id.*

One of NEPA's principal requirements is that a federal agency prepare a "detailed statement" before engaging in "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (1975).[3] This statement, referred to as an Environmental Impact Statement (EIS), must identify:

> (i)   the environmental impact of the proposed action,
> (ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,

---

[3] Congress amended NEPA in 2023. *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46. "[C]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The relevant 2023 amendments to NEPA do not declare the congressional "intent" behind an earlier version of the statute, nor do they purport to apply retroactively. For the purpose of this appeal, we consider statutory provisions of NEPA as they existed in 2021, when the relevant action took place.

> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

A federal agency may not know before preparing an EIS whether the environmental impacts of its action will be significant, or it may have reason to believe that the action is not likely to have significant effects. In such instances, the agency must, under the applicable regulations, conduct an Environmental Assessment (EA) that describes, among other things, "the purpose and need for the proposed action," alternatives to that action, and the "environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(a), (c) (2020). Based on the EA, the agency may determine that the action will not have significant environmental impacts, in which case it issues a Finding of No Significant Impact ("FONSI"). *Id.* at § 1501.6(a) (2020). Or the agency may determine that its activity will have significant environmental effects, in which case it must prepare an EIS. *Id.* at § 1501.1(a)(3) (2020).[4]

No matter which form of environmental review an agency undertakes, timing and public engagement are

---

[4] Agencies may designate "categorical exclusions" for actions that "normally do not have a significant effect on the human environment" and "therefore do not require preparation of an [EA] or [EIS]," barring "extraordinary circumstances." 40 C.F.R. § 1501.4(a)–(b) (2020).

critical. With respect to timing, agencies must take a "hard look" at environmental impacts "*before* taking . . . action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (emphasis added) (citing *Kleppe*, 427 U.S. at 410 n.21). "[B]y focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349.

The Council on Environmental Quality (CEQ), the agency that promulgates NEPA's implementing regulations, has emphasized the need to conduct NEPA review "at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions." 40 C.F.R. § 1501.2(a) (2020). NEPA regulations require an agency to "commence preparation of an [EIS] as close as practicable to the time the agency is developing . . . a proposal" and at least "early enough so that it can serve as an important practical contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Id.* at § 1502.5 (2020). Where an agency "directly undertake[s]" a project, "the agency shall prepare the [EIS] at the feasibility analysis [or go/no-go] stage and may supplement it at a later stage, if necessary." *Id.* at § 1502.5(a) (2020). More generally, an agency may not act on a proposal that has an "adverse environmental effect" or "limit[s] the choice of reasonable alternatives" until it has issued a FONSI or another record of decision. *Id.* at § 1506.1(a) (2020).

Public engagement also plays a crucial role in realizing NEPA's policy goals. "[P]ublic comment procedures," including both public notice and public participation, "are at

the heart of the NEPA review process," reflecting "the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision" before it makes that decision. *California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982) (citing 42 U.S.C. § 4332(2)(C) (1976)); *see also* 40 C.F.R. § 1500.2(d) (2020) (noting that federal agencies must, to the fullest extent possible, "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment").

Whether the proposed agency action requires an EIS or EA, agencies must provide "public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons . . . who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b) (2020). NEPA regulations outline a more formal public engagement process when an agency prepares an EIS. *See id.* at § 1503.1 *et seq.* (2020). Even when the agency prepares only an EA, NEPA regulations "require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA." *Bering Strait Citizens for Responsible Res. Dev.*, 524 F.3d 938, 953 (9th Cir. 2009) (quoting *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005)).

B

RCRA is a substantive environmental statute that "empowers [the U.S. Environmental Protection Agency (EPA)] to regulate hazardous wastes from cradle to grave, in

accordance with the rigorous safeguards and waste management procedures" set forth in the statute. *City of Chicago v. Envt'l Def. Fund*, 511 U.S. 328, 331 (1994). RCRA governs facilities that "treat[], stor[e], [or] dispos[e]" of hazardous waste and authorizes EPA to set performance standards for such facilities by regulation. 42 U.S.C. § 6924(a) (1996).

To handle hazardous waste, a facility must apply for and obtain a RCRA permit. *See id.* at § 6925 (1996). The application requires prospective permittees to submit, among other things, a "description of the processes to be used for treating, storing, and disposing of hazardous waste," 40 C.F.R. § 270.13(i) (2006); "[c]hemical and physical analyses of the hazardous waste and hazardous debris to be handled at the facility," *id.* at § 270.14(b)(2) (2006); and a "description of procedures, structures or equipment" used to prevent runoff, water contamination, atmospheric releases, and other hazards to the surrounding area and personnel, *id.* at § 270.14(b)(8) (2006).

Applicants that propose to operate "miscellaneous" waste disposal units, of which the Air Force is one, must also submit "[d]etailed hydrologic, geologic, and meteorologic assessments" that "address and ensure compliance of the unit" with certain environmental performance standards. *See id.* at § 270.23(b) (1987) (detailing application requirements for facilities that dispose of waste through "miscellaneous units"). EPA or a designated state agency, *see infra*, must provide public notice of its intent to issue a RCRA permit, allow for public comment, and, under certain circumstances, hold a public hearing on the proposed permit. *See* 42 U.S.C. § 6974(b)(2) (1980); 40 C.F.R. §§ 124.10–.14.

Under RCRA, EPA may authorize a state to administer a hazardous waste program "in lieu of the Federal program." 42 U.S.C. § 6926(b) (1986). To receive such authorization, a state must develop a hazardous waste program, provide notice and opportunity for public hearing, and submit an application to EPA. *Id.* With EPA's authorization, the state may "issue and enforce [RCRA] permits," *id.*, and take action with the "same force and effect as action taken by [EPA]," *id.* at § 6926(d).

The Guam Environmental Protection Agency (Guam EPA) applied to administer RCRA in 1985 and received its authorization from EPA in January 1986. *See* 51 Fed. Reg. 1370–71 (Jan. 13, 1986). Guam EPA administers RCRA pursuant to its Hazardous Waste Management regulations, which mimic EPA's regulations—including its RCRA permit application requirements—in significant part. *See* 22 Guam Admin. R. & Regs. §§ 30101–30113.

Under Guam EPA's regulations, a RCRA permit is "effective for a fixed term not to exceed 3 years." *Id.* at § 30109(m). When a facility timely applies for the renewal of its RCRA permit, Guam EPA regulations provide that the facility's "expired permit continue[s] in force . . . until the effective date of a new permit." 40 C.F.R. § 270.51 (2005); *see also* 22 Guam Admin. R. & Regs. § 30109(a), (o) (adopting 40 C.F.R. § 270.51).

Guam EPA largely adopts the federal approach when it comes to public participation in the RCRA permitting process. When Guam EPA has tentatively decided to issue a RCRA permit, it provides public notice and allows at least forty-five days for public comment. 22 Guam Admin. R. & Regs. § 30110(i). During this period, interested persons may submit written comments on the proposed permit and ask for

a public hearing, which must be held on request or when Guam EPA finds a "significant degree of public interest" in the permit. *Id.* at §§ 30110(j), 30110(k)(a)(1).

C

The Air Force operates Andersen Air Force Base (AAFB) in northern Guam. It has erected an Explosive Ordnance Disposal (EOD) range at Tarague Beach, directly adjacent to the Base. The Air Force uses this range to dispose of "unserviceable ordnance and other pyrotechnic devices," such as "black powder, white/red phosphorus, tear gas, ammunitions, propellants, and [other] explosive materials."

The Air Force has used two methods to destroy hazardous munitions waste at Tarague Beach: open burning (OB) and open detonation (OD) (together, "OB/OD operations"). Open burning entails placing the waste munitions in a four-foot-wide, five-foot-tall "burn kettle," along with wood, roughly ten gallons of diesel fuel, and an ignition device. Open detonation involves placing the waste munitions, an explosive charge, and an igniter into a pit. Under both operations, the igniter is remotely activated from a personnel bunker and the waste munitions are destroyed through burning or explosion. A 2,400 foot-radius safety zone surrounds the active treatment units at Tarague Beach.

The Air Force first received a RCRA permit to conduct OB/OD operations on Tarague Beach in 1982. Every three years since then, it has applied for a new permit. Guam EPA has granted each permit since it was authorized to do so. While OD operations have occurred under each permit, no OB operations have taken place since at least the early 2000s. The burn kettle the Air Force previously used for OB operations is "non-operational due to severe corrosion," and "[b]efore any open burning activity is allowed under the

[RCRA] permit, the unit must meet . . . [certain] design and operational specifications."

Guam EPA issued the Air Force's most recent RCRA permit in 2018; it was set to expire on September 3, 2021. As the expiration date approached, the agency had to decide whether it would continue OD operations (and potentially restart OB operations) on Tarague Beach or find another way to manage hazardous waste munitions. The Air Force submitted an application for permit renewal in May 2021, reflecting its intention to conduct OB/OD operations at the beach from 2021 to 2024.

The Air Force applied for the 2021–2024 RCRA permit without issuing either an EIS or EA or invoking a categorical exclusion. There was no provision for public comment on the proposed action's environmental impacts or on reasonable alternatives to the proposed action before the Air Force submitted its permit application. The NEPA bypass occurred notwithstanding known potential environmental impacts of OB/OD operations, including groundwater contamination, ejection of waste materials into the ground or air, and the possible existence of a range of potential alternatives for disposing of hazardous waste munitions.

After receiving the Air Force's application in May 2021, Guam EPA held a public review and comment period from July 30, 2021 to September 13, 2021 and hosted a public hearing on August 30, 2021. As Guam EPA explained in its Notice of Preliminary Decision on the Air Force's application Guam EPA received "significant comments that warrant[ed] this Agency to address [*sic*] before making a final decision on the completeness and technical aspects of the permit renewal application." On October 15, 2021, Guam EPA issued to the Air Force its Notice of Preliminary

Decision that "neither den[ied] nor approve[d]" the Air Force's permit application while Guam EPA continued to review the public comments. In the meantime, with Guam EPA's approval, the Air Force has continued to operate the OB/OD facility on Tarague Beach under the terms of its 2018 permit while its renewal application is pending. *See* 40 C.F.R. § 270.51(d) (authorizing a renewal permit applicant to extend the life of its current permit by filing a timely and complete application to the appropriate RCRA permitting authority).

D

In January 2022, Prutehi Litekyan sued the U.S. Air Force, Secretary of the Air Force Frank Kendall, and U.S. Secretary of Defense Lloyd Austin, alleging that they violated NEPA by submitting a RCRA permit renewal application without preparing an EIS or EA that "(1) takes the requisite 'hard look' at the environmental impacts of the proposed OB/OD operations, (2) considers a reasonable range of alternatives, including the 'no action' alternative, and (3) provides opportunities for public comment on the proposed operations and reasonable alternatives."

Prutehi Litekyan identified several ways in which its members' interests would be concretely harmed by the Air Force's proposed OB/OD operations. The organization asserted that owners of the land surrounding Tarague Beach would be injured by the potential contamination of land, beach, and water that OB/OD operations could cause. Prutehi Litekyan also alleged that its members frequently spend time on Tarague Beach for recreational, cultural, spiritual, and aesthetic purposes, and that the explosions, smoke, noise, and potential contamination from the Air Force's disposal operations over the period covered by the

permit application would interfere with their use and enjoyment of the area. The Air Force's planned activities on Tarague Beach would, the organization alleged, also interfere with their fisher members' food-gathering. And, on behalf of its wildlife biologist members, Prutehi Litekyan expressed concern that shockwaves from explosions on the Beach and the potential for marine contamination could harm their professional and scientific interest in studying Guam's endangered green sea turtles.

Among other forms of relief, Prutehi Litekyan sought a declaratory judgment that Defendants had violated NEPA and a grant of injunctive relief (1) compelling Defendants to withdraw their pending RCRA permit application and (2) enjoining continued OB/OD operations and resubmission of any RCRA application as long as Defendants did not comply with NEPA's requirements.

Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), which the district court granted, on several grounds. The court first held that Prutehi Litekyan's injury was not fairly traceable to the Air Force's submission of its permit application, so the organization lacked standing. It also determined that there was no final agency action, so Prutehi Litekyan's challenge was unripe, as Guam EPA had yet to make a decision on the permit application. Holding that Prutehi Litekyan lacked Article III standing and its challenge was unripe, the district court dismissed the complaint for lack of subject matter jurisdiction.

As an alternate ground for dismissal, the district court held that Prutehi Litekyan failed to state a claim upon which relief could be granted because the Air Force's permit application was not subject to NEPA. The district court relied for this conclusion on the "functional equivalence

doctrine," which exempts agency action from NEPA review where another statute imposes environmental review procedures that would be "redundant with" those provided for under NEPA. *See Alabama ex rel. Siegelman v. U.S. E.P.A.*, 911 F.2d 499, 504 (11th Cir. 1990).

Prutehi Litekyan timely appealed the district court's decision, challenging all three grounds for dismissal— standing, ripeness, and failure to state a claim due to an applicable NEPA exception.

## II. DISCUSSION

"We review de novo a district court's dismissal under Rule 12(b)(1) or Rule 12(b)(6)." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 878 (9th Cir. 2022). In reviewing a motion to dismiss for lack of standing, we "constru[e] the factual allegations in the complaint in favor of the plaintiffs." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting *Mont. Shooting Sports Ass'n v. Holder,* 727 F.3d 975, 979 (9th Cir. 2013)). And in reviewing a motion to dismiss for failure to state a claim, we "accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Dent v. Nat'l Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) (quoting *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013)). "Dismissal is only proper where the allegations in the complaint do not factually support a cognizable legal theory." *Id*.

### A. Standing

To establish standing, Prutehi Litekyan must demonstrate that it has (1) suffered an "injury in fact" that is (2) fairly traceable to the challenged conduct of the

defendant and (3) likely to be redressed by a favorable
judicial opinion. *Lujan v. Defs. of Wildlife*, 504 U.S. 555,
560–61 (1992).

The district court concluded that the Plaintiff's "injury is
not fairly traceable to the challenged action of Defendants."**5**

To establish traceability, "there must be a causal
connection between the injury and the conduct complained
of—the injury has to be fairly traceable to the challenged
action of the defendant, and not the result of the independent
action of some third party not before the court." *Id.* at 560
(alterations omitted) (quoting *Simon v. E. Ky. Welfare Rts.
Org.,* 426 U.S. 26, 41–42 (1976)). But when a plaintiff seeks
to enforce a procedural right like the ones NEPA guarantees,
both the traceability and redressability requirements are
"relaxed." *Whitewater Draw Nat. Res. Conservation Dist. v.
Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) (quoting *W.*

---

[5] In passing, the Air Force suggests that Prutehi Litekyan has not
experienced an injury-in-fact because it claims deprivation of a
"procedural right in vacuo."

Prutehi Litekyan did adequately allege injury-in-fact. The
organization's procedural injury "is tied to a substantive 'harm to the
environment,'" which "consists of added risk to the environment that
takes place when governmental decisionmakers make up their minds
without having before them an analysis (with public comment) of the
likely effects of their decision on the environment." *Citizens for Better
Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003)
(quoting *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 n.14 (9th
Cir. 2000)). And the injury is "concrete" because Prutehi Litekyan's
members, such as local families, fishers, and scientists, have a
"geographic nexus . . . to the location suffering an environmental
impact," "use the affected area," and "are persons for whom the aesthetic
and recreational values of the area," among other values, "will be
lessened by the challenged activity." *WildEarth Guardians*, 795 F.3d at
1154 (9th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl.
Servs., Inc.*, 528 U.S. 167, 183 (2000)).

*Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)). As explained in *Lujan*, procedural rights are "special," and a plaintiff who asserts a procedural right to protected concrete interests "can assert that right without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n.7. Specifically, a NEPA plaintiff "need not show" that compliance with the procedural requirement "would lead to a different result at either the programmatic or project-specific level." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015). Instead, the plaintiff need demonstrate only that the agency's decision "could be influenced by the environmental considerations that NEPA requires an agency to study." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001); *see also W. Watersheds Project*, 632 F.3d at 485.

Construing the allegations in the complaint in Prutehi Litekyan's favor, the organization's injury was fairly traceable to the Air Force's decision to carry out OB/OD operations (as detailed in its 2021 RCRA permit application) without first conducting an EA or EIS. According to the complaint, the Air Force did not carry out the detailed and complete environmental review NEPA requires. In particular, it did not take the "requisite 'hard look' at the potential impact" of OB/OD operations, *Ocean Advocs. v. U.S. Army Corps of Engin'rs*, 402 F.3d 846, 864 (9th Cir. 2005), including "meaningful[ly] consider[ing]" alternatives to its proposed waste disposal plan, *Se. Alaska Conserv. Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1057 (9th Cir. 2011) (quoting *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988)). The Air Force also failed to engage the public *before* deciding to continue disposing of

hazardous waste at Tarague Beach, as is required under
NEPA whether an agency ultimately issues an EA or EIS.

If the Air Force had conducted NEPA's mandatory
environmental review at the required time, its
decisionmaking process could have been influenced "by the
environmental considerations that NEPA requires an agency
to study," *Hall*, 266 F.3d at 977, and could have resulted in
a different decision, including a decision not to carry out
OB/OD operations on Tarague Beach in the following three
years or to do so differently. Prutehi Litekyan's injury is thus
fairly traceable to the Air Force's noncompliance with
NEPA.

That Guam EPA acts as the RCRA permitting authority
does not require a different result. Prutehi Litekyan does not
"challenge[] . . . the anticipated approval" of a "currently
pending" permit application. *Montana Envtl. Info. Ctr. v.
Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014).
Instead, it challenges the deprivation of a procedural right,
which occurred when the Air Force chose not to comply with
NEPA before arriving at the decision to carry out OB/OD
operations on Tarague Beach for the next three years. So
long as there is a reasonable probability that Guam EPA will
approve the Air Force's application—something the Air
Force does not dispute—enforcing that procedural right will
reduce the likelihood of Prutehi Litekyan's experiencing its
asserted injury. That makes its injury fairly traceable to the
challenged conduct.

## B. Final Agency Action

The district court also held that Prutehi Litekyan's NEPA
claim failed because the Air Force's action was not final. We
disagree. The finality of the Air Force's action determines
both whether Prutehi Litekyan can sue under the APA and

whether the claim is ripe under Article III. There was final
agency action here, so Prutehi Litekyan's claim is ready for
adjudication.

(i)

Judicial review of a NEPA claim "is governed by the
[Administrative Procedure Act (APA)], which limits review
to 'final agency action.'" *Env't Def. Ctr. v. Bureau of Ocean
Energy Mgmt.*, 36 F.4th 850, 867 (9th Cir. 2022) (quoting 5
U.S.C. § 704). "For there to be 'final agency action,' there
must first be 'agency action.'" *S.F. Herring Ass'n v. Dep't
of the Interior*, 946 F.3d 564, 575 (9th Cir. 2019) (citation
omitted) (quoting 5 U.S.C. § 704).

The APA defines "agency action" as "the whole or a part
of an agency rule, order, license, sanction, relief, or the
equivalent or denial thereof, or failure to act." 5 U.S.C.
§ 551(13). The statutory definition of an agency "rule" is
"broad[]," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95
(2015), and encompasses "the whole or a part of an agency
statement of general or particular applicability and future
effect designed to implement, interpret, or prescribe law or
policy or describing the organization, procedure, or practice
requirements of an agency," 5 U.S.C. § 551(4). The
definition of "rule" includes "nearly every statement an
agency may make." *Batterton v. Marshall*, 648 F.2d 694,
700 (D.C. Cir. 1980).

Both the Air Force and the Department of Defense are
federal administrative agencies subject to the APA. The Air
Force's decision to conduct OB/OD operations in the future
according to specified protocols, as evidenced by the content
of its RCRA permit renewal application, is an agency
statement of "particular applicability"—*i.e.*, a statement
concerning its plan for hazardous waste removal at Tarague

Beach—and "future effect designed to implement . . . policy." 5 U.S.C. § 551(4). The agency plan constitutes agency action.

(ii)

For agency action to be final, "two conditions must be satisfied." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (citation omitted) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113 (1948)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71 (1970)). "In applying this test, we look to factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024) (internal quotation marks omitted) (quoting *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022)). "We also focus on the practical and legal effects of the agency action: The finality element must be interpreted in a pragmatic and flexible manner." *Saliba*, 47 F.4th at 967 (internal quotation marks and alteration omitted) (quoting *Oregon Nat. Desert Ass'n v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)).

1

With respect to the first *Bennett* condition, the Air Force had reached the "consummation" of its decisionmaking

process when it filed its permit application. Before the agency's 2018 permit expired in 2021, the Air Force decided to continue OD operations and restart OB operations at Tarague Beach for a forward-looking three-year period. The Air Force "arrived at [this] definitive position . . . and put [it] into effect" by submitting a 2021 permit renewal application that described how the agency would carry out OB/OD activities between 2021 and 2024. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985–86 (9th Cir. 2006).

   *(a) The Air Force's decision was not of a "tentative or interlocutory nature."*

   The Air Force contends that "[r]equesting action by another agency is of a 'tentative or interlocutory nature'" because "the legal effect [of the request] depends on the other agency's actions," and "preliminary or interim steps in a permitting process are not themselves final agency action." The Air Force—and the Dissent—misidentify the agency action Prutehi Litekyan contests. The organization does not characterize as the final action Guam EPA's eventual permitting decision under RCRA, *see* Dissent at 54, 55, or challenge an intermediate step along the way to that permitting decision, *see* Dissent at 49, n.2; *id.* at 54-58. Instead, it challenges the *Air Force's decision* to engage in OB/OD operations over the next three years under particular protocols, reflected by the content of the 2021 permit application.**[6]**

   The Air Force's decision marked an endpoint, not a starting point. The agency has "not suggest[ed] it is still in

---

[6] Contrary to the Dissent's characterization, Prutehi Litekyan has consistently framed its challenge this way, from the filing of its initial complaint to its appellate briefing.

the middle of trying to figure out its position on" OB/OD operations at Tarague Beach, or that the plan memorialized in its application was tentative from the agency's perspective. *S.F. Herring*, 946 F.3d at 578. Accepting Prutehi Litekyan's allegations as true and drawing reasonable inferences in its favor, the Air Force engaged in an "evaluative process" to prepare its renewal application. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1136 (9th Cir. 1998). And the agency "arrive[d] at a reasoned, deliberate decision" to conduct OB/OD operations at Tarague Beach for the period covered by its application. *Id.* The final agency action requirement is meant to "prevent premature intrusion [by courts] into the agency's deliberations," not to insist that parties "keep knocking at the agency's door when the agency has already made its position clear." *S.F. Herring*, 946 F.3d at 579.

Even if the Air Force were to revisit its OB/OD operations *sua sponte* or at Guam EPA's request, "[t]he mere possibility that [the] agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Id.* (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)). Most, if not all, agency decisions incorporate some contingencies, but that is not enough to shield them from judicial review.

For instance, in *Environmental Defense Center v. Bureau of Ocean Energy Management*, two federal agencies—the Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement—issued a programmatic EA and FONSI regarding offshore well simulation treatments (or "fracking") in the Pacific Outer Continental Shelf. 36 F.4th at 864–66. We held that the issuance of these NEPA documents constituted "final agency action" even though the agencies in question had not

approved "site-specific permits" that, if applied for and approved, would lead "private entities" to engage in fracking in the region. *Id.* at 866–69.

Likewise, in *California Wilderness Coalition v. U.S. Department of Energy*, we held that the Department of Energy's designation of particular geographic areas as "national interest electric transmission corridors" (NIETCs) was final agency action. 631 F.3d 1072, 1100 (9th Cir. 2011). The agency's NIETC designation "ma[de] available a fast-track approval process to utilities seeking permits for transmission lines within the corridor," *id.* at 1080, although "any question as to the actual siting [or authorization] of a facility within the corridors w[ould] be addressed to" a different federal agency, the Federal Energy Regulatory Commission (FERC), *id.* at 1100. Even though FERC had the ultimate power to "authorize the construction or modification of electric transmission facilities," *id.* at 1100 (quoting National Electric Transmission Congestion Report, 73 Fed. Reg. 12,959, 12,969 (Mar. 11, 2008)), the NIETC designation "conclude[d]" the DOE's responsibilities and "undoubtedly" qualified as final agency action, *id.*

Similarly, in *Havasupai Tribe v. Provencio*, we considered whether the Forest Service engaged in final agency action when it issued a Mineral Report specifying that a private mine owner had existing mining rights on a particular piece of public land. 906 F.3d 1155, 1159–63 (9th Cir. 2018). We concluded that the Forest Service's conduct qualified as final agency action even though "the final decision to *contest* a claim of existing rights rest[ed]" with a different federal agency, and "[r]ights to a mineral deposit on public land are not [technically] *conferred* by agency action; they are acquired by the miner's own actions of location and discovery." *Id.* at 1162.

These examples demonstrate that a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party. In short, "[a]n agency action can be final even if its legal or practical effects are contingent on a future event." *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1185 (9th Cir. 2019).

Here, the Air Force's ultimate implementation of its proposed waste disposal plan depends on whether Guam EPA grants or denies its application. Still, the permit renewal application represents the *Air Force's* "last word" on its intent to carry out OB/OD operations at Tarague Beach. *Or. Nat. Desert Ass'n*, 465 F.3d at 984.

*(b) The Air Force's decision changed the "status quo."*

In addition to its mistaken focus on Guam EPA's permitting decision, the Air Force maintains that the decision to conduct OB/OD operations at Tarague Beach is also not final for a separate reason—that it reflects ongoing agency operations, not a change in the "status quo." This argument downplays two critical points.

For one, to conduct OB/OD operations, the Air Force is required to apply anew for a RCRA permit every three years. Each time the Air Force applies for a new RCRA permit, it must assess whether OB/OD operations make sense based on then-existing conditions, not conditions at the time it first applied for a permit. *See* 22 Guam Admin. R. & Regs. § 30109(a). And if the Air Force does not reapply for a permit covering a particular three-year period, its existing permit will lapse and burning or detonation on Tarague Beach will have to cease.

The design of the RCRA permitting regime distinguishes the Air Force's decision from the kinds of routine implementation decisions this Court has deemed not to constitute final agency action. For instance, a federal fish hatchery's decision to periodically close dam gates and divert water from one body of water to another reflects "day-to-day operations that merely implement operational plans" that the agency had already set; it does not consummate an agency process for establishing future plans. *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801–02 (9th Cir. 2013). Similarly, the Forest Service's "routine [trail] maintenance work" on federal lands does not qualify as final agency action, as these activities "implement [the agency's pre-existing] travel management and forest plans" for the lands in question. *Mont. Wilderness Ass'n v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds*, 542 U.S. 917 (2004).

In cases like *Wild Fish Conservancy* and *Montana Wilderness Association*, a federal agency made a decision to adopt a particular program or plan; the subsequent activities implemented that decision. Here, by contrast, each of the Air Force's triennial permit applications reflects a discrete commitment to carry out hazardous waste removal repeatedly at Tarague Beach in future years. As reflected by its permit application, the Air Force has affirmatively chosen to pursue OB/OD operations continually for a three-year period as a means of waste removal, over the alternative of letting its approval to do so lapse. Put another way, the analogue to the closing of dam gates in *Wild Fish Conservancy* and the routine maintenance work in *Montana Wilderness Association* would be the decision to carry out OB/OD operations on a particular day during the three-year

LITEKYAN V. USAF 29

period covered by a permit, not the decision to produce a plan for such operations spanning that entire time period.[7]

The design of RCRA's permitting regime forecloses a related argument put forth by the Air Force: that it decided to engage in OB/OD operations only when it first applied for a RCRA permit decades ago, so Prutehi Litekyan's claim is time-barred. Again, every three years, the Air Force must affirmatively decide to engage in OB/OD operations at Tarague Beach for the forward-looking three-year period; the agency must then submit a permit application—based on current conditions, not conditions as they were decades ago—that memorializes this decision. The Air Force's statute of limitations argument fundamentally misapprehends this point.[8]

---

[7] The Dissent cites two out-of-circuit opinions to support its position that the Air Force's decision does not change the status quo. *See* Dissent at 60-61 (citing *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 191 (4th Cir. 2013); *Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997)). Like *Wild Fish Conservancy* and *Montana Wilderness Association*, these cases are consequentially distinct from the one at bar. The text of the RCRA statute and its implementing regulations specifically impose periodic decisional junctures on permittees, requiring them to reevaluate various aspects of their disposal procedures every three years if they wish to continue managing hazardous waste. *See, e.g.,* 42 U.S.C. § 6925; 22 Guam Admin. R. & Regs. § 30109. There are no such statutorily-mandated trigger points at issue in the cases the Dissent references.

[8] The Dissent represents that the Air Force's "longstanding decision" to carry out OB/OD operations at Tarague Beach, "first made in 1982, was even reflected in the latest [permit] Application: that 'the OB/OD units will be operated until the Air Force Base ceases operation.'" Dissent at 56. The application contains no reference to any earlier decision. And it

Additionally, the Air Force's latest permit renewal application does propose to change the status quo, in a very specific way. OB operations "have been inactive since at least before May 2002," and the "burn kettle previously used for open burning [has not been] operational due to severe corrosion." The status quo at Tarague Beach has been *no* open burning. As Prutehi Litekyan's complaint alleges, the Air Force has now "propose[d] to construct a new device to restart open burning operations" that have not been conducted at Tarague Beach in decades. So it is not true that the Air Force is passively proposing to continue ongoing operations.

In sum, the Air Force "consummated" its decisionmaking process when it elected to apply and applied to continue OB/OD operations at Tarague Beach for three years. The application memorialized the agency's decision and spelled out its details. There was nothing tentative or uncertain about the plan the Air Force memorialized in its application. And the agency's final action occurred when it decided to apply and then applied for a RCRA permit in 2021, not many years earlier.

2

The second *Bennett* condition requires that the agency action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (quoting *Port of Bos. Marine Terminal Ass'n,* 400 U.S. at 71). The Air Force's decision imposes a legal obligation upon the agency. Should

---

states that "*[i]t is estimated that* the OB/OD units will be operated until the Air Force Base ceases operation [emphasis added]," not that a decision has been made in that regard.

Guam EPA issue the Air Force a renewal permit, the permit's terms and conditions will be predicated on the representations made and the disposal plans set forth in the Air Force's application. And if Guam EPA issues a permit, the Air Force will not be able to deviate unilaterally from the conditions imposed by its permit: Both misrepresentations made in a permit application and noncompliance with the terms of a permit are grounds for permit termination, *see* 22 Guam Admin. R. & Regs. § 30110(d) (adopting 40 C.F.R. § 270.43), and substantive modifications must be made with the permission of Guam EPA, *see id.* (citing 40 C.F.R. §§ 270.41–42). Finally, if Guam EPA denies the permit, that too would impose a legal consequence flowing from the Air Force's waste disposal plan—the obligation not to conduct waste disposal in accord with the decision reached before the application was submitted.

Given these circumstances, the Air Force's waste disposal plan is closely analogous to the agency action at issue in *Bennett* itself. *Bennett* concerned the status of a Biological Opinion issued pursuant to the Endangered Species Act (ESA). 520 U.S. at 157. Under the ESA, when a federal agency determines that an action it proposes to take may adversely impact a protected species or its habitat, the Fish and Wildlife Service must prepare a written statement—the Biological Opinion—that analyzes the likely impact of the proposed activity. *Id.* at 158. Where the Service concludes that the proposed agency action would threaten a protected species or habitat, its Biological Opinion must outline "reasonable and prudent alternatives" that the Service believes would avoid that consequence. *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)). If the Biological Opinion concludes that the "agency action will not result in jeopardy or adverse habitat modification, or if it offers reasonable and

prudent alternatives to avoid that consequence, the Service must provide the agency with a written statement (known as the Incidental Take Statement) specifying the 'impact of such incidental taking on the species,' any 'reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact,' and setting forth 'the terms and conditions . . . that must be complied with by the Federal agency . . . to implement [those measures].'" *Id.* (quoting 16 U.S.C. § 1536(b)(4)).

*Bennett* concluded that the Biological Opinion and its accompanying Incidental Take Statement constituted final agency action, as they "alter[ed] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Id.* at 178. The court distinguished these statements from agency reports that "carried 'no direct consequences' and served 'more like . . . tentative recommendation[s] than . . . final and binding determination[s].'" *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992)).

At least as much as, and probably even *more* than, the Service's Biological Opinion and Incidental Take Statement in *Bennett*, the waste disposal plan included in the Air Force's permit application has the "direct and appreciable legal consequence[]," *id.* at 178, of committing the Air Force to a particular course of action—waste removal operations under the protocol proposed in the application. Far from being "purely advisory," *id.*, the Air Force's waste disposal plan as articulated in its application lays the groundwork for the plan it will have to follow during the permit period. It bears repeating that even if the Air Force modifies or abandons its waste disposal plan down the road, or Guam EPA directs it to, "[t]he mere possibility that [the] agency

might reconsider [its plans] . . . does not suffice to make an otherwise final agency action nonfinal." *S.F. Herring*, 946 F.3d at 579 (quoting *Sackett*, 566 U.S. at 127).

In sum, the Air Force's decision to proceed with OB/OD operations at Tarague Beach determined legal obligations,[9] satisfying the second prong of the *Bennett* test. As both prongs of the *Bennett* standard for final action are met, we conclude that the Air Force took "final agency action" for the purposes of judicial review, so Prutehi Litekyan can bring suit under the APA.

(iii)

The district court discussed final agency action in its ruling on ripeness. As our final agency action analysis makes evident that Prutehi Litekyan's claim is ready for adjudication, the claim is also jurisdictionally and prudentially ripe.

"Evaluating ripeness in the agency context requires considering '(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.'" *Env't Def. Ctr.*, 36 F.4th at 870 (quoting *Ohio Forestry Ass'n v. Sierra*

---

[9] The Air Force's decision to carry out OB/OD operations for the next three years, as memorialized in its permit renewal application, also had the legal consequence of prolonging the life of its 2018 permit. *See* 40 C.F.R. § 270.51(d). The Air Force has continued to conduct OD operations at Tarague Beach under the authority of its 2018 permit. The decision to continue waste disposal operations as detailed in the permit application not only determines legal obligations, but also affords it the legal right to continue disposal operations under its prior permit.

*Club*, 523 U.S. 726, 733 (1998)). All three factors militate in favor of adjudicating Prutehi Litekyan's claim now.

First, "delayed review would cause hardship to [Prutehi Litekyan] because [it is] alleging only procedural violations in this case," and delaying the review of procedural injuries "den[ies]" Prutehi Litekyan "the fundamental safeguards" provided by NEPA, thereby "extend[ing] and compound[ing] the harms" the organization alleges. *Id.* Second, as we have explained, the Air Force has taken a definitive position on hazardous waste disposal at Tarague Beach for the 2021–2024 permitting period. Whether or not Guam EPA issues the Air Force's next RCRA permit, the Air Force has reached an "administrative resting place" on this project, rendering its conduct ready for judicial review. *Id.* (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003)). Third, "there is no need for further factual development" because "[f]or claims of procedural injury, we have held that the need for factual development ceases when the alleged procedural violation is complete." *Id.* at 870–71; *see also Ohio Forestry*, 523 U.S. at 737 (explaining that a party challenging "a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper"). Our final agency action holding therefore disposes of any ripeness concern.

### C. Failure to State a Claim

As an alternate ground for dismissal, the district court held that Prutehi Litekyan failed to state a claim. It reasoned that NEPA's environmental review process is "redundant" with RCRA's permitting process, so NEPA does not apply.

We do not agree. To explain why, we first clarify the analytical framework for assessing whether another statute

exempts an agency from complying with NEPA's procedural requirements. We then address why RCRA complements, but does not substitute for, environmental review under NEPA.

NEPA pronounces that "Congress authorizes and directs that, to the fullest extent possible . . . public laws of the United States shall be interpreted and administered with the policies [that NEPA] set[s] forth." 42 U.S.C. § 4332. We have interpreted this "congressional mandate" as a "direction to 'make as liberal an interpretation as we can to accommodate the application of NEPA.'" *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 398 (9th Cir. 1988) (quoting *Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986)).

Implementing that precept, our Court has recognized "only 'two circumstances'" in which an agency need not comply with NEPA's procedural requirements "in the presence of major federal action and despite an absence of express statutory exemption": (1) "where doing so 'would create an irreconcilable and fundamental conflict' with the substantive statute at issue," and (2) where, "in limited circumstances, a substantive statute 'displaces' NEPA's procedural requirements." *Stand Up for California! v. U.S. Dep't of Interior*, 959 F.3d 1154, 1163–64 (9th Cir. 2020) (quoting *Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958, 963 (9th Cir. 2016)).

The first of the two NEPA exemptions applies only where an irreconcilable and fundamental statutory conflict is "clear and unavoidable." *Jones*, 792 F.2d at 826 (quoting *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 788 (1976)). For example, where an agency's substantive statute provides that a document filed with the agency automatically becomes effective in thirty days, there

is no way an EIS could be drafted, circulated, commented on, and revised in that time frame. *See Flint Ridge*, 426 U.S. at 788. In that circumstance, NEPA does not apply, as it conflicts with the specific directive of the substantive statute governing the particular action.

It is possible and practicable for the Air Force to comply with both NEPA and RCRA. As we have explained, the RCRA permitting process is "flexible enough to accommodate" NEPA's procedural requirements. *San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d 581, 648 (9th Cir. 2014). The NEPA requirements apply *before* a permit application is submitted and do not involve any interaction with the permitting agency, here Guam EPA. The district court correctly held that the conflict exemption is "not applicable in the instant case."

Even if there is no conflict between NEPA and another statute, an alternative statute may "displace" NEPA's procedural requirements by "creat[ing] a[] comparable process for ensuring environmental protection." *Stand Up for California!*, 959 F.3d at 1165. So we may discuss the displacement issue with clarity, we first address some terminological confusion. At one point, our Court distinguished between a "displacement" exemption to NEPA, which was said to apply where "Congress [has] intended to displace one [statute's environmental review] procedure with another," and a "functional equivalent" exemption, which was said to apply where "one [statute's] process requires the same steps as another." *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1504 n.10 (9th Cir. 1995).

Over time, reliance on this distinction has faded. As we stated more recently, "[r]egardless of the language used to conduct the [second NEPA exemption] analysis," the

"factors" we consider are the "same." *Jewell*, 747 F.3d at
651 n.51. Specifically, we ask whether the environmental
review processes set forth in NEPA and the alternative
statute are "sufficiently similar" that the overlap renders
NEPA superfluous, or "sufficiently different" that the
divergence reflects Congress's intent to replace NEPA's
processes for those articulated in the alternative statute. *Id.*
at 650 (comparing *Douglas Cnty.*, in which we held that
Section 4 of the Endangered Species Act displaced NEPA
"because the[ir] processes are sufficiently similar," with
*Merrell v. Thomas*, 807 F.2d 776, 779 (9th Cir. 1986), in
which we held that the Federal Insecticide, Fungicide, and
Rodenticide Act displaced NEPA because their processes
were "sufficiently different" that Congress could not have
intended regulated parties to comply with both).

(i)

We first consider whether the processes set forth in
NEPA and RCRA are so similar that compliance with NEPA
would be, in the district court's words, "redundant." Only on
rare occasions has this Court held that substantial overlap
between NEPA and another statute justifies exemption from
NEPA's environmental review.

In *Municipality of Anchorage v. United States*, for
example, we addressed whether a Memorandum of
Agreement between EPA and the U.S. Army that
implemented dredge and fill guidelines mandated by the
Clean Water Act (CWA) was subject to NEPA. 980 F.2d
1320, 1328–29 (9th Cir. 1992). After concluding that the
CWA expressly exempted the Memorandum from NEPA's
EIS requirement, *Anchorage* went on to consider whether
the Memorandum was subject to any of NEPA's other
procedural requirements. We concluded that it was not,

reasoning that "[i]n the CWA, Congress instruct[ed] the EPA and the [Army] to consider many of the same things that NEPA would require before adopting [the] guidelines." *Id.* at 1329. In other words, the "duties and obligations" imposed on the federal agencies by the CWA would "insure that any action taken by the [EPA] administrator under [a section of the Act] w[ould] have been subjected to the 'functional equivalent' of NEPA requirements." *Id.* Because NEPA's purpose would be fulfilled by adhering to the CWA's procedural mandates, exemption from NEPA was appropriate under "the circumstances of th[at] case." *Id.*

Under the circumstances of *this* case, NEPA exemption is not appropriate. There is, to be sure, some overlap between NEPA's procedural requirements and Guam EPA's RCRA permitting process: Both require some analysis of the environmental impact of a proposed action and some degree of public involvement. *Compare* 40 C.F.R. §§ 1500.1–1508.1 (2020) (describing environmental impact assessment and public engagement requirements under NEPA), *with* 40 C.F.R. §§ 270.14, 270.23(b) (requiring assessment of certain environmental impacts as part of the RCRA application process), *and* 42 U.S.C. § 6974(b)(2) (providing for public notice, and public hearing upon request, before the issuance of a RCRA permit).

But critically, the timing of each statute's prescribed environmental review is entirely distinct, reflecting the fundamentally different purposes of the two statutes. Most notably, under NEPA, agencies must prepare an EIS or EA and engage with the public *before* reaching a final decision to undertake a particular activity that may have significant environmental impact. *See* 40 C.F.R. § 1503.1 (2020). The point of NEPA's environmental review requirements is to assure that environmental assessment is "integrate[d]" at the

"earliest possible time to insure that planning and decisions reflect environmental values." *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (quoting 43 Fed. Reg. 55992 (1978)). That timing assures that environmental impacts are not "overlooked or underestimated" and then discovered, if at all, "after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. Furthermore, building in environmental analyses at the planning and decisional stages allows nuanced adjustments of the proposed project by those most familiar with the project's goals and practical limitations.

Review of a RCRA application, by contrast, considers an applicant's settled decision to handle hazardous waste in a particular fashion and to seek permission, here from Guam EPA, to so proceed. *See, e.g.,* 22 Guam Admin. R. & Regs. § 30109(m)(a). Given that role, an environmental agency's application review under RCRA does not impose "'action-forcing' procedures" requiring a "'hard look' at environmental consequences" and "provid[ing] for broad dissemination of relevant environmental information" *before* a waste-handling facility adopts the plan memorialized in its application. *Robertson*, 490 U.S. at 350 (quoting *Kleppe*, 427 U.S. at 410 n.21). Indeed, as the Dissent observes, the environmental disclosures in the Air Force's RCRA application are "short and minimally descriptive," and "certainly not 'precise' by scientific or environmental standards." Dissent at 56. In any case, even if Guam EPA conducts a careful *post hoc* environmental assessment of the Air Force's application, it would be evaluating a commitment the Air Force had already made to a specific course of action. And even though RCRA provides for public engagement before the issuance of a permit, that public engagement cannot lead to the "internaliz[ation of]

opposing viewpoints into [the Air Force's] decisionmaking process to ensure that [the agency is] cognizant of all the environmental trade-offs"; RCRA public engagement, too, occurs only after the Air Force has completed its decisionmaking. *Block*, 690 F.2d at 771.

There is a related, key difference between NEPA and RCRA. "[A]n integral part of [NEPA's] statutory scheme" is "[i]nformed and meaningful consideration of alternatives—including the no action alternative." *Se. Alaska Conservation Council*, 649 F.3d at 1057 (quoting *Bob Marshall All.*, 852 F.2d at 1228). Specifically, NEPA commands agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(E) (1975); *see also id.* at § 4332(C)(iii) (requiring that the EIS include a discussion of a "reasonable range of alternatives to the proposed agency action," including a "no action alternative"); 40 C.F.R. § 1502.14 (2020) (detailing the requirements for the "alternatives section" of the EIS); *id.* at § 1501.5(c) (2020) (requiring discussion of alternatives and environmental effects of alternatives in an EA).

RCRA, by contrast, does not demand the same kind of in-depth analysis of alternatives, and so does not require the permit applicant to give the "full and meaningful consideration" that either an EIS or EA would require. *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217–18 (9th Cir. 2008) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005)). The result is that, as far as the RCRA application process is concerned, the Air Force can proceed on a single track approach in each application cycle, never meaningfully considering whether an alternative approach to

waste disposal would achieve its purpose with less adverse environmental impacts.

NEPA's focus on the internal decisionmaking of operational agencies explains why this Court, and others, have almost exclusively limited NEPA redundancy exemptions to agencies whose focus is protecting the environment. *See, e.g., Anchorage*, 980 F.2d at 1328–29 (exempting the EPA); *Douglas Cnty*, 48 F.3d at 1507–08 (Fish and Wildlife); *Merrell*, 807 F.2d at 781 (EPA); *Building Industry Ass'n of the Bay Area v. U.S. Dep't. of Commerce*, 792 F.3d 1027, 1036 (9th Cir. 2015) (National Marine Fisheries Service). Even then, we have cautioned against blanket NEPA exemptions for environmental agencies, as lightening this administrative load may "result in no one policing the police." *Anchorage*, 980 F.2d at 1328.

Other circuit courts have taken a similar approach.[10] For example, the Eleventh Circuit's *Siegelman* decision, on which the district court heavily relied, concluded that *EPA* that need not comply with NEPA because RCRA provides substantially similar requirements. 911 F.2d at 504. The court noted that "an agency need not comply with NEPA

---

[10] *See, e.g.*, *Env't Def. Fund, Inc. v. EPA*, 489 F.2d 1247, 1257 (D.C. Cir. 1973) ("We conclude that where an agency is engaged *primarily* in an examination of environmental questions, where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, but functional compliance is sufficient.") (emphasis added); *Tex. Comm. on Nat. Res. v. Bergland*, 573 F.2d 201, 208 (5th Cir. 1978) (requiring NEPA compliance because "[u]nlike an agency whose sole responsibility is to protect the environment, the Forest Service is charged with . . . both promotion of conservation of renewable timber resources and a duty to ensure that there is a sustained yield of those resources available.").

*where the agency is engaged primarily in an examination of environmental questions* and where 'the agency's organic legislation mandate[s] specific procedures for considering the environment that [are] functional equivalents of the impact statement process.'" *Id.* (quoting *Tex. Comm. on Nat. Res. v. Bergland*, 573 F.2d 201, 207 (5th Cir. 1978)) (emphasis added).

Neither the Air Force nor the Department of Defense is "engaged primarily in an examination of environmental questions." *Id.* Nor are they agencies whose "raison d'etre is the protection of the environment and whose decision . . . is necessarily infused with the environmental considerations so pertinent to Congress in designing the statutory framework." *Id.* at 504 n.11 (quoting *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 650 n.130 (D.C. Cir. 1973)). The Air Force and Department of Defense focus instead on protecting national security. *See* 50 U.S.C. § 3002; 10 U.S.C. § 9062(c). It is NEPA that requires the Air Force to incorporate environmental considerations into its decisionmaking process, not the statutes that govern its principal operations. Given the non-environmental priorities of the Air Force and its parent agency, NEPA requires incorporation of environmental considerations where they would not otherwise be taken into account. "NEPA must be accorded full vitality [especially] as to non-environmental agencies . . . ." *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973).

In sum, key differences demonstrate that the processes outlined in NEPA and RCRA are fundamentallty dissimilar in important respects. Compliance with RCRA does not render NEPA "superfluous."

(ii)

As to the flipside analysis—whether the differences between NEPA and RCRA justify the inference that Congress did not mean for them to coexist—the Air Force contends that the differences between the two statutes suggest that RCRA "leaves little room for the imposition of the NEPA requirements." We reject this variant of the NEPA displacement argument as well, for several reasons.

First, we reiterate that the issue here is not whether NEPA applies to the "RCRA permitting process," which begins once a RCRA permit application is filed. As we have explained, the question instead is whether NEPA applies to an agency's antecedent decision to dispose of hazardous waste in a particular manner at a particular location, a decision memorialized in the permit application *before* Guam EPA reviews the application using RCRA standards.

Eliding this distinction, the Air Force points to an EPA regulation stating that RCRA permits "are not subject to the [EIS] provisions of section 102(2)(C)" of NEPA. 40 C.F.R. § 124.9(b)(6). According to the Air Force, this regulation supports the conclusion that NEPA does not apply when RCRA does. Not so.

The regulation invoked is labeled "Administrative record for draft permits when EPA is the permitting authority." *Id.* at § 124.9. As its title suggests, the regulation prescribes the content of the record "[for preparing] a draft permit." So the regulation is directed at EPA and clarifies that EPA is not subject to NEPA's EIS provisions.**11** *Siegelman* so recognized, noting that "*EPA* need not comply

---

[11] We note that it is far from clear that the regulation applies when EPA is not the permitting agency. Here the EPA is not—Guam EPA is.

with NEPA when granting RCRA permits." 911 F.2d at 502 (emphasis added). The EPA rule says nothing about how NEPA applies to internal decisionmaking by a prospective RCRA applicant.**[12]**

Second, nothing in RCRA's language or structure suggests that applying the statute alongside NEPA would "sabotage the delicate machinery that Congress designed" in enacting RCRA. *Merrell*, 807 F.2d at 779. Congress enacted RCRA after NEPA became effective and subsequently amended RCRA a few times without providing that NEPA would apply to underlying decisions by applicants to engage in hazardous waste disposal. Silence—especially silence concerning a decisionmaking process not itself covered by RCRA—does not indicate that Congress intended to override NEPA's mandates as to potential permit applicants before they have submitted a RCRA permit application. "Congress has repeatedly demonstrated that it knows how to exempt particular substantive statutes from the EIS requirement when it wishes to do so." *Jewell*, 747 F.3d at 647.

Further, assuming, without deciding, that Congress has tacitly approved of *EPA*'s exemption from NEPA as a RCRA permitting authority, as EPA's regulation provides, that inference supports, rather than detracts from, the

---

[12] The Air Force also points to a CEQ regulation providing for environmental review coordination between federal and state or local agencies and suggests that it obviates the need for multiple agencies to conduct separate NEPA analyses. 40 C.F.R. § 1501.7(g) (2020); *see also* 42 U.S.C. § 4370m-4(a) (2015) (describing the need for concurrent environmental review under NEPA and other environmental review statutes "to the maximum extent practicable"). But coordination of environmental review does not relieve agencies of the obligation to comply fully with all applicable environmental laws.

conclusion that there is no exemption for a permit applicant's internal decisionmaking process preceding its submission of a permit application. *See id*. Any inferred EPA exemption from NEPA regarding the RCRA permitting process would flow from the RCRA provisions governing that process. There are no RCRA provisions prescribing the process by which operational agencies decide whether, and, if so, how, to dispose of hazardous waste.

The Air Force likens this case to *Merrell*, in which we considered whether "Congress intend[ed] to superimpose NEPA's procedures on top of the [pesticide] registration procedure" outlined in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). 807 F.2d at 778. We held that post-NEPA amendments to FIFRA made clear that Congress "d[id] not intend to make NEPA apply" to the federal process for registering pesticides. *Id.* at 780.

The analogy is inapposite. For one, *Merrell* concerned whether NEPA applies *to the EPA* when it registers pesticides under FIFRA, not whether the statute applies to a regulated entity as it decides whether to apply to register and use a pesticide.

For another, RCRA's text and focus do not give rise to the same displacement concerns as FIFRA's. Some of Congress's amendments to FIFRA created clear tensions between FIFRA and NEPA, bordering on outright conflict. For example, one amendment to FIFRA required the EPA Administrator to act "as expeditiously as possible" in processing a FIFRA registration application, with Congress expecting the Administrator to "reach a decision within three months of receiving an application." *Id.* at 778. *Merrell* explained that this "time frame [wa]s incompatible with the lengthy research and hearings that are ordinarily part of

preparing an EIS." *Id.* Another amendment provided that the Administrator would make available to the public the information on which he based a decision to register a pesticide within thirty days of that decision, but it prevented him from releasing that information if it included test data or contained trade secrets. *Id. Merrell* explained that NEPA's public notice requirement "does not contain equivalent restrictions." *Id.*

A second set of FIFRA amendments—which, among other things, waived certain procedural requirements for applicants and liberalized standards associated with pesticide registration—reflected Congress's specific intent to "lighten the 'regulatory burdens upon the [pesticide] industry, pesticide users, and non-Federal regulatory agencies.'" *Id.* at 779 (quoting S. Rep. No. 95-334, at 26–27 (1977)). Given this legislative context, *Merrell* concluded, "[t]o apply NEPA to FIFRA's registration process would sabotage the delicate machinery that Congress designed to register new pesticides" and "increase a regulatory burden that Congress intentionally lightened." *Id.*

There are no such near-conflicts or legislative cross-purposes here. NEPA and RCRA achieve fundamentally different, but complementary, goals. NEPA ensures that federal agencies, with meaningful public input, take a "hard look" at a comprehensive set of environmental impacts before making their decisions. *Robertson*, 490 U.S. at 350. RCRA seeks to reduce and regulate the generation of hazardous waste in a way that "minimize[s] the present and future threat to human health and the environment," 42 U.S.C. § 6902(b). If anything, applying NEPA to an agency's antecedent decision to dispose of hazardous waste *furthers*, rather than detracts from, RCRA's statutory purpose.

In sum, RCRA is not so similar to NEPA that it renders NEPA review redundant, nor is it so different from NEPA to suggest that Congress did not intend compliance with both statutes. We therefore reverse the dismissal of Prutehi Litekyan's complaint for failure to state a claim under NEPA.

### III. CONCLUSION

Contrary to its rulings, the district court had subject matter jurisdiction over Prutehi Litekyan's claim, and NEPA applies to the Air Force's decision to conduct OB/OD operations at Tarague Beach for another three years. The district court judgment dismissing the case is therefore **REVERSED AND REMANDED** for proceedings consistent with this opinion.

---

VANDYKE, Circuit Judge, dissenting:

Defendants have undertaken their open burn and open detonation (OB/OD) operations at their Explosive Ordnance Disposal (EOD) range since the early 1980s. As required by the Resource Conservation and Recovery Act (RCRA), Defendants first applied for a permit to conduct such operations more than four decades ago—in 1982. To continue implementing their ongoing OB/OD operations, Defendants like clockwork have applied to renew that same permit every three years, which the Guam Environmental Protection Agency (Guam EPA) has always evaluated and then granted.

Following Defendants' submission of their application in 2021 (the Application), Plaintiff brought suit alleging that the National Environmental Policy Act's (NEPA)

requirements applied to Defendants' submission of the Application. But in doing so, Plaintiff's lawsuit failed to challenge any final agency action. Defendants' decision to submit the Application (1) merely facilitated ongoing operations rather than marking the culmination of any agency decisionmaking process and (2) did not determine the legal rights of any parties. Absent final agency action, our court lacks statutory jurisdiction to consider the merits of this case. I thus respectfully dissent.[1]

## I.

The district court correctly dismissed Plaintiff's case under Rule 12(b)(1) because Plaintiff failed to challenge a final agency action. To qualify as final agency action, "two conditions must be satisfied." *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (citations omitted). "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (citations omitted). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted). Without satisfying these conditions, "[a] claim is not ripe for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998).

## A.

Before turning to the analysis of the *Bennett* conditions, it is important to first be clear about the precise final agency

---

[1] Because I would decide this case at the threshold issue of final agency action, it is unnecessary for me to address the majority's other arguments regarding whether Plaintiff had standing, and whether the RCRA permitting requirements have displaced NEPA in the context of RCRA permitting.

action Plaintiff challenges. Contrary to the majority's
characterization, Plaintiff's theory has been anything but
"consistently framed." Rather, Plaintiff has changed its
theory as to what agency "action" it is challenging
repeatedly throughout this litigation, and has in fact
abandoned the theory that the majority now adopts.

Plaintiff initially argued in its complaint before the
district court that the "final agency action" it was
challenging was just the submission of the Application (the
"Application-only theory").**2** But the Application alone is
not a final agency action. It is merely a request to *initiate* a
decisionmaking process—not the culmination of one. *See
Indus. Customers of Nw. Utilities v. Bonneville Power
Admin.*, 408 F.3d 638, 646–47 (9th Cir. 2005) (holding that
a decision, even if it has "immediate … impact," is not a final
agency action when it merely "serves … to initiate the
proceedings" (cleaned up)).

Presumably recognizing that the Application alone was
not enough, Plaintiff quickly changed its tune. Running

---

[2] To be precise, Plaintiff claimed that Defendants' "decision to seek
renewal of the … [p]ermit for OB/OD operations … and submit[] their
[A]pplication" constituted the "final agency action" it was challenging.
The majority adopts that framing. But this framing reduces to merely
submitting the Application because the supposed decision to submit adds
nothing. The agency would never submit an application without
deciding to do so. And if the agency supposedly "decided" to submit the
application, but for some reason never did so, then it's not accurate to
say the agency "finally" decided to submit an application it never
submitted. Adding the decision to submit the application to the
submission itself is thus mere makeweight. Plaintiff's initial theory (and
the majority's adoption of it) is properly characterized as just the
submission of the Application. Even Plaintiff appeared to acknowledge
as much elsewhere in its complaint when it appropriately referred to just
submitting the Application.

away from the Application-only theory, Plaintiff switched to insisting that "the challenged action is *not* the RCRA application itself" (emphasis added), but rather "Defendants' failure to comply with NEPA before deciding to 'conduct open burning and open detonation … at Anderson Air Force Base'" (cleaned up).

But this "NEPA violation-only theory" likewise falls short of final agency action and is foreclosed by our precedent. When a plaintiff alleges that an agency has "never undertaken the environmental assessments required by NEPA," it must still identify a separate final agency action to invoke judicial review. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021); *see also In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019).[3] Moreover, Plaintiff has never cited the statutory basis for an agency action unlawfully withheld, 5 U.S.C. § 706(1), or the relevant test for a "failure to act" claim. *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (concluding there was no final agency action where the "agency failed to take a *discrete* agency action that it is *required to take*"—i.e., a "specific legislative command" (cleaned up)). The majority doesn't even address this replacement theory—which is the theory that Plaintiff

---

[3] Binding precedent is clear on this point. The Supreme Court held in *Lujan v. National Wildlife Federation* that the plaintiff had failed to identify "a 'final agency action'" despite allegations that the agency "fail[ed] to provide required public notice" and "fail[ed] to provide adequate [EISs]." 497 U.S. 871, 890–91 (1990). Other circuits also recognize this. In *Public Citizen v. Office of the United States Trade Representatives*, the D.C. Circuit held that the "refusal to prepare an EIS is not itself a final agency action for purposes of APA review." 970 F.2d 916, 918–19 (D.C. Cir. 1992).

finally settled on in the district court—apparently because the majority too recognizes that the failure to prepare a required environmental analysis can't possibly serve as the basis for final agency action.

By the time this matter reached us, however, Plaintiff shifted once more—again, implicitly recognizing the shortcomings of *both* its abandoned theories. This time, Plaintiff resurrected the submission of the Application but added something more: the Application *plus* the automatic extension to continue OB/OD operations that flows from the submission of an application is what Plaintiff argued to us qualifies as final agency action (the "Application-plus theory").**[4]** But the automatic extension was not once mentioned in Plaintiff's complaint. And Plaintiff never amended its complaint to pursue the Application-plus theory. Even if it had, this temporary extension of the *prior* permit is still not a final agency action because it merely implements a pre-existing plan formed decades ago, does not alter the status quo, and does not determine any rights. *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). Nevertheless, Plaintiff appears to have ultimately settled on the Application-plus theory and, as far as I can tell, has abandoned the Application-only theory.

The majority does not differentiate between Plaintiff's various theories, and it does not rely on the Application-plus theory that Plaintiff has pressed in this appeal.**[5]** Instead, the

---

[4] Plaintiff does still mention the failure to prepare a NEPA analysis in this appeal. But it primarily presses its new Application-plus theory.

[5] The majority accuses me and the Defendants of misidentifying the final agency action in this case as "Guam EPA's eventual permitting decision under RCRA." That's a particularly strange accusation, given that all

majority relegates any discussion of the Application-plus theory to a mere footnote. By resurrecting Plaintiff's abandoned Application-only theory, the majority does not just improperly make itself an advocate for one of the parties in this case. It issues a sweeping decision concluding that an essentially perfunctory action—effectively copying and pasting the same application and resubmitting it every three years—is enough to trigger final agency action and license potential judicial review. But "federal courts 'have long recognized that the term [agency action] is not so all-encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency.'" *Wild Fish Conservancy*, 730 F.3d at 800–01 (alterations in original) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)). And for good reason. Such a broad theory would subject almost every operational action to judicial review. Yet that is what the majority blesses here, creating tension with this circuit's precedents, as well as other circuits' precedents, in the process.

**B.**

Turning to the *Bennett* analysis, I start with the Application itself given the majority's focus on the Application-only theory. Putting aside Plaintiff's implied rejection of this theory by abandoning it on appeal, submission of an application is a far cry from final agency action. Not only is there no threshold agency action, but it

---

the majority needs to do is read this dissent to see that I nowhere say that. Nor do Defendants describe Plaintiff's theory in this way. So in addition to three theories that Plaintiff *actually* presented (while abandoning two of them), the majority briefly adds a fourth strawman of its own creation that it deftly smacks down.

also fails to satisfy the *Bennett* conditions.  There is no
culmination of decisionmaking, no change to the status quo,
and no resulting impact on any legal rights or obligations.

**1.**

As an initial matter, "for there to be 'final agency action,'
there must first be 'agency action.'"  *S.F. Herring Ass'n v.
Dep't of the Interior*, 946 F.3d 564, 575 (9th Cir. 2019)
(citation omitted).  "Agency action" is defined as including
"the whole or a part of an agency rule, order, license,
sanction, relief, or the equivalent or denial thereof, or failure
to act."  5 U.S.C. § 551(13).  A qualifying agency action is
"final" only if its impact is "direct and immediate."  *Franklin
v. Massachusetts,* 505 U.S. 788, 796–97 (1992).    Put
differently, an action cannot be "final" unless it "mark[s] the
'consummation' of the agency's decisionmaking process"
rather than being "merely tentative or interlocutory [in]
nature."  *Bennett*, 520 U.S. at 178.

Defendants' submission of the Application fails this
threshold requirement because it "does not fit into any of the
statutorily defined categories for agency action."  *Mont.
Wilderness Ass'n v. United States*, 314 F.3d 1146, 1150 (9th
Cir. 2003), *cert. granted, vacated on other grounds sub.
nom. by Veneman v. Mont. Wilderness Ass'n, Inc.*, 542 U.S.
917 (2004).  The Application is not itself a license, nor does
it approximate any other category in 5 U.S.C. § 551(13).  By
its very nature, a permitting process is pending until the
permit is issued.  *See, e.g.*, *Int'l Bhd. of Teamsters v. U.S.
Dep't of Transp.*, 861 F.3d 944, 952–53 (9th Cir. 2017)
(concluding that a report was not a final agency action
despite the fact it "clear[ed] the way" for permits to be
issued); *Columbia Riverkeeper v. U.S. Coast Guard*, 761
F.3d 1084, 1093 (9th Cir. 2014) (holding that one agency's

recommendation to another agency on a permit application was not a final agency action); *City of San Diego v. Whitman*, 242 F.3d 1097, 1098 (9th Cir. 2001) (concluding that a letter setting forth an agency's legal position on renewal of a permit was not a final agency action until a final decision was issued on the permit). A step taken by an agency along the way toward securing a permit in the future is inherently "interlocutory [in] nature" and not a final disposition. *Bennett*, 520 U.S. at 178. Despite this clear understanding in our case law about the interlocutory nature of a permit process, the majority incorrectly treats the mere submission of the Application as an agency statement of "particular applicability" that qualifies as agency action.

**2.**

Even if this threshold requirement was satisfied, the majority does not identify a concrete final decision that marks the culmination of Defendants' decisionmaking process.    The majority describes the Application as "mark[ing] an endpoint, not a starting point."    But the Application was neither—it was a midpoint. Characterizing the Application as an "endpoint" overlooks the fact that submitting the Application only *initiated* a permit process that would allow Defendants to *continue* their longstanding OB/OD operations. *See Indus. Customers of Nw. Utilities*, 408 F.3d at 646–47.    The actual endpoint hasn't even occurred yet.  It will occur if the permit process culminates in the approval of the new permit.

The majority acknowledges that what it characterizes as "the 'consummation' of [Defendants'] decisionmaking process when it filed its permit application" was merely a decision to "continue" what the agency has been doing for

decades—conducting OB/OD operations since 1982.**[6]** No doubt, preparing and filing the Application was *a* decision. But the same is true for an endless number of potential midpoint acts, such as completing a particular burning or detonation operation, putting gas in a vehicle to drive to the location where that burning or detonation will commence, or deciding to sharpen your pencil to fill out some ancillary paperwork. Pointing to some completed act does not automatically transform it into final agency action. Submitting the Application, as Defendants have routinely done every three years, merely complied with Guam EPA's requirement so that Defendants could continue OB/OD operations. It was an intermediate step toward what could, eventually, be a final action (approval of the permit). Put differently, it was just another intermediate act that "clear[ed] the way" for a permit to be issued in furtherance of Defendants' consistent activity that has not changed since it originally started four decades ago. *Columbia Riverkeeper*, 761 F.3d at 1093.

The closest the majority comes to identifying final agency action is by pointing to the submission of the Application as "memorializ[ing] the agency's decision." But, as explained above, the submission of the Application itself does not "mark the 'consummation' of [Defendants'] decisionmaking process," *Bennett*, 520 U.S. at 178, because it "merely implement[ed] operational plans" already established for the EOD range long ago, *Wild Fish Conservancy*, 730 F.3d at 801. In furtherance of their ongoing operational plan, Defendants routinely reapplied to renew their RCRA permit every three years. They did not

---

[6] The majority also incorrectly states the Air Force decided to "restart OB operations," which I address below.

reopen their decisionmaking process along with each permit application. To the contrary, Defendants' longstanding decision, first made in 1982, was even reflected in the latest Application: that "the OB/OD units will be operated until the Air Force Base ceases operation." There is no evidence to the contrary and it strains credulity to assume otherwise. The submission of the Application continued to "merely implement" preexisting "operational plans." *Wild Fish Conservancy*, 730 F.3d at 801.

In fact, the record supports that Defendants did not at all "revisit[] the question of" the environmental impact of OB/OD operations or "how precisely [they] planned to destroy" the ordnance. *See Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dept. of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997). While the Application contains environmental disclosures similar to those required by NEPA, many of these disclosures are short and minimally descriptive. They are certainly not "precise" by scientific or environmental standards. For example, the portion discussing available alternatives to OB/OD operations is only one page in total. Perhaps most telling for purposes of this case is the fact that the environmental disclosures in the Application appear to be copy-pasted from the previous RCRA application submitted in 2018. This indicates that Defendants continued to rely on environmental considerations made previously—or at the very least the record shows no evidence that Defendants revisited the environmental issues or made an explicit decision in 2021 to continue OB/OD operations over other possible alternatives.

Where an agency does not revisit its previous decision and instead continues to implement a previous one, courts have routinely concluded that no final agency action exists. Our precedents illustrate this point. For example, in *Wild*

*Fish Conservancy*, a hatchery would open or close gates in a river channel "at various times during the year" pursuant to its ongoing operations plan. 730 F.3d at 795. While the hatchery did not operate the gates daily, our court concluded that "the individual acts of closing the gates" were not final agency actions "because they constitute day-to-day operations that merely implement operational plans for the Hatchery." *Id.* at 801. Similarly, in *Montana Wilderness Association*, the Forest Service was charged with maintaining a Wilderness Study Area while it was studied for suitability to be designated as a wilderness. 314 F.3d at 1148. Because the activity of maintaining trails simply "implement[ed] … plans adopted for the Study Areas," our court concluded that the decision to conduct specific maintenance operations was not a final agency action. *Id.* at 1150.

The majority's attempt to distinguish these cases falls flat. Just as the hatchery's periodic operation of the dam gates and the Forest Service's maintenance of trails were actions taken in service of preexisting operational plans, so too are Defendants' periodic submissions of RCRA applications to continue longstanding and ongoing operations. None of these intermediate steps are final agency action. Instead, these routine actions are aimed at the same goal: implementing a preexisting operational plan, of which the Application was part. Even if the agency must act "based on current conditions," that does not somehow alter the fundamental purpose of implementing a prior decision. Nor does this reality transform any of these intermediate activities into affirmative steps constituting new decisions in their own right. These activities exist to effectuate the previous plan. Full stop. The majority fails to appreciate that it is this continuation of an existing decision that makes

an activity tentative or intermediate in nature—not the possibility that the agency might later reconsider the steps it takes or because the ultimate impact may rest on some future occurrence.

**3.**

The majority also contends that submission of the Application necessarily changed the status quo because OB/OD operations would cease if the Application was never filed. But that's a warped understanding of "status quo." Status quo means that which has been the consistent state of things for a long period of time. Defendants have conducted OB/OD operations for more than four decades. Submitting the same application every three years is an implementation decision that does not alter the state of OB/OD operations. Even if the requirement to resubmit an application every three years presents the agency with an opportunity to decide to stop some longstanding activity, that still does not change the status quo from a longstanding and continuous activity to one of inactivity. Construing an intermediate decision point as changing the status quo would mean that any so-called period of inactivity—no matter how small—is a change to the status quo.

To show why this can't be correct, consider a forest ranger who puts gasoline into his truck so that he can continue his longstanding activity of patrolling the forest. That decision point does not change the status quo from patrolling the forest to *not* patrolling the forest simply because, had the ranger not refueled, he would have been unable to continue patrolling. Similarly, here, Defendants' decision to submit the Application did not change the status quo just because, had Defendants not submitted it, they

would have had to cease their longstanding OB/OD
operations.

Our court made a similar point in *ONRC Action v.
Bureau of Land Management* when the Bureau of Land
Management (BLM) refused to institute a moratorium on
certain longstanding logging activities until an
Environmental Impact Statement (EIS) for a new land
management program could be completed. 150 F.3d 1132,
1134–35 (9th Cir. 1998). Critically, "BLM never *entered
into* the decisionmaking process because it never *intended* to
consider a change of the status quo," and therefore we
concluded that the refusal could not be a final agency action
that marked the *consummation* of a decisionmaking process.
*Id.* at 1136 (emphases added). There is no evidence in the
record that Defendants intended to change the status quo of
engaging in OB/OD operations or that they made any
decision other than to take steps to perpetuate their
longstanding OB/OD plan.

Yet the majority nonetheless portrays the Application's
request for a permit for open burning operations as changing
the status quo because open burning has not been conducted
at the EOD range in recent years. But the Application's mere
*request* to be allowed to burn is nothing new. Defendants
have always requested permission to conduct open burning
operations: the 2018 permit allowed open burning operations
if certain conditions were met. And Defendants appear to
never have stated that they seek to alter the way they perform
operations.    In other words, nothing has changed.
Defendants have always had a permit for both burning and
detonation operations, even while they have refrained from
doing everything allowed by the permit. Nothing about the
Application changes the status quo that has existed for
decades.

Recognizing that the Application didn't change the status quo is consistent with the reasoning applied by other circuits. In *Village of Bald Head Island v. U.S. Army Corps of Engineers*, the Corps created a final plan for the management of a navigation channel in 2000. 714 F.3d 186, 191 (4th Cir. 2013). The plan included the performance of "maintenance dredging" every two years. *Id.* The Fourth Circuit concluded that the particular dredging activities subsequently carried out were merely "project implementation" rather than a "'final' agency action subject to judicial review under the APA." *Id.* at 195. Defendants here made an analogous decision over forty years ago to conduct OB/OD operations. These operations require, inter alia, Defendants to submit a RCRA application every three years. But like the dredging activities conducted every two years in *Bald Head Island*, the periodic submission of a RCRA application does not transform that one aspect of ongoing "project implementation" into a final agency action.

The Tenth Circuit reached a similar conclusion. In *Chemical Weapons*, the Army issued an EIS in 1989 regarding the destruction of chemical weapons and decided to dispose of them through on-site incineration. 111 F.3d at 1488. Six years later, the Army performed another risk assessment, "again concluding that the accident-associated risk of continued stockpile storage significantly outweighed that of incineration operations," and began trial burns. *Id.* The Tenth Circuit concluded that no action after the 1989 decision constituted a "final disposition in a matter, rather than the implementation of a final disposition already made." *Id.* at 1494 (cleaned up). Similarly, here, Defendants made a decision in the early 1980s to conduct OB/OD operations. As in *Chemical Weapons*, there is no evidence that Defendants "revisited the question of how

precisely it planned to destroy the … weapons." *Id.* The cyclical submission of a RCRA application every three years is part of the ongoing implementation of Defendants' forty-plus-years-old decision, not a series of final agency actions. And as it relates to the present Application, the majority even acknowledges that "the Air Force's ultimate implementation of its proposed waste disposal plan depends on whether Guam EPA grants or denies its [A]pplication."

Although our court reached a different conclusion in a case on which the majority relies, *Oregon Natural Desert Association v. Forest Service*, that case is dissimilar to this one in important ways. 465 F.3d 977 (9th Cir. 2006). There, the Forest Service issued Annual Operating Instructions (AOI) for grazing on national forest land. *Id.* at 979. Our court rejected the Forest Service's argument that the AOI "merely implement[ed] other decisions that the Forest Service ha[d] already made" because the AOI determined "the extent, limitation, and other restrictions on a permit holder's right to graze his livestock under the terms of the permit." *Id.* at 985–86. Unlike in *Oregon Natural Desert*, the submission of the Application here did not define any legal limitations on Defendants' current OB/OD operations—those terms were provided by the administratively extended 2018 permit, which Plaintiff has expressly not challenged.

Ultimately, this case is more analogous to *Wild Fish Conservancy*, *ONRC Action*, *Bald Head Island*, and *Chemical Weapons* than it is to *Oregon Natural Desert*. Because Defendants made the decision to conduct OB/OD operations decades ago and there is no evidence in the record that they have ever "revisited the question," *Chemical Weapons*, 111 F.3d at 1494, the submission of a RCRA application every three years for the last four decades simply

implemented their prior decision. It therefore did not "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178 (cleaned up).

The majority responds to these cases from other circuits in a footnote summarily distinguishing them based wholly on the majority's own ipse dixit and made-up terms. The majority argues that, unlike this case, the relevant statutes in those cases are different because they didn't create so-called "periodic decisional junctures" or "mandated trigger points" (whatever those are). But it's important to recognize that these novel, made-up terms are simply cover for the majority inventing and imposing a whole new set of ill-defined "trigger points" freshly authorizing judicial review. And it is unclear whether the majority understands the vast potential consequences of its shiny new terminology.

It will never work to apply the majority's new test as capaciously as its terms might imply. Except perhaps for the broadest delegations from Congress, basically any statute that directs an agency to do anything requires a long list of agency decisions that could be characterized as "periodic decisional junctures" or "mandated trigger points"—many of which are not even explicit. Every single intermediate action that an agency must take in order to promulgate a statute—from refueling its vehicles to deciding to start recycling—could be characterized as a "decisional juncture" (to refuel or not to refuel?) or "trigger point" (to recycle or not to recycle?). I suppose we can hope that the majority's ambiguous new test won't be applied that broadly. How broadly, then? What will be deemed a "mandated trigger point" and what won't? We have no idea. I guess we'll know it as we see it. So instead of *Bennett*'s test, we now have the Ninth Circuit's judiciary-empowering "mandated trigger points" test that I guess we'll learn more about in the

decades to come. But just to be clear, this novel and far-reaching expansion of our judicial review power finds support in none of our cases—or any cases for that matter. RCRA and NEPA certainly don't support it, since neither statutory scheme expressly labels intermediate acts of this sort as final agency actions.

That there is a total dearth of support for the majority's invented test is unsurprising because it also conflicts with the controlling test for final agency action. Applying *Bennett*'s test, there undoubtedly are "decision points" mandated by statute that do *not* qualify as final agency action. And there are decision points not required by statute that do qualify. If the agency's action satisfies *Bennett*'s two conditions, it is final agency action. 520 U.S. at 177. That's what matters. You can certainly conceptualize filling up a gas tank or sharpening a pencil as a "periodical decision juncture," a "mandated trigger point," or whatever else you want. But these fun labels do not change the fact that neither act would satisfy *Bennett*'s two requirements.

To show you what I mean, consider a decision point from the very statutory scheme at issue in this case. Under NEPA, an agency is required to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a "detailed [EIS]." 42 U.S.C. § 4332(2)(C). The EIS must address a variety of topics, including "the environmental impact of the proposed action," "alternatives to the proposed agency action," and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action." *Id.* § 4332(2)(C)(i)–(v). The reason for this requirement is "to insure that the agency has taken a 'hard look' at environmental consequences," *Kleppe v. Sierra Club*, 427

U.S. 390, 410 n.21 (1976) (citation omitted)," because engaging in this "necessary process" is "almost certain to affect the agency's substantive decision," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted). Despite this clear "decisional juncture," the case law unmistakably holds that an agency's failure to prepare the EIS is *not* itself final agency action subject to judicial review. *E.g.*, *Lujan*, 497 U.S. at 890–91; *Whitewater Draw*, 5 F.4th at 1010; *Pub. Citizen v. Off. of the U.S. Trade Representatives*, 970 F.2d at 918–19. Yet under the majority's test that lumps together all statutory decision points as per se final agency action, the failure to prepare the required EIS alone would now count notwithstanding clear precedent to the contrary.

Ultimately, the majority doesn't address the fact that its conclusion in this case—Defendants' decision to (again) renew a permit for longstanding operations is a challengeable final agency action—has the potential to envelop almost any decision made by an agency. In today's hyper-regulated environment, many permits will inevitably be periodically required as part of any long-term operational plan, just like a channel might need to be dredged every few years as part of a similar plan. *Bald Head Island*, 714 F.3d at 191. Both are decisions made as part of the ongoing implementation of long-term operations. And consider again the forest ranger analogy: if a decision to renew the permit here is a final agency action, then why not a forest ranger's decision to fill up his truck with gas so he can continue patrolling the forest? In all of these examples, the so-called final action is the but-for cause of a pre-existing operation's continuance. The majority's failure to answer such a question speaks volumes about the opacity and inadministrability of its new test.

**4.**

Even if the submission of the Application qualified as final agency action, there must also be a determination of legal rights or obligations due to that agency action. *Bennett*, 520 U.S. at 178. But no legal rights or obligations were determined here. Submission of the Application to facilitate OB/OD operations does not determine any legal rights of the parties because Defendants' rights are still governed by the terms of the older 2018 permit. And, similarly, the continuation of OB/OD operations does not change a previous determination of legal rights or obligations because Defendants were already committed to a particular course of action.

When discussing the second *Bennett* prong, the majority uses conditional language tethered to a contingent future event: "*Should* Guam EPA issue … a renewal permit, the permit's terms and conditions will be predicated on the representations made and the disposal plans set forth in the … [A]pplication." This use of contingent language underscores the problem with the majority's reasoning. Guam EPA hasn't granted the permit, so any new potential legal obligations contained within the contingent 2021 permit have not yet been determined. Defendants are therefore still bound by the 2018 permit. Put another way, how can the Application be a final and binding culmination of decisionmaking without any decision on that application by Guam EPA? It can't be, because there is still an additional action the agency needs to take to alter the legal obligations at play. Until that point, any legal obligations necessarily flow from the 2018 permit, which is not challenged in this lawsuit. The majority's analysis thus reinforces the point that Defendants are still operating under the 2018 permit, and no new legal obligations were

determined by submitting the new application.    Only if
Guam EPA grants the new permit will new legal rights be
determined and culminate as a new final agency action.  So
the prior permit still controls because the Application did not
displace it and determine a new set of legal rights and
obligations.

Finally, the majority describes Defendants' waste
disposal plan as "closely analogous to … *Bennett* itself"
because Defendants' permit application has direct and
appreciable legal consequences grounded in the eventual
permit conditions with which Defendants must comply.
Such conditions, the majority explains, will "alter[] the legal
regime to which the … agency is subject, authorizing
[certain actions] if (but only if) it complies with the
prescribed conditions."      This point appears to be a
reformulation of Plaintiff's argument that Defendants' waste
removal plan, which was predicated on the failure to prepare
a NEPA analysis, determined a legal right because it
"violated … the regulations implementing NEPA."

Following this argument to its logical conclusion would
mean that any decision that culminates the final
decisionmaking process at the same time it violates NEPA is
necessarily a final agency action.  The very case Plaintiff
cites for this claim belies this circular idea.  In *Citizens for
Better Forestry v. U.S. Department of Agriculture*, our court
examined a challenge to the Department of Agriculture's
(USDA) failure to comply with NEPA's notice-and-
comment requirements.  341 F.3d 961, 965 (9th Cir. 2003).
While we did note that the plaintiffs suffered an injury
because the USDA violated their rights under NEPA, *id.* at
970, we did not rely on this fact in concluding that the
plaintiffs challenged a final agency action.  Instead, we
relied on the agency's own characterization of the action in

concluding that it was final. *Id.* at 976. If a procedural NEPA violation was sufficient to satisfy the second prong of the *Bennett* test, there would have been no reason to discuss the agency's acknowledgment. As with the automatic extension of time, a bare NEPA violation is not sufficient to satisfy *Bennett*'s second prong. And even if it was enough, any impact on a legal right or obligation stems from the original course of action to which Defendants were already committed—the 2018 permit—and not the new Application.

## C.

As already noted, the majority mostly ignores Plaintiff's now-operative theory of final agency action (the Application-plus theory), relegating discussion of it to a single footnote. But even after Plaintiff settled on the Application-plus theory before us, this theory is still not enough to qualify as final agency action for reasons similar to those already discussed. At the outset, the Application plus the automatic extension "does not fit into any of the statutorily defined categories for agency action." *Mont. Wilderness Ass'n*, 314 F.3d at 1150. All that is different from the Application-only theory is the receipt of an automatic extension. As with the Application itself, the receipt of a temporary extension of the previous permit while awaiting a decision on the pending Application is in no way "part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" for the same reasons discussed above. 5 U.S.C. § 551(13). And because it is not something the Air Force did (the extension derives from Guam EPA), it is certainly not a statement of "particular applicability." Moreover, the Application plus the extension neither marks the consummation of the agency's final decisionmaking process nor alters the status quo for the same reasons explained above. The culmination

of decisionmaking cannot occur until the new permit is issued. The temporary extension merely continues longstanding OB/OD operations under the prior permit regime.

Where the Application-plus theory carries the most force is in its claim that a determination of legal rights results from the filing of the Application that, because of Guam EPA's rules, automatically grants a temporary extension to conduct the OB/OD operations under the prior permit. Implicit in this argument is the assumption that Defendants applied for the new permit *to get the extension*. But that is an implausible way to conceive of the Application. The much more plausible assumption, rather, is that Defendants applied for the new permit *to get a permit*. This argument attempts to tie the automatic extension of the 2018 permit to the Application for a new permit. But the automatic extension of the 2018 permit is better understood as tied to the 2018 permit application rather than to the potential new permit, whose terms are not yet defined and whose legal ramifications are yet unknown. The extension is, after all, an extension of the *2018 permit*. And if you reasonably assume the Defendants will apply for a new permit every three years like clockwork (as they have done for decades based on the operative decision made more than forty years ago), then each automatic extension pending review of the new permit application is best conceptualized as part of the *prior* permit being extended, not part of the *new* permit, which has not even been issued yet and may never be issued. In fact, at the time this lawsuit was filed—and apparently remains true today—a decision on the permit has *still* not occurred.

A hypothetical example illustrates the error in attempting to tie the permit extension to the Application for a new

permit, instead of to the prior permit's extension. Guam EPA could conceivably issue a permit that has a three-year term, but that automatically extends to five years once the permittee conducts a single OB/OD operation. Obviously, someone could (and presumably would) conduct an OB/OD operation for any number of reasons unrelated to receiving the longer permit term. It would be illogical to say that the decision to conduct a single OB/OD operation as a part of Defendants' day-to-day operations would be *another* final agency action (beyond the original grant of the permit) simply because it triggers a pre-existing alternative term of the current RCRA permit.

The situation presented here is not meaningfully different from this hypothetical. Instead of a 3-plus-2-years permit, with the longer term triggered by anticipated agency action, Defendants in 2018 obtained a 3-years-plus-indeterminate-time permit triggered by anticipated agency action. In short, the automatic extension of the 2018 permit is best understood as part of the 2018 permit itself, not some separate final agency action. And the parties agree that Plaintiff is not challenging the issuance of the 2018 permit.

The majority also briefly asserts, without any accompanying analysis, that the decision to continue OB/OD operations for another three years "had the legal consequence of prolonging the life of [the] 2018 permit." But this suggests that Defendants' decision to file must be a final agency action because it is a but-for cause of the extension of time. Critically, something being a but-for cause of something else does not mean that it satisfies *Bennett*'s second prong. Myriad things are but-for causes of Defendants' ability to conduct OB/OD operations. Defendants likely maintain numerous permits from multiple

governing authorities—each is a but-for cause of the base continuing to operate, and thus a but-for cause of the OB/OD operations that will continue as long as the base operates. An even more direct cause for a given OB/OD operation is the decision to explode a certain ordnance on a particular day. The fact that such a decision is a but-for cause of Defendants' continued OB/OD operations does not therefore make each particular decision to conduct an OB/OD exercise a challengeable final agency action.

**D.**

Because the majority doesn't rely on Plaintiff's Application-plus theory and instead focuses on Plaintiff's abandoned Application-only theory, the majority's approach actually creates a rule that is much farther reaching: a perfunctory action, like routinely submitting a permit application, is enough on its own to qualify as final agency action. Such a sweeping decision will have massive implications beyond this case. By creating a rule that will capture each and every permit application, this decision turns the prevailing understanding of final agency action on its head. And, in doing so, it creates a conflict with precedent from our circuit as well as other circuits. Not even Plaintiff asked us for this.

Start with our own circuit. We have held that a decision is not final agency action when it merely "serves … to initiate the proceedings." *Indus. Customers of Nw. Utilities*, 408 F.3d at 646–47. Inherent in the name, a permit *application* initiates proceedings and is not final until the permit actually issues. *Int'l Bhd. of Teamsters*, 861 F.3d at 952–53. Interlocutory steps merely "clear the way" for permits to be issued. *Id.* Unless receipt of the permit is automatic, there is a deliberative process on the part of the

entity that decides whether or not to grant the permit. *See, e.g.*, *Columbia Riverkeeper*, 761 F.3d at 1093 (holding that one agency's recommendation to another agency on a permit application was not a final agency action); *City of San Diego*, 242 F.3d at 1098 (concluding that a letter setting forth an agency's legal position on renewal of a permit was not a final agency action until a final decision was issued on the permit). And as the majority concedes, "the Air Force's ultimate implementation of its proposed waste disposal plan depends on whether Guam EPA grants or denies its [A]pplication."

The majority's understanding is also at odds with decisions in other circuits. Contrary to the majority's position, "[a] broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704." *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006). Such an exaggerated understanding would reach a whole category of perfunctory "implementation decision[s] … that merely carr[y] out a broader agency plan that marked the consummation of the relevant decision-making process." *Cnty. Commissioners of Cnty. of Sierra v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 953 (D.N.M. 2022) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). That is why an agency letter furthering a decision made long ago does not count as final. *E.g.*, *Cherry v. U.S. Dep't of Agr.*, 13 F. App'x 886, 890–91 (10th Cir. 2001). Nor does an agency's initiation of an investigation qualify. *E.g.*, *Veldboen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994). And while "the issuance of a permit likely constitutes a final agency action," *Gulf Restoration Network v. U.S. Army Corp. of Engineers*, No. 15-6193, 2016 WL 4987256, \*3 (W.D. La. Sept. 19, 2016), that certainly does not imply that any particular step toward the issuance of the permit is

itself a final agency action. To the contrary, if the issuance of a permit only *likely* constitutes final agency action, a fortiori the intermediate steps toward the issue of a permit do not constitute final agency action.

Even if these actions are the outcome of *some* decisionmaking process, they do not represent the agency's "'last word on the matter in question.'" *Cnty. Commissioners of Cnty. of Sierra*, 614 F. Supp. 3d at 953 (quoting *Whitman*, 531 U.S. at 478). This remains just as true for "actions with novel (and perhaps impactful) physical consequences … when they merely implement an agency's previous disposition of a matter." *Id.* at 953–54. Each of these actions "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. at 300 (quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). And in such circumstances, a lawsuit filed before the desired future event occurs is premature. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016).

Permit applications are no exception. As an act to implement a prior decision, the application is just one of several steps in the middle of the decisionmaking process. It is a pending request for a permit, not the permit itself. Only the issuance or denial of the permit may count as final agency action. Prior to that decision, there is no guarantee that the application will be accepted for consideration since there could be a deficiency that leads to its rejection and requires refiling. That is why courts lack jurisdiction until after a decision on the permit application. *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1334 (5th Cir. 1996) (involving a challenge to set aside final agency action

after an affirmative decision on the permit application despite that decision taking four years).

Taken to its logical conclusion, the majority's novel and broad theory would subject almost every operational action to judicial review. Yet "federal courts 'have long recognized that the term [agency action] is not so all-encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency.'" *Wild Fish Conservancy*, 730 F.3d at 800–01 (alterations in original) (quoting *Fund for Animals, Inc.*, 460 F.3d at 19).

It is worth reiterating that Plaintiff has firmly pivoted to the Application-plus theory and is not hanging its hat on the Application alone. Why? Plaintiff seems to have predicted that asking us to expand our understanding of final agency action to include the mere submission of an application would be far too big a request for most courts. But not this one. Instead of basing its opinion just on the Application-plus theory (although still incorrect), the majority goes beyond what is necessary to decide this case. The result is the creation of a far-reaching rule in conflict with not just our own circuit's case law, but that of other circuits as well.

\*        \*        \*

The majority pays lip service to the fact that the final agency action requirement is designed to "prevent premature intrusion [by courts] into the agency's deliberations" and to avoid encouraging parties to "keep knocking at the agency's door when the agency has already made its position clear." *S.F. Herring Ass'n*, 946 F.3d at 579. Notwithstanding the hat tip, the majority's opinion fails to heed its own warning. Defendants did not undertake an "agency action" within the meaning of Section 551(13) because the submission of the Application is not "fairly analogous" to any of the statutory

categories. *Wild Fish Conservancy*, 730 F.3d at 801. Nor was it the culmination of Defendants' decisionmaking process, and it caused no change to the status quo. Such a decision was merely a routine part of implementing a pre-existing operational plan—just as Defendants have done for decades. The same is true for receiving an automatic extension of the prior permit by submitting the Application. Regardless of the theory, there was still no determination of legal rights because the determination of any such rights traces back to the terms of the currently operative 2018 permit, which Plaintiff does not challenge. For these reasons, I would conclude that there is no "'final' agency action subject to judicial review under the APA." *Bald Head Island*, 714 F.3d at 195. And without a challenge based on final agency action, the district court correctly determined that it lacked jurisdiction over Plaintiff's claims.